Alexis DeLaCruz (SBN 031273)
adelacruz@nativedisabilitylaw.org
Tara C. Ford+
Ford.Tara.C@gmail.com
NATIVE AMERICAN DISABILITY
LAW CENTER
3535 E. 30th Street, Suite 201
Farmington, NM 87402
Telephone:  505.566.5880

Mark Rosenbaum+
mrosenbaum@publiccounsel.org
Kathryn Eidmann+
keidmann@publiccounsel.org
Anne Hudson-Price+
aprice@publiccounsel.org
Elizabeth Song+
esong@publiccounsel.org
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: 213.385.2977

Elisabeth Bechtold+
ebechtold@aclu-nm.org
Maria Martinez-Sánchez+
mmartinez@aclu-nm.org
AMERICAN CIVIL LIBERTIES UNION of
NEW MEXICO
1410 Coal Avenue SW
Albuquerque, NM 87104
Telephone: 505.266.5915

Bradley S. Phillips+
Brad.Phillips@mto.com
Bryan H. Heckenlively+
bryan.heckenlively@mto.com
Seth J. Fortin+
Seth.Fortin@mto.com
Emily Curran-Huberty+
Emily.Curran-Huberty@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA  90071
Telephone: 213.683.9100

Judith M. Dworkin (SBN 010849)
Judith.Dworkin@SacksTierney.com
David C. Tierney (SBN 002385)
David.Tierney@SacksTierney.com
SACKS TIERNEY P.A.
4250 N. Drinkwater Blvd., 4th Floor
Scottsdale, AZ 85251-3693
Telephone:  480.425.2600

*Attorneys for Plaintiffs*

+ Application for admission *Pro Hac Vice* forthcoming

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stephen C., a minor, by Frank C., guardian ad litem; Anna D., a minor, by Elsa D., guardian ad litem; Durell P., a minor, by Billie P., guardian ad litem; Taylor P., a minor, by Billie P., guardian ad litem; Levi R., a minor, by Laila R., guardian ad litem; Leo R., a minor, by Laila R., guardian ad litem; Jenny A., a minor, by Jasmine A., guardian ad litem; Jeremy A., a minor, by Jasmine A., guardian ad litem; Jordan A., a minor, by Jasmine A., guardian ad litem; and The Native American Disability Law Center, | No. |
| *Plaintiffs*, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |

1  Bureau of Indian Education; United States
2  Department of The Interior; Sally Jewell, in her
   official capacity as Secretary of the Interior;
3  Lawrence Roberts, in his official capacity as
   Principal Deputy Assistant Secretary - Indian
4  Affairs; Tony Dearman, in his official capacity
   as Director of the Bureau of Indian Education;
5  Jeff Williamson, in his official capacity as
   Principal of Havasupai Elementary School,

6  *Defendants*.

7

8  ## INTRODUCTION

9      1.    Federal law requires that the federal government provide Native children with

10 educational opportunities that equal or exceed those for all other students in the United

11 States.  The government must provide for not only the basic elementary and secondary

12 education needs of Native students, but also the unique educational and cultural academic

13 needs of these children.  Further, the government must ensure that Native students with

14 disabilities are not deprived of meaningful access to education.  The U.S. government has

15 dismally failed to fulfill these responsibilities.

16     2.    Nine Havasupai students and the Native American Disability Law Center

17 (collectively, "Plaintiffs") bring this suit to hold the U.S. government accountable for these

18 failures and to correct longstanding educational deprivations that have for years denied

19 Havasupai children meaningful and equitable educational opportunity.  Defendants—the

20 federal government agencies and officials responsible for administering and ensuring the

21 provision of education to Native students in the United States[1]—have knowingly failed to

22 provide basic general education, a system of special education, and necessary wellness and

23 mental health support to Havasupai students, resulting in indefensible deficits in academic

24 achievement and educational attainment.

___

25 [1] Defendants are the United States Department of the Interior ("DOI"), United States
26 Bureau of Indian Education ("BIE"), Defendant Sally Jewell, in her official capacity as
   U.S. Secretary of the Interior, Lawrence Roberts, in his official capacity as Principal
27 Deputy Assistant Secretary—Indian Affairs, Tony Dearman, in his official capacity as
   Director of the Bureau of Indian Education, and Jeff Williamson, in his official capacity as
28 Principal of Havasupai Elementary School (collectively, "Defendants").

1634975.v1

3.    Havasupai Elementary School ("the School"), which serves students in kindergarten through the eighth grade, is operated by the federal Bureau of Indian Education ("BIE") and is the only option available to Plaintiffs to obtain elementary education in their community.  In direct violation of the numerous federal statutes and regulations that prescribe with specificity the content and form of the general and special education that must be provided in BIE-administered schools, federal government officials have systemically deprived Plaintiffs of meaningful access to education:

•    **Failure to Provide General Education Curriculum:**  The *only subject areas in which Havasupai Elementary School provides instruction are math, reading, and writing*.  There is no science, history, social studies, foreign language, arts, or physical education curriculum.  Nor does the School provide culturally relevant instruction, such as instruction in the Havasupai language.

•    **Persistent Understaffing and Vacancies:**  The longstanding failure to adequately staff Havasupai Elementary School has caused persistent teacher and staff vacancies.  *These vacancies have caused the school to shut down for weeks at a time, and the vacancies are covered by non-certificated personnel, such as the school janitor or secretary, or by temporary staff who rotate in and out on two-week details.*

•    **Denial of Basic Educational Resources**: Havasupai Elementary School lacks adequate numbers of textbooks, a functioning school library, and any extracurricular activities, such as sports, arts, music, or clubs.

•    **No System to Provide Special Education:** Although approximately one-half of the students at the school have been identified as students with disabilities, Havasupai Elementary School has no system for delivering the specialized instruction, related services, and accommodations necessary to access public education.  Instead, students with disabilities are routinely physically excluded from school and subjected to punitive discipline and police prosecution on the basis of their disabilities.

•    **Failure to Provide a Full Day of Public Education to Students with Disabilities:** Students with disabilities are excluded from the school and denied a full day

of public education by placement on "restricted hours" or "homebound" schedules, pursuant to which *they receive as few as three hours of education per week*. Plaintiffs Levi R. and Durell P. have each been limited to such restricted-hours schedules continuously for over three and five years, respectively.[2]

• **<u>Excessive Exclusionary Discipline</u>**:   Students, including students with disabilities, are repeatedly removed from the classroom, suspended, and expelled, causing them to miss significant instructional time.  Plaintiff Stephen C. is sent home from school, on average, three to four times per week such that he misses approximately 50% of instructional time.  When he was only eight years old, Plaintiff Durell P. was permitted to attend school for only approximately 20% of a school year due to repeated exclusionary discipline.

• **<u>Abusive Law Enforcement Involvement</u>**: Instead of providing support, the school routinely refers children, including children with disabilities, to Bureau of Indian Affairs ("BIA") law enforcement in response to minor incidents of misbehavior.  Eleven-year-old Plaintiff Stephen C. was prosecuted in federal court for pulling the cord out of the back of a computer monitor.

• **<u>Failure to Provide Necessary Wellness and Mental Health Support</u>**: Despite the clear need for wellness promotion and mental health support, Havasupai Elementary School has no system for addressing the needs of students whose ability to learn is impacted by exposure to childhood adversity.  The counselor position at the school was long vacant until it was filled in December 2016, and the operation of Havasupai Elementary School contributes to these problems as well.  For example, Plaintiff Levi R. was forcibly restrained in the classroom when he was ten years old.  A teacher sat and laid down on Levi R. while he cried out and yelled, "I can't breathe.  Get off of me, you're hurting me."

---

[2] Plaintiffs have filed, concurrently with the complaint, a motion for leave to proceed under the fictitious first names and last initials used to refer to Plaintiffs and their parents or guardians in the complaint.

• **Exclusion of the Community from School Decision-Making**: Defendants have effectively precluded the Havasupai Advisory School Board from operating and have established a pattern of retaliation against teachers, staff, community members, and parents who have sought to advocate on behalf of students. Moreover, Defendants have failed to provide families and community members adequate access to student data, achievement records, and other metrics that would allow them to evaluate the performance of the school.

4. The consequences of these educational deprivations for Havasupai children are devastating and enduring. Students perform many years below grade level: The most recent publicly-available BIE data reflects that in the 2012-2013 school year, Havasupai Elementary School students performed at only the **1st percentile in reading and 3rd percentile in math**, based on a median percentile rank from 1 up to 100.[3] This places the School dead last—by a large margin—in both reading and math achievement among BIE schools. Moreover, the longer students remain at Havasupai Elementary School, the farther behind they fall. BIE data reflects that Havasupai Elementary School students experienced a ***large negative growth index*** of **-.72** and **-.71** in reading and math, respectively, meaning that the academic progress made by individual students as they continued to attend the School was approximately 0.7 standard deviations lower than expected. As the BIE has acknowledged, this indicates "***well-below average gains made by the student[s].***"[4]

5. Plaintiff Stephen C., a sixth grader, struggles to read and write. Plaintiff Levi R. was reading at a second grade level when he was in fifth grade. Many Havasupai Elementary students have never learned basic information, such as what the states are and where they are located, the difference between North America and South America, and how to spell simple words.

---

[3] Northwest Education Evaluation Association, *BIE Report on Student Achievement and Growth* at 56, 58 (Feb. 2014), http://www.bie.edu/cs/groups/webteam/documents/document/idc1-028067.pdf
[4] *Id.* at 17.

6. Because Havasupai Elementary School provides instruction only in grades kindergarten through eight, students have no option to attend secondary school on the Havasupai reservation and must leave their community to attend high school. But, because of the substandard education provided at Havasupai Elementary School, students cannot meet entrance and proficiency requirements for admission to BIE secondary schools. Those who are admitted are not prepared to succeed. Only an estimated 20% of Havasupai Elementary School students ultimately graduate from high school.

7. Havasupai families and community members have advocated for years to address these longstanding and well-known deprivations and secure the educational opportunities their children deserve. But when students and families have sought to assert their educational rights, federal government officials have repeatedly disclaimed any obligation for providing equal educational opportunity and an effective system for delivery of special education to students with disabilities in BIE-administered schools like Havasupai Elementary School.

8. Defendants' abdication of responsibility defies unmistakably clear federal law. The federal government has specific statutory and regulatory obligations to provide Native students with a basic education and to meet the needs of Native students with disabilities. These obligations, grounded in the federal government's "undisputed . . . trust relationship [with] the Indian people,"[5] are assigned to Defendants, the federal government agencies and officials charged with administering and overseeing the education of Native students.

9. Numerous federal statutes and regulations, including the Indian Education Act and its implementing regulations, expressly require Defendants to provide an education to Native American children that meets basic educational standards and enables students to access post-secondary educational opportunities.[6] Congress and the BIE have detailed the content of the federal government's robust duties to Native students attending BIE-funded and operated schools. Binding regulations describe with specificity the content and form

---

[5] *See United States v. Navajo Nation*, 537 U.S. 488, 506 (2003).
[6] *See, e.g.*, 25 U.S.C. §§ 2000, 2001; 25 C.F.R. §§ 32.3-32.4.

1634975.v1

of the education that must be provided in BIE schools, including the subject areas that must be taught and the educational resources that must be available.[7]

10.   Defendants are likewise directly responsible for enforcing federal statutes that prohibit discrimination on the basis of disability in schools funded and administered by the BIE.  Since at least as early as 1978, Congress has made clear that Defendants bear the obligation to ensure that all Bureau-administered schools are in compliance with Section 504 of the Rehabilitation Act of 1973 ("Section 504"), which prohibits discrimination on the basis of disability in federally-funded programs.[8]

11.   Despite these legal mandates, Defendants have failed to provide basic general education to students at Havasupai Elementary School and to establish a system to deliver specialized instruction, related services, and accommodations necessary for students with disabilities—including but not limited to students whose ability to learn has been impacted by exposure to childhood adversity—to access the benefits of a public education.  These deprivations violate the federal government's substantive obligations under the Indian Education Act as amended, Section 504 of the Rehabilitation Act of 1973, and their implementing regulations.  Defendants' neglect of and indifference to the educational rights of Havasupai children has systemically excluded Plaintiffs from the opportunity to attain economic self-sufficiency and meaningfully participate in our democratic society.[9]

12.   To redress the deprivation of rights secured to students attending Havasupai Elementary School, Plaintiffs bring this complaint under the Administrative Procedure Act and Section 504 of the Rehabilitation Act for declaratory and injunctive relief.  Plaintiffs seek a declaration of the rights and obligations of Defendants with respect to the delivery of general and special education to Havasupai Elementary School students. They also seek

---

[7] 25 C.F.R. §§ 36.11-36.51.

[8] Pub. L. No. 95-561, § 1125, 92 Stat. 2143, 2319 (1978); 25 U.S.C. § 2005(b)(1); Exec. Order No. 13,160, 65 Fed. Reg. 39775 (June 23, 2000).

[9] *Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955); *see also Wisconsin v. Yoder*, 406 U.S. 205, 221 (1972) ("[S]ome degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence.").

1634975.v1

injunctive relief to ensure that Defendants comply with those rights and obligations, and do so in a way that is culturally relevant. Exhaustion of administrative remedies is not required because, among other reasons explained below, it would be futile. In addition, Plaintiffs seek compensatory and remedial education to provide them access to the benefits of a general education, along with any needed special education and related services.

13.   Plaintiffs' allegations against Defendants are based upon information and belief. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under federal law. Venue is appropriate in this Court under 28 U.S.C. § 1402(a) because Plaintiffs reside in the District of Arizona.

## FACTUAL ALLEGATIONS

## I.   PARTIES

### Plaintiffs

14.   **Plaintiff Stephen C.** is an eleven-year-old Havasupai boy who resides on the Havasupai reservation in Supai, Arizona.  Stephen C. is enrolled in the sixth grade at Havasupai Elementary School and is legally required to attend school.  Stephen C. has attended Havasupai Elementary School since kindergarten.  The guardian of Stephen C., Frank C., has concurrently filed a petition with the Court to act as his guardian *ad litem* in connection with this litigation.

15.   As a direct result of Defendants' failure to ensure that Havasupai Elementary School has the capacity to deliver access to basic education, Plaintiff Stephen C. has been deprived of access to required general education curriculum and culturally relevant instruction and has been subject to school conditions—including lack of access to textbooks, a functioning library, and extracurricular activities—that prevent him from learning.

16.   Plaintiff Stephen C. is a student who has been identified with Attention Deficit Hyperactive Disorder ("ADHD") and is eligible to receive special education services. In addition to needing special education services, Stephen C. requires positive behavior support and counseling services to address his behaviors and mental health needs.  As a

direct result of Defendants' failure to ensure that Havasupai Elementary School has a system in place to deliver special education, Stephen C. has not been provided with the specialized instruction, related services, and accommodations necessary for him to access the benefits of a public education. Plaintiff Stephen C. has also been deprived of education as a result of Defendants' failure to establish a system to deliver specialized instruction, related services, and accommodations necessary for students whose ability to access the benefits of a public education is affected by exposure to adversity and complex trauma.

17. **Plaintiff Anna D.** is an eight-year-old Havasupai girl who resides on the Havasupai reservation in Supai, Arizona. Anna D. is enrolled in the third grade at Havasupai Elementary School and is legally required to attend school. Anna D. has attended Havasupai Elementary School since kindergarten. The mother of Anna D., Elsa D., has concurrently filed a petition with the Court to act as her guardian *ad litem* in connection with this litigation.

18. As a direct result of Defendants' failure to ensure that Havasupai Elementary School has the capacity to deliver access to basic education, Plaintiff Anna D. has been deprived of access to required general education curriculum and culturally relevant instruction and has been subject to school conditions—including lack of access to textbooks, a library, and extracurricular activities—that prevent her from learning. Plaintiff Anna D. has also been deprived of education as a result of Defendants' failure to establish a system to deliver specialized instruction, related services, and accommodations necessary for students whose ability to access the benefits of a public education is affected by exposure to adversity and complex trauma.

19. **Plaintiff Durell P.** is a thirteen-year-old Havasupai boy who resides on the Havasupai reservation in Supai, Arizona. Durell P. is enrolled in the seventh grade at Havasupai Elementary School and is legally required to attend school. Durell P. has been enrolled at Havasupai Elementary School since kindergarten, except for a 45-day period when the school compelled him to enroll in a residential placement because the school could not meet his educational needs. The mother of Durell P., Billie P., has concurrently

1  filed a petition with the Court to act as his guardian *ad litem* in connection with this

2  litigation.

3       20.  As a direct result of Defendants' failure to ensure that Havasupai Elementary

4  School has the capacity to deliver access to basic education, Plaintiff Durell P. has been

5  deprived of access to required general education curriculum and culturally relevant

6  instruction and has been subject to school conditions—including lack of access to

7  textbooks, a library, and extracurricular activities—that prevent him from learning.

8       21.  Plaintiff Durell P. is a student identified with Oppositional Defiant Disorder,

9  ADHD, and significant mental health needs and is eligible to receive special education

10 services. In addition to needing special education services, Durell P. requires positive

11 behavior support and counseling to address his behaviors and mental health needs. As a

12 direct result of Defendants' failure to ensure that Havasupai Elementary School has a

13 system in place to deliver special education, Durell P. has not been provided with the

14 specialized instruction, related services, and accommodations necessary for him to access

15 the benefits of a public education. Plaintiff Durell P. has also been deprived of education

16 as a result of Defendants' failure to establish a system to deliver specialized instruction,

17 related services, and accommodations necessary for students whose ability to access the

18 benefits of a public education is affected by exposure to adversity and complex trauma.

19      22.  **Plaintiff Taylor P.** is a six-year-old Havasupai girl who resides on the

20 Havasupai Reservation in Supai, Arizona. Taylor P. is enrolled in kindergarten at

21 Havasupai Elementary School and is legally required to attend school. The mother of

22 Taylor P., Billie P., has concurrently filed a petition with the Court to act as her guardian

23 *ad litem* in connection with this litigation.

24      23.  As a direct result of Defendants' failure to ensure that Havasupai Elementary

25 School has the capacity to deliver access to basic education, Plaintiff Taylor P. has been

26 deprived of access to required general education curriculum and culturally relevant

27 instruction and has been subject to school conditions—including lack of access to

28 textbooks, a library, and extracurricular activities—that prevent her from learning.

COMPLAINT

Plaintiff Taylor P. has also been deprived of education as a result of Defendants' failure to establish a system to deliver specialized instruction, related services, and accommodations necessary for students whose ability to access the benefits of a public education is affected by exposure to adversity and complex trauma.

24.   **Plaintiff Levi R.** is a 13-year-old Havasupai boy who resides in Yavapai County, Arizona.   Levi R. attended Havasupai Elementary School from kindergarten through the beginning of the eighth grade, except for a two-month period in 2014 when he was receiving online education services because the school could not meet his educational needs.  Levi R. is legally required to attend school. Due to the inadequacy of the education provided at the school, Levi R.'s mother, Laila R., recently moved her family out of Supai, Arizona when Levi R. was in the eighth grade. Levi R. is currently enrolled in the eighth grade at a public school in Yavapai County.  Laila R. has concurrently filed a petition with the Court to act as his guardian *ad litem* in connection with this litigation.

25.   As a direct result of Defendants' failure to ensure that Havasupai Elementary School has the capacity to deliver access to basic education, Plaintiff Levi R. has been deprived of access to required general education curriculum and culturally relevant instruction and has been subject to school conditions—including lack of access to textbooks, a library, and extracurricular activities—that prevent him from learning.

26.   Plaintiff Levi R. is a student identified with ADHD and a specific learning disability and is eligible to receive special education services. In addition to needing special education services, Levi R. requires positive behavior support and counseling services to address his behaviors and mental health needs. As a direct result of Defendants' failure to ensure that Havasupai Elementary School has a system in place to deliver special education, Levi R. has not been provided with the specialized instruction, related services, and accommodations necessary for students whose ability to access the benefits of a public education is affected by exposure to adversity and complex trauma.

27.   **Plaintiff Leo R**. is a 15-year-old Havasupai boy who resides in Yavapai County, Arizona.   Leo R. attended Havasupai Elementary School from kindergarten

through the eighth grade.  Because Havasupai Elementary School does not provide a high school education, Leo R. left his family in Supai, Arizona in order to attend a public school in Arizona in the ninth grade. Leo R. is currently enrolled in the tenth grade at a public school in Yavapai County, and is legally required to attend school. Leo R.'s mother, Laila R., has concurrently filed a petition with the Court to act as his guardian *ad litem* in connection with this litigation.

28.   As a direct result of Defendants' failure to ensure that Havasupai Elementary School has the capacity to deliver access to basic education, Plaintiff Leo R. has been deprived of access to required general education curriculum and culturally relevant instruction and has been subject to school conditions—including lack of access to textbooks, a library, and extracurricular activities—that prevent him from learning. Plaintiff Leo R. has also been deprived of education as a result of Defendants' failure to establish a system to deliver specialized instruction, related services, and accommodations necessary for students whose ability to access the benefits of a public education is affected by exposure to adversity and complex trauma.

29.   **Plaintiff Jenny A**. is a 14-year-old Havasupai girl who resides on the Havasupai Reservation in Supai, Arizona.   Jenny A. attended Havasupai Elementary School from kindergarten through the sixth grade.  Due to the inadequacy of the education provided at the school, Jenny A.'s mother, Jasmine A., decided to enroll her daughter at a BIE boarding school in Oklahoma.  Jenny A. is currently enrolled in the ninth grade, and she is legally required to attend school.   The mother of Jenny A., Jasmine A., has concurrently filed a petition with the Court to act as her guardian *ad litem* in connection with this litigation.

30.   As a direct result of Defendants' failure to ensure that Havasupai Elementary School has the capacity to deliver access to basic education, Plaintiff Jenny A. has been deprived of access to required general education curriculum and culturally relevant instruction and has been subject to school conditions—including lack of access to textbooks, a library, and extracurricular activities—that prevent her from learning.

31.   Plaintiff Jenny A. is a student identified with significant mental health needs and is eligible to receive special education services as a student with an emotional disturbance ("ED"). In addition to needing special education services, Jenny A. requires positive behavior support and counseling to address her behaviors and mental health needs. As a direct result of Defendants' failure to ensure that Havasupai Elementary School has a system in place to deliver special education, Jenny A. has not been provided with the specialized instruction, related services, and accommodations necessary for her to access the benefits of a public education.  Plaintiff Jenny A. has also been deprived of education as a result of Defendants' failure to establish a system to deliver specialized instruction, related services, and accommodations necessary for students whose ability to access the benefits of a public education is affected by exposure to adversity and complex trauma.

32.   **Plaintiff Jeremy A.** is a 12-year-old Havasupai boy who resides on the Havasupai Reservation in Supai, Arizona.  Jeremy A. attended Havasupai Elementary School from kindergarten through the fifth grade.  Due to the inadequacy of the education provided at the school, Jeremy A.'s mother, Jasmine A., decided to enroll Jeremy A. at a BIE boarding school in Oklahoma.  Jeremy A. is currently enrolled in the seventh grade, and he is legally required to attend school.  The mother of Jeremy A., Jasmine A., has concurrently filed a petition with the Court to act as his guardian *ad litem* in connection with this litigation.

33.   As a direct result of Defendants' failure to ensure that Havasupai Elementary School has the capacity to deliver access to basic education, Plaintiff Jeremy A. has been deprived of access to required general education curriculum and culturally relevant instruction and has been subject to school conditions—including lack of access to textbooks, a library, and extracurricular activities—that prevent him from learning. Plaintiff Jeremy A. has also been deprived of education as a result of Defendants' failure to establish a system to deliver specialized instruction, related services, and accommodations necessary for students whose ability to access the benefits of a public education is affected by exposure to adversity and complex trauma.

-11-
COMPLAINT

34.  **Plaintiff Jordan A.** is a 10-year-old Havasupai boy who resides on the Havasupai Reservation in Supai, Arizona.  Jordan A. attended Havasupai Elementary School from kindergarten through the third grade.  Due to the inadequacy of the education provided at the school, Jordan A.'s mother, Jasmine A., decided to enroll Jordan A. at a BIE boarding school in Oklahoma.  Jordan A. is currently enrolled in the fourth grade, and he is legally required to attend school.  The mother of Jordan A., Jasmine A., has concurrently filed a petition with the Court to act as his guardian *ad litem* in connection with this litigation.

35.  As a direct result of Defendants' failure to ensure that Havasupai Elementary School has the capacity to deliver access to basic education, Plaintiff Jordan A. has been deprived of access to required general education curriculum and culturally relevant instruction and has been subject to school conditions—including lack of access to textbooks, a library, and extracurricular activities—that prevent him from learning.

36.  Plaintiff Jordan A. is a student identified with a specific learning disability ("SLD"), and is eligible to receive special education services.  In addition to needing special education services, Jordan A. requires additional supports to address his SLD.  As a direct result of Defendants' failure to ensure that Havasupai Elementary School has a system in place to deliver special education, Jordan A. has not been provided with the specialized instruction, related services, and accommodations necessary for him to access the benefits of a public education. Plaintiff Jordan A. has also been deprived of education as a result of Defendants' failure to establish a system to deliver specialized instruction, related services, and accommodations necessary for students whose ability to access the benefits of a public education is affected by exposure to adversity and complex trauma.

37.  **Plaintiff Native American Disability Law Center** ("NADLC") is a 501(c) nonprofit organization based in Farmington, New Mexico that advocates for the legal rights of Native Americans with disabilities.  NADLC has worked extensively with members of the Havasupai community, including representing families and engaging in education advocacy on behalf of Havasupai children with disabilities.  NADLC's mission

COMPLAINT

is to advocate so that the rights of Native Americans with disabilities in the Four Corners area are enforced, strengthened, and brought in harmony with their communities.  Further details about the NADLC and its interests are discussed below, *see infra* para. 228-244.

### *Defendants*

38.  **Defendant Bureau of Indian Education ("BIE")** is a bureau within the U.S. Department of the Interior.  Pursuant to Department of the Interior regulations, the Assistant Secretary—Indian Affairs has delegated to the BIE the authority to provide education services to Native American children, including children with disabilities.  The BIE is responsible for meeting the requirements of Section 504 of the Rehabilitation Act and the educational needs of Native American children residing on reservations and attending elementary and secondary schools funded by the Department of the Interior.

39.  **Defendant United States Department of the Interior ("DOI")** is a federal agency.  As the parent agency of the BIE, the DOI is responsible for meeting the requirements of Section 504 of the Rehabilitation Act and the educational needs of Native American children residing on reservations and attending elementary and secondary schools funded by the Secretary of the Interior.

40.  **Defendant Sally Jewell**, sued here in her official capacity, is the U.S. Secretary of the Interior (the "Secretary") and as such is responsible for meeting the requirements of Section 504 of the Rehabilitation Act and the educational needs of Native American children residing on reservations and attending elementary and secondary schools funded by the Department of the Interior.

41.  **Defendant Lawrence Roberts**, sued here in his official capacity, is the Principal Deputy Assistant Secretary—Indian Affairs within DOI.  By regulation, he is responsible for meeting the requirements of Section 504 of the Rehabilitation Act and the educational needs of Native American children residing on reservations and attending elementary and secondary schools funded by the Department of the Interior.  He can delegate those responsibilities only to the Director of the BIE.

1634975.v1

42.  **Defendant Tony Dearman,** sued here in his official capacity, is Director of the BIE.  As Director, he oversees all operations of the BIE.  As such, he is responsible for ensuring the constitutional, statutory, civil, and human rights of all Native American students.  By delegation of authority by the Assistant Secretary—Indian Affairs, the Director of the BIE is responsible for meeting the requirements of Section 504 of the Rehabilitation Act and the educational needs of Native American children residing on reservations and attending elementary and secondary schools funded by DOI.

43.  **Defendant Jeff Williamson**, sued here in his official capacity, is the Principal of Havasupai Elementary School.  In that capacity, he is responsible for assisting Defendant Dearman in ensuring that the BIE meets the requirements of Section 504 of the Rehabilitation Act and the educational needs of Native American children attending Havasupai Elementary School.

## II.  U.S. GOVERNMENT'S OBLIGATION TO PROVIDE EDUCATION TO HAVASUPAI STUDENTS

44.  The historic and current government-to-government relationship between the Havasupai Nation and the United States includes promises made by the United States to educate Havasupai children, as well as mandates in federal statutes and regulations spelling out the federal government's obligations to fulfill these promises.  Those legal obligations are set forth below.

### A.  Forced Removal of the Havasupai from Their Homelands

45.  The Havasupai are a federally recognized Native American tribe who has resided for centuries in the Grand Canyon.  The tribe has historically lived on lands that include the base and rim of Havasu Canyon.  The Havasupai people cultivated crops at the bottom of the canyon in the spring and summer, while migrating to the plateau in the fall and winter months for hunting and grazing.[10]

---

[10] For a history of the Havasupai people, including the history of public education in Supai, see STEPHEN HIRST, I AM THE GRAND CANYON (3d ed. 2006).

COMPLAINT
1634975.v1

46.   Through a series of executive orders in 1880 and 1882, the United States government established a reservation for the Havasupai on a parcel of approximately 518 acres of flood-prone land at the bottom of Havasu Canyon, which is within the Grand Canyon.   The reservation represented a mere fraction of the Havasupai's original homelands, denying them access to their ancestral homes, burial grounds, and valuable hunting and grazing land on the plateau.  Following the creation of Grand Canyon National Park in 1919, the Havasupai reservation was largely encircled by federal lands. The National Park Service forcibly removed a number of Havasupai from their homes on the canyon rim, restricting the tribe's use of their homelands to the shrunken reservation at the canyon bottom.

47.   For decades, the Havasupai fought for the return of their tribal lands in the Grand Canyon and their traditional wintering grounds on the plateau.   Following a protracted legislative battle, the Havasupai finally won the return of a substantial portion of their tribal lands through the passage of the Grand Canyon National Park Enlargement Act of 1975.  Through this legislation, the Havasupai Tribe received about 185,000 acres of tribal land on the plateau, as well as additional acreage that was placed under the joint governance of the Havasupai and the National Park Service. At the time, this was the largest amount of land returned to any Native American tribe by the federal government.

48.   The Havasupai reservation currently consists of 188,077 acres along the western corner of the Grand Canyon's South Rim. There are approximately 730 enrolled members of the Havasupai Tribe.  Of these, more than 160 are children under the age of 18, and more than 100 are in the age group eligible to attend Havasupai Elementary School.  About 61% of Havasupai children under the age of 18 live below the poverty line.[11]

---

[11]  Arizona Rural Policy Institute et al., *Demographic Analysis of the Havasupai Tribe Using 2010 Census and 2010 American Community Survey Estimates* 32, http://azcia.gov/Documents/Links/DemoProfiles/Havasupai%20Tribe.pdf (hereinafter "Demographic Analysis").

COMPLAINT

49.   The primary residential community in the Havasupai reservation is the village of Supai, which is located at the base of Havasu Canyon. The relative remoteness of the reservation, and Supai in particular, stems from a history of federal government discrimination toward the Havasupai people and their right to reside on their once-expansive tribal homelands. To access Supai, one must descend down eight miles of dirt trails or arrive by helicopter.  The population of Supai, according to the 2010 census, totals more than 200 individuals.

**B.     History of the School in Havasupai**

50.   A public schoolhouse has existed in Supai since 1895, when the first school building was constructed after the creation of the Havasupai reservation.[12]  Instruction was initially led by church missionaries, before the BIA, and later the BIE, took over operation of the school.[13]

51.   Because the public school in Supai offered instruction only in limited grades, Havasupai children were compelled to attend BIE boarding schools to complete their education. The nearest boarding school was located in Fort Apache, 350 miles away.  At these schools, tribal culture was forcibly suppressed, and Havasupai children were forbidden from speaking their native languages.   Children were often abused or malnourished, and their belongings stolen.

52.   For decades, Havasupai families strove to resist sending their children away from home into the rampant abuse and neglect of the boarding schools.  Along with their struggle to regain their tribal homelands, the Havasupai fought to have their children educated in the communities and on the lands that form an inseparable part of their identity

---

[12] *See* STEPHEN HIRST, I AM THE GRAND CANYON 73 (3d ed. 2006).

[13] Where appropriate, the term "BIE" will also denote its predecessor agencies within DOI, including the Office of Indian Education Programs ("OIEP") and OIEP's parent agency the BIA. The BIE was created in 2006 when OIEP was elevated to bureau status, taken outside of the umbrella of the BIA, and renamed the Bureau of Indian Education.  Currently, the BIA and the BIE are two separate sister bureaus within Indian Affairs at DOI.  Prior to the creation of the BIA in 1947, responsibility for Native American education fell to the Office of Indian Affairs or the Indian Service, both within DOI.

1634975.v1

as a people.  They rejected the flawed proposition that a public education required the dilution of their culture, which remains deeply rooted in their ancestral homelands in the Grand Canyon.

53.   Rather than submit their children to the uncertain fate of the boarding schools, Havasupai families attempted to secure admission for their children at public schools in neighboring communities or at the nearby Grand Canyon Village School, which served the families of National Park Service employees.  Despite their repeated efforts, the Havasupai were denied admission to these neighboring schools, and they were told that no federal funds were available to construct a new school to serve their community.

54.   In the 1950s, as part of the Eisenhower administration's Indian termination policy, the Havasupai were encouraged to leave their reservations and assimilate into majority culture.  In addition to Native American boarding schools, the federal government sponsored relocation programs, which unsuccessfully attempted to resettle Havasupai members in large urban centers far from their communities.  These coercive federal policies were designed to systematically dismantle tribal allegiances and "civilize" tribal members.

55.   By 1955, the BIA closed the school in Supai and required that Havasupai children attend the boarding schools for all grades.[14]  To receive an education, Havasupai children attending distant boarding schools were separated from their families for nine months out of the year, with some children remaining away from home for years at a time. Other children dropped out of school altogether.

56.   Over time, these federal policies inflicted long-lasting trauma and suffering on Havasupai children, who were separated from their families to attend assimilationist boarding schools, as well as on their families and community.  Rates of suicide, alcoholism, and truancy rose, and few Havasupai youth ever managed to graduate from high school.

---

[14] *See* STEPHEN HIRST, I AM THE GRAND CANYON 189 (3d ed. 2006).

57.   Yet the Havasupai persisted in their struggle to ensure access to tribal education.  In 1964, the Havasupai successfully lobbied for the reopening of the Supai Day School.[15]  With only one teacher, the school provided education on the reservation for young children from kindergarten through second grade.[16]  After the age of 8 or 9, however, children were still required to leave home to complete their education at the boarding schools.

58.   In 1976, the BIA shut down the Supai Day School until further notice.[17] With no alternative other than a complete return to the boarding school system, the Havasupai Tribe intervened and requested permission to operate the school.   The Havasupai Tribe was one of the first in the nation to submit a "638" proposal under the Indian Self-Determination Act, P.L. 93-638, which provided it with federal funding to run the school.  The BIA in turn agreed to issue the Havasupai Tribe a contract to manage the school.

59.   The new Supai Day School offered kindergarten through eighth grade and finally opened its doors in 1982.  Tribal operation of the school encouraged community engagement and improved student outcomes while providing many Havasupai children with a culturally relevant education for the first time.  Members of the tribe created primers and storybooks to teach schoolchildren Havasupai culture.   Others helped develop a language curriculum to teach the Havasupai language.  In 2006, the Havasupai language was spoken fluently by over 90% of tribal members, one of the highest rates among any Native American tribe in North America at the time.[18]

---

[15] *See* STEPHEN HIRST, I AM THE GRAND CANYON 194 (3d ed. 2006).

[16] Department of the Interior, Office of the Secretary, *Report on the Social and Economic Conditions of the Havasupai Tribe of the Havasupai Reservation, Arizona, Beneficiary of an Award Granted in the Indian Claims Commission Docket Numbered 91*, at 6 (Jan. 6, 1972).

[17] *See* STEPHEN HIRST, I AM THE GRAND CANYON 241 (3d ed. 2006).

[18] *See* STEPHEN HIRST, I AM THE GRAND CANYON 243 (3d ed. 2006).  The percentage has declined in the intervening years, which is not surprising because Havasupai Elementary

60.   In 2002, the Havasupai transferred the operation of the school back to the BIA due to inadequate financial resources and a lack of administrative and technical support from the BIA in implementing the new requirements of the No Child Left Behind Act of 2001.

61.   Today, the school in Supai—renamed Havasupai Elementary School—serves approximately 70 students in grades kindergarten through eight.  There continues to be no high school instruction provided to Havasupai students; students who wish to pursue secondary education must leave their community to attend public schools or BIE-operated boarding schools outside of the canyon.

### C.   The U.S. Government's Historic Failure to Provide Education to Native Students

62.   Defendants' failure to provide education to students in Havasupai is consistent with Defendants' long history of failing to provide meaningful education to Native students.  For over a century, the boarding school system described above was used in an attempt to dismantle Native families, tear apart communities, eradicate Native culture, and "civilize" Native children.  Indeed, an early stated purpose of "Indian schools" made no effort to obscure this objective; it was to "rescue [Native Americans] from their troubled lifestyle,"[19] or, more bluntly, to "'kill the Indian . . . and save the man.'"[20]

---

School does not provide any instruction in the Havasupai language, despite a legal obligation to do so.

[19] Nizhone Meza, *Indian Education: Maintaining Tribal Sovereignty Through Native American Culture and Language Preservation*, 2015 B.Y.U. Educ. & L.J. 353, 354 (2015) (quoting Aaron J. Stewart, *Acting for the Left Behind: How the Native Class Act Could Close the Gaps in American Indian Education*, 36 Am. Indian L. Rev. 347, 350 (2012)).

[20] Geoffrey D. Strommer, Stephen D. Osborne, *The History, Status, and Future of Tribal Self-Governance Under the Indian Self-Determination and Education Assistance Act*, 39 Am. Indian L. Rev. 1, 27-28 (2015) (alteration in original) (quoting Richard H. Pratt, The Advantages of Mingling Indians with Whites (1892), in *Americanizing the American Indians: Writings by the "Friends of the Indian" 1880-1900*, at 261 (Francis Paul Prucha ed., 1973)). "Captain Pratt was the founder of the Carlisle Indian School in Pennsylvania." *Id.* at n.175.

COMPLAINT

63.   Starting in the 19th century, large numbers of Native youth were forcibly removed from their families and homes and sent outside their communities to these boarding schools, where they were punished for speaking their own languages or practicing their own religions, and where they were frequently subjected to corporal punishment, sexual assault, and hard labor.[21]   As recently as the 1970s, up to 17% of Native American children still resided in such schools.[22]   As a federal court summarized this history:

> [t]he legacy [of the federal government's involvement in Native American education] is characterized by inadequate resource allocation, systematic exclusion of Indian parents and communities from any role in the education of their children, and a one-way transmission of white American education to the Indian child as a means to remove the child from his aboriginal culture and assimilate him into the dominant white culture. Put another way, Native Americans have endured generations of inadequate and inappropriate education.[23]

64.   Through the activism of Native communities and their allies, federal attention began to coalesce around the magnitude of the educational failure of Native American boarding schools.   These efforts spurred the release of national reports on the dire state of Native education and eventually led to the closure or wholesale reform of many boarding schools.

65.   In 1969, a Special Senate Subcommittee Report on Native education titled "Indian Education: A National Tragedy - A National Challenge" was published.[24]   The authors summarized the subcommittee's research as "a major indictment of the [federal

---

[21] Ann Murray Haag, *The Indian Boarding School Era and Its Continuing Impact on Tribal Families and the Provision of Government Services*, 43 Tulsa L. Rev. 149, 154 (Fall 2007).

[22] *Id.* at 161.

[23] *Cheyenne River Sioux Tribe v. Kempthorne*, 496 F. Supp. 2d 1059, 1066 (D.S.D. 2007) (citations omitted).

[24] *Indian Education: A National Tragedy - A National Challenge (Kennedy Report), 1969 Report of the Committee on Labor and Public Welfare, United States Senate, Made by its Special Subcommittee on Indian Education Pursuant to Sen. Res. 80*. S. Rep. No. 91-501, 91st Cong.,1st Sess., *available at* http://files.eric.ed.gov/fulltext/ED034625.pdf.

government's] failure" to "live up to its responsibility" to educate Native American children and admonished, "[t]hese cold statistics illuminate a national tragedy and a national disgrace."[25]   The Report's conclusions were bleak:

> We have developed page after page of statistics. These cold figures mark a stain on our national conscience, a stain which has spread slowly for hundreds of years. They tell a story to be sure. But they cannot tell the whole story. They cannot, for example, tell of the despair, the frustration, the hopelessness, the poignancy, of children who want to learn but are not taught; of adults who try to read but have no one to teach them; of families which want to stay together but are forced apart; or of 9-year old children who want neighborhood school [sic] but are sent thousands of miles away to remote and alien boarding schools. . . . We have concluded that our national policies for educating American Indians are a failure of major proportions. They have not offered Indian children—in years past or today—an educational opportunity anywhere near equal to that offered the great bulk of American children.[26]

66.   In an attempt to redress the stark reality depicted in the Report,[27] Congress passed the Indian Education Act of 1972 ("IEA"),[28] which forms the basis for current federal policy concerning the education of Native American students.   This landmark legislation, the first "comprehensive approach to meeting the unique needs" of Native students,[29] established the National Advisory Council on Indian Education, created the Office of Indian Education (the predecessor to today's BIE), and authorized a number of grants targeted at improving Native American educational opportunities and addressing the unique educational needs of Native American students.[30]   In his opening statement at the hearings before the Senate Subcommittee on Education, Senator Ted Kennedy, one of the

---

[25] *Id.* at ix-x.

[26] *Id.* at xi.

[27] To Amend The Higher Education Act Of 1965, The Vocational Educational Act Of 1968. And Related Acts, And For Other Purposes, Hearing on S. 659, Before the Subcommittee on Education of the Committee on Labor and Public Welfare, 92nd Cong. 1-4, (April 28, 1971) (statement of Senator Edward Kennedy) pp. 1710-11 (hereinafter "1972 Hearings").

[28] Education Amendments of 1972, Pub. L. 92-318, tit. IV, 86 Stat. 334 (1972).

[29] U.S. Department of Education, Office of Elementary and Secondary Education, *History of Indian Education*, *available at* http://www2.ed.gov/about/offices/list/oese/oie/history.html (last visited May 20, 2016).

[30] Pub. L. 92-318, *supra* note 28, 86 Stat, at 334-45.

1634975.v1

Act's sponsors, proclaimed, "[t]he time is now ripe for Congress to undertake the job of providing substance behind its own often-voiced commitment to improving Indian education."[31]   Affirming this mandate, a 1976 pamphlet released by the Department of Health, Education, and Welfare described the "[c]ongressional intent in enacting the Indian Education Act" as "to give all Native American students equal educational opportunity."[32]

### D.   Federal Responsibility to Provide General and Special Education in BIE-Funded Schools

67.   In response to the federal government's troubled legacy of neglect, oppression, and cultural eradication in Native education, the federal government has committed to providing education for Native American students attending schools funded or operated by the BIE.  Title XI of the Education Amendments of 1978, as amended by the Native American Education Improvement Act of 2001 ("Title XI"), expressly states that in order to fulfill the federal government's "unique and continuing trust responsibility . . . for the education of Indian children," the "Federal Government has *the sole responsibility* for the operation and financial support of the [BIE] funded school system. . . ."[33] The Act further "vests in the Assistant Secretary for Indian Affairs all functions with respect to formulation and establishment of policy and procedure and supervision of programs and expenditures of Federal funds for the purpose of Indian education administered by the Bureau."

68.   In this respect, the governance and administration of BIE-funded schools is distinct from the traditional public school system, in which education is primarily the responsibility of the state.  Unlike a traditional public school, Havasupai Elementary School—one of 57 schools that is both funded and operated by the BIE—is not controlled

---

[31] 1972 Hearings, *supra* note 27, at 1711.

[32] National Institute of Education, U.S. Department of Health, Education & Welfare, *The Indian Education Act: Reformation in Progress* 5 DHEW Publication No. (OE) 76-02403 (1976), http://files.eric.ed.gov/fulltext/ED136990.pdf.

[33] 25 U.S.C. § 2000 (emphasis added).

1634975.v1

1   or operated by the Havasupai government and is not subject to the jurisdiction of any State

2   Educational Agency ("SEA") other than the BIE.[34]

3   69.  **General Education:** Numerous federal statutes and regulations expressly

4   obligate Defendants to provide an education to Native American children that meets basic

5   educational standards and enables students to access post-secondary educational

6   opportunities.   Indeed, Congress has made clear that the BIE must provide Native

7   American children "with educational opportunities that *equal or exceed those for all other*

8   *students in the United States*."[35]   Other statutes and regulations similarly refer to

9   Defendants' obligation to provide education that is "adequate,"[36] "comprehensive,"[37] "of

10  the highest quality,"[38] and that meets "the basic elementary and secondary educational

11  needs."[39]   These statutory and regulatory obligations are reinforced by the federal

12  government's "trust" responsibility for Native American students.[40]

13  70.  Federal statutes likewise recognize Defendants' obligation to meet the distinct

14  educational and cultural needs of Native students attending BIE schools.  Title VI of the

15  Elementary and Secondary Education Act, for example, requires the federal government to

16  work to ensure "that programs that serve Indian children are of the highest quality and

17  provide for not only the basic elementary and secondary educational needs, but also the

18  unique educational and culturally related academic needs of these children."[41]

19  71.  **<u>Special Education:</u>** Defendants are likewise tasked with complying with

20  federal statutes that prohibit discrimination against students with disabilities—including

21  Section 504 of the Rehabilitation Act ("Section 504")—in the administration and operation

22

23  _____

    [34] 20 U.S.C. § 7801(30)(C).

24  [35] 25 U.S.C. § 2001(a)(1) (emphasis added).

25  [36] 25 C.F.R. § 32.4(r).

    [37] 25 C.F.R. § 32.3 (codified into law under 25 U.S.C. § 2003).

26  [38] 25 U.S.C. § 2000.

27  [39] *Id.*

    [40] *See Navajo Nation*, 537 U.S. at 506.

28  [41] 20 U.S.C. § 7401.

COMPLAINT

of all BIE schools.  Beginning in 1978, Congress directed the Secretary of the Interior to bring all schools operated by the Bureau into compliance with Section 504.  In enacting the No Child Left Behind Act of 2001, Congress once again directed the Secretary to bring all schools operated by the Bureau into compliance with Section 504.[42]  Similarly, Executive Order 13160, signed in 2001, specifically applies Section 504's non-discrimination principles to federal education programs, including those at BIE schools.

**III.**   **DEFENDANTS' FAILURE TO DELIVER BASIC EDUCATION AT HAVASUPAI ELEMENTARY SCHOOL**

72.   Under Defendants' control and operation, Havasupai Elementary School has failed to deliver the basic education required by federal statute and Defendants' own regulations.  It does not even purport to provide a comprehensive general education curriculum, depriving students of instruction in numerous required subject and content areas, including culturally relevant instruction.  Defendants have failed to provide students with basic instructional materials and resources like textbooks, a functioning library, and extracurricular activities, and to ensure that Havasupai Elementary School is adequately staffed such that it can effectively deliver basic education.  Additionally, Defendants have actively excluded the community from school decision-making and discouraged advocacy to improve the school and secure student rights.

    **A.**   **Defendants' Failure to Provide Required Instruction at Havasupai Elementary School**

        (1)   Legal Obligations of Defendants

73.   The BIE has issued binding regulations detailing the content and form that a basic education must take.  The regulations governing curricula in BIE-operated schools are comprehensive.  For each age group, the regulations articulate the governing educational philosophy, enumerate the instructional content that must be covered, and describe the educational concepts that must be incorporated into the curriculum.  For example:

---

[42] 25 U.S.C. § 2005(b)(1).

1634975.v1

• **25 C.F.R. § 36.21** outlines the minimum requirements for kindergarten, including, *inter alia*, a curriculum that emphasizes language development and the development of positive feelings as well as instruction in "exploration of the environment (number, space and time relationships, natural science)" and "psychomotor and socialization development."

• **25 C.F.R. § 36.22** outlines the elementary curriculum, covering grades one through six, and listing six subject areas that the instructional programs must offer—language arts, mathematics, social studies, sciences, fine arts, and physical education—as well as five content areas that must be integrated into the curriculum—career awareness, environmental and safety education, health education, metric education, and computer literacy.

• **25 C.F.R. § 36.23** outlines the junior high/middle school instructional program, listing seven instructional subject areas—language arts, social studies, mathematics, science, fine arts and practical arts, computer literacy, and physical education—as well as five content areas that must be integrated into the curriculum—career exploration and orientation, environmental and safety education, metric education, consumer economics (including personal finances), and health education—along with minimum units, such as that "one unit [of science] shall be required of each student every year."

• **25 C.F.R. § 36.24** outlines the "secondary instructional program," enumerating nine subject areas—language arts, sciences, mathematics, social studies, fine arts and practical arts, physical education, languages other than English, driver education, and vocational education— four general content areas to be integrated into the curriculum (consumer economics, metric education, safety education, and health education), and a number of guiding principles to promote graduation.

74.   There also are regulations generally applicable to all grade levels that take into account the cultural, ethnic, and linguistic needs of Native students.  The educational program must "include multi-culture and multi-ethnic dimensions designed to enable

COMPLAINT

students to function effectively in a pluralistic society."[43]   Specifically, each "school's language arts program shall assess the English and native language abilities of its students and provide instruction that teaches and/or maintains both the English and the primary native language of the school population," and each such program must "meet local tribal approval."[44]   Additionally, "[t]he school program shall include aspects of the native culture in all curriculum areas" and the content of the program must "meet local tribal approval."[45] Each school must "assess the learning styles of its students and provide instruction based upon that assessment" and provide "for at least one field trip per child per year to broaden social and academic experiences."[46]

(2)   Defendants' Failure to Provide a Culturally Relevant, General Education Curriculum at Havasupai Elementary School

75.   The instruction provided at Havasupai Elementary School is limited to the subject areas of reading, writing, and math.   Plaintiffs do not receive instruction in the subject areas of science, social studies, any language other than English, arts, or physical education.   The school provides no culturally relevant instruction, such as instruction in Havasupai history, culture, arts, or language.   Nor does it provide instruction in the "content areas" required by BIE regulations to be integrated into the curriculum.[47]

76.   Defendants have also failed to ensure that the school provides instruction in the Havasupai language, which is necessary to promote the goals of language preservation, enhanced educational outcomes, cultural familiarity, and community pride.   Defendants have equally failed to provide appropriate bilingual education to students who speak

---

[43] 25 C.F.R. § 36.20(b).

[44] 25 C.F.R. § 36.20(b)(1).

[45] 25 C.F.R. § 36.20(b)(2).

[46] 25 C.F.R. §§ 36.20(b)(3), (b)(4).

[47] For students in first through sixth grade, these areas are career awareness, environmental and safety education, health education, metric education, and computer literacy.   For students in seventh and eighth grade, these areas are career exploration and orientation, environmental and safety education, metric education, consumer economics (including personal finances), and health education.

COMPLAINT

1634975.v1

primarily the Havasupai language and are learning English as a second language. No members of the teaching staff speak the Havasupai language. No assessment has been made of the English and Havasupai language skills of students at the School. No comprehensive program of multicultural and multilingual education—including the creation and use of culturally appropriate instructional materials, methodologies, and assessments—exists at the school. Defendants have not engaged in collaboration or consultation with Havasupai families, community members, or tribal officials to enact such culturally relevant language programs.

(3)     Consequences of Defendants' Failure to Provide a Culturally
Relevant, General Education Curriculum

77. The consequences of the school's failure to provide a comprehensive general education curriculum are profound. Denial of access to basic instruction in subjects like science and social studies deprives Plaintiffs of foundational knowledge critical to success in secondary and post-secondary education and in the twenty-first century workplace. Additionally, limiting the curriculum in this manner holds students back in English/Language Arts as well. Particularly after third grade, age-appropriate literacy development is dependent not merely on skills like phonics and word recognition, but on knowledge capabilities like reading comprehension, vocabulary, composition, and analysis. Developing these higher-level literacy skills relies on appropriate subject-matter instruction: a child who has never been introduced to basic biological or environmental terms and concepts in science class, for example, will be unable to recognize the vocabulary or understand written materials relying on these words and concepts. Moreover, education research shows that culturally relevant instruction and engaging activities like the arts and physical education are directly linked with motivation and engagement.[48]

---

[48] In recognition of the important role of physical education, the BIA Manual enumerates internal agency requirements regarding the provision of physical education and other physical activities at BIE schools. *See* Indian Affairs Manual, Part 30, Chapter 7: Education (Management) Health and Wellness Policy, https://www.indianaffairs.gov/cs/groups/xraca/documents/text/idc016046.pdf.

1634975.v1

(4)     Remedy

78.   Defendants have an obligation to provide students in Havasupai Elementary School access to all required subjects and required content areas as well as to appropriate curriculum and instruction in these subject and content areas. Defendants must also assess the language capabilities of Havasupai students and offer opportunities to maintain and enhance both the English and Havasupai language skills of students.

79.   Requiring Defendants to consult with the Havasupai Tribe, already a legal requirement, and Native education experts will ensure that students are provided with opportunities to learn meaningful, relevant, and culturally grounded content and to establish an appropriate program of multicultural and multilingual education—including the adoption of culturally relevant instructional materials, methodologies, and assessments.

80.   Culturally relevant education refers to a holistic approach that "infuses the history, values, and language—or ways of knowing—of Native people into the contents of the curriculum, the language of instruction, the delivery of instruction, and the interaction with Native students."[49] This integration of Native culture into mainstream educational frameworks does not detract from traditional curricular areas, and it serves as a critical and complementary component of educational success.[50]   By encouraging cultural continuity between a child's home community and the school, culturally relevant practices are critical to "motivating students, promoting a positive sense of identity and self, stimulating positive attitudes about school and others . . . and supporting improved academic

---

[49] Nat'l Indian Educ. Ass'n ("NIEA") and Nat'l Educ. Ass'n, *Voices of Native Educators: Strategies that Support Success of Native High School Students* 23 (2011), http://files.eric.ed.gov/fulltext/ED528946.pdf.

[50] *See, e.g.*, NIEA, *Using Culturally Based Education to Increase Academic Achievement and Graduation Rates* 2 (2008), http://files.eric.ed.gov/fulltext/ED523558.pdf; Teresa L. McCarty, *The Role of Native Languages and Cultures in American Indian, Alaska Native, and Native Hawaiian Student Achievement* 2 (2011), https://static1.squarespace.com/static/52cf1070e4b048ae22d972b2/t/54aac6b3e4b0c309d027948a/1420478131256/McCarty+(2011).+Role+and+Impact+of+Native+Languages+and+Cultural+Context.pdf ("The issue, then, is not whether schooling based on Native students' tribal language and culture is beneficial, but rather which approaches are most effective and under what conditions.").

COMPLAINT

performance."[51]   In fact, research has shown robust linkages between culturally relevant instruction and educational benefits such as "improved academic performance, decreased dropout rates, improved school attendance rates, decreased clinical symptoms, and improved student behavior."[52]   By promoting educational practices that are relevant to and reflective of Native students' home communities, Defendants can ensure that Native students are equipped with the skills needed to excel in their tribal communities and beyond.

### B. <u>Failure to Adequately Staff the School</u>

#### (1)   <u>Legal Obligations of Defendants</u>

81.   Defendants are subject to a series of regulations specifying the staffing and administrative requirements at BIE schools in order to ensure both the quality and quantity of instruction and educational support received by Native students.   Among other things, these regulations provide that "in the absence of a regular teacher," schools must guarantee "a certified substitute teacher who meets the State substitute teacher qualifications,"[53] and that "[i]n the event that such a substitute is not available . . . a class cannot have as a teacher an employee without teaching credentials for more than 20 school days during any one school year."[54]   Similarly, BIE regulations guarantee the provision of a professional student counselor at each school "concerned with physical, social, emotional, intellectual, and vocational growth for each individual," and "familiar with the unique tribal, social, and economic characteristics of students."[55]

---

[51] William G. Demmert, Jr., *Improving Academic Performance Among Native Students: A Review of the Research Literature* 42 (2001), http://files.eric.ed.gov/fulltext/ED463917.pdf.

[52] *Id*. at 17; *see also* Angela E. Castagno & Bryan McKinley Jones Brayboy, *Culturally responsive schooling for Indigenous youth: A review of the literature*, 78 Review of Educational Research 941, 958 (2008), http://www.mn-indianed.org/docs/CulturallyResponsiveSchoolingForIndigenousYouth.pdf.

[53] 25 C.F.R. § 36.11(a)(5).

[54] *Id*.

[55] 25 C.F.R. § 36.42.

1634975.v1

82.   To ensure an adequate amount of instruction, BIE regulations further provide that any day that meets only "three-fourths of the instructional hours" may not be counted as a full school day except in the rare case of emergencies arising from "an uncontrollable circumstance during the school day."[56]   Federal statutes underscore Defendants' obligation to provide educational programs that "are of the highest quality" and "provide for the basic elementary and secondary educational needs of Indian children."[57]   Such educational obligations cannot be fulfilled without adequate learning conditions, including the basic elements of learning time and quality instruction.

(2)   Defendants' Longstanding Failure to Adequately Staff Havasupai Elementary School

83.   Defendants have consistently failed to ensure that Havasupai Elementary School is adequately staffed such that it can effectively deliver basic education. Defendants have failed to fill teacher and staff positions at the school, resulting in near-constant vacancies.   Teacher and staff vacancies have lasted for months and even years. Teacher vacancies have been covered by adults who lack teaching credentials—including the school janitor and the school secretary—and temporary BIE instructors on two-week details who rotate through the position and by combining students from multiple grade levels into a single classroom. Instead of certified teachers or trained aides, older children at the school sometimes help "teach" in these classrooms.

84.   For example, the current 2016-2017 school year began on August 16, 2016 with the principal, counselor, and first-grade teacher positions all vacant.   Because there was no first-grade teacher hired, the kindergarten and first-grade classes were combined. A general education teacher who lacks an administrative credential and has a full-time teaching load served as the acting principal for approximately the first 12 weeks of the school year.   The counselor position remained vacant until December 2016.

---

[56] 25 C.F.R. § 36.20(a).

[57] 25 U.S.C. § 2000.

COMPLAINT

1634975.v1

85.   The 2015-2016 academic year was scheduled to begin on August 25, 2015, but due to a severe staffing shortage students did not begin attending school until September 15.  For the remainder of the school year, most classrooms were covered by temporary BIE instructors who rotated through two-week details.  A general education teacher who lacks an administrative credential and had a full-time teaching load served as the acting principal for the entire school year.

86.   The 2014-2015 school year likewise began with the principal position vacant. In spring 2014, the staffing for the entire school consisted of: one acting principal, one special education teacher, two general education teachers, one teaching assistant, and one secretary.

87.   Plaintiffs have been repeatedly subject to the effects of these chronic staffing shortages.  For example, Plaintiff Anna D.'s teachers have frequently left during the middle of the school year.  In the first grade, Anna D.'s teacher switched twice during the school year.  In the second grade, Anna D.'s teacher switched at least five times over the course of the year.  Plaintiff Stephen C.'s teachers have also repeatedly left during the middle of the school year.  In particular, last year, Stephen C. was taught by a series of temporary teachers who stayed only two weeks at a time before a permanent teaching position was filled.

88.   Insufficient staffing has repeatedly caused the school to shut down altogether. On multiple occasions, the school has been so severely understaffed that it has been unable to operate.  For example, due to insufficient staffing, school was not in session from August 24 to September 15, 2015.

89.   In addition, for years, Havasupai Elementary School has often closed after lunch on specified Fridays, depriving students of more than a half-day of instruction.  On these days, the school permits teachers and staff to leave Havasu Canyon early for the weekend.  Students are sent home because the school has insufficient numbers of teachers to operate.  The learning time lost as a result of these closures alone adds up to more than two weeks of instruction per year.

COMPLAINT

1634975.v1

90.   Making matters worse**,** the school remains subject to repeated closures or early dismissals with little or no notice. In November 2016, Defendants shifted to a half-day schedule every day. This practice began without any notice.  In early and mid-November, all of the students in the school were assembled together in the multipurpose room instead of their regular classrooms and then sent home after only a half-day of school.  Then, on November 18, 2016, the School provided students with a flyer announcing that, beginning on Monday, November 28, after the Thanksgiving holiday, "students will be on a half day schedule till further notice."  On November 28, school was cancelled for the day.  The School continued on a half-day schedule on November 29 and finally resumed a full day schedule on November 30, 2016.

91.   The BIE has exacerbated its failure to hire an adequate number of teachers in the first instance by creating conditions for high staff turnover.  Between the 2015-16 and 2016-17 school years, for example, approximately one-third of the staff turned over.  From 2005 to 2016, there have been approximately 7 to 10 different principals at the school, not including those who arrived on temporary details from the BIE.  This turnover has been caused by the BIE's failure to provide adequate support to teachers and staff and by the termination—including termination during the school year—of teachers who have acted as advocates for students and families.

92.   For example, during the 2015-2016 school year, the BIE terminated both a teacher and a counselor who were deeply committed to working with children in the community and who sought to advocate for additional resources for students.  The teacher was removed and asked to leave the next day.  The counselor was terminated on May 6, 2016.  The school failed to fill either of these vacancies before the end of the school year, resulting in approximately two months of the school year during which students were deprived of the necessary services and instruction provided by these staff members.

93. Even when Havasupai Elementary School is considered "fully staffed," multiple grade levels are combined into a single classroom, but teachers are not provided the training or support necessary to serve such combined classrooms.  Grade levels are

COMPLAINT

typically combined in K/1, 2/3, 4/5, 6 and 7 /8 classrooms.  For example, Anna D. receives her third grade instruction in a combined classroom, and she also received instruction in the first and second grades in a combined classroom.  During periods of inadequate staffing, there have been up to three grade levels in a single classroom.  At present, due to the lack of a dedicated sixth-grade teacher, students are being placed in a combined classroom for grades 6 through 8.  Along with other sixth-grade students at the School, Stephen C. receives his instruction in the same classroom with seventh- and eighth-grade students.

(3)    Defendants' Failure to Adequately Staff Havasupai Elementary
        School Directly Impacts Student Learning

94.   The severe and persistent instability of the Havasupai School's teaching staff has pernicious consequences for student learning.  When the teaching staff undergoes frequent turnover, or when substitute teachers regularly cover vacancies, Havasupai students are deprived of valuable learning time and the guidance of a teacher who has the necessary experience and understanding of specific student needs.  Learning requires, at minimum, consistency and stability in teaching faculties, which allows teachers to build trusting relationships with students and to teach effectively and within the particular school community.  Even when a new teacher is hired, that teacher must spend valuable time adapting to the school and its students as well as learning about the community.  As a result, frequent teacher turnover substantially contributes to low academic achievement. Moreover, vacant positions are often filled by a series of substitutes, who typically lack expertise and experience in the curricular subject areas where they are placed.  Little learning takes place during these chaotic transitions, and Havasupai students subjected to such practices internalize the harmful message that their learning is not an educational priority.

95.   As a result of the combined classrooms, teachers must also serve students with especially wide ranges of proficiency levels, disabilities, and social-emotional needs in a single classroom, but they lack the training or support to meet the needs of all students in

this setting.  As a result, in many classrooms at Havasupai Elementary School, the teacher provides instruction to only a small group of students at any one time, while the remaining students wait, unsupervised and not engaged in any educational activity.

96.   In addition to a lack of adequate classroom instruction, Defendants have also failed to ensure that Havasupai Elementary School is consistently staffed with a professional student counselor attuned to the individual needs of students and familiar with the tribal community.  As a result, Havasupai students have been deprived of access to critical counselling services, ranging from academic guidance in the formation of "an academic and career plan," to "preventative and crisis counselling" to meet mental health needs, as well as other important services to support student development.[58]   Rather, inadequately trained teachers and staff at Havasupai Elementary School must scramble to meet these critical student needs in the limited time available or leave these needs wholly unaddressed in the absence of a dedicated school counselor.

97.   The lack of adequate staffing also leads to dangerous conditions at the school when children are routinely left unsupervised.  Recently, two children accessed a supply cabinet at the school during the school day and drank hand sanitizer.  One child was airlifted out of the canyon for medical treatment, and the other was handcuffed and taken to the local medical clinic.

98.   Similarly, Plaintiff Taylor P. was recently pushed against a wall and choked by another student while her kindergarten teacher was not watching.  In her first semester at the school, Taylor P. was also sexually assaulted and penetrated by another student on the playground.  In neither situation was Taylor P.'s mother, Billie P., informed by the school of what had happened.

(4)   Remedies

99.   Adequate staffing of qualified teachers and staff at Havasupai Elementary School, including offering sufficient instructional time for students of each grade and hiring qualified counselors and administrators, is fundamental to the provision of education

---

[58] 25 C.F.R. § 36.42(b)(3).

COMPLAINT

1634975.v1

to Havasupai students.  Research in Native American education reveals effective practices in recruiting and retaining highly qualified teachers to work in schools located in tribal communities, such as partnering new teachers with elders in the community to coach them and to help the teachers as they learn how to participate in the community.  Similar research shows that investing in professional development and training programs for teachers and offering improved living conditions helps decrease teacher attrition rates.[59] Defendants must adopt these and other practices to recruit, retain, and appropriately train qualified teachers and staff.

### C.    Lack of Basic Learning Materials and Activities

#### (1)    Legal Obligations of Defendants

100. BIE regulations mandate that Defendants provide Native students with appropriate instructional resources as well as the opportunity to participate in a well-balanced range of student activities.  Specifically, these regulations set forth a series of baseline requirements that Defendants must satisfy in the provision of learning materials, such as textbooks, and student activities at BIE schools. For example:

• **25 C.F.R. § 36.40** specifies that "each school shall provide a library/media program" meeting applicable local and state requirements, along with federal standards specifying *inter alia* the numbers of grade-level appropriate books, reference and periodical texts, professional texts for teachers and staff, copies of principal textbooks, as well as a variety of audio-visual materials, such as maps, films, and recordings.  The regulation additionally provides that the library media center "shall be serviced by a librarian," and that library resources shall incorporate materials relevant to Native American tribes.

• **25 C.F.R. § 36.41** requires that each BIE school establish a textbook review committee, composed of teachers, parents, students, and school board members.  This

---

[59] Angela E. Castagno & Bryan McKinley Jones Brayboy, *Culturally responsive schooling for Indigenous youth: A review of the literature*, 78 Review of Educational Research 941, 981 (2008), http://www.mn-indianed.org/docs/CulturallyResponsiveSchoolingForIndigenousYouth.pdf.

COMPLAINT

committee is charged with reviewing textbooks and other instructional materials to ensure that they meet curricular objectives, adequately portray different cultures, are recent and in good condition, and reflect varied reading levels.

• **25 C.F.R. § 36.43** mandates that each school "provide and maintain a well-balanced student activities program" that shall function as "an integral part of the overall educational program." These activities, such as "special interest clubs, physical activities, student government, and cultural affairs," are designed to "help develop leadership abilities and provide opportunities for student participation."

(2)   Defendants' Failure to Provide Required Instructional Support at Havasupai Elementary School

101. Defendants have failed to meet the most basic of these regulations to ensure that Havasupai students have access to the instructional materials and activities that are both necessary for learning and required by BIE regulation.

102. Havasupai Elementary School does not have sufficient numbers of textbooks, let alone a community-based review committee, to ensure that textbooks and other instructional materials are appropriate.  As a result, students are unable to bring books home from school.  On days when Plaintiffs have homework, they typically carry home photocopied sheets of paper.

103. Sufficient learning resources and technology are not available at the School to support student education, such as the presence of a functioning school library or media center.  A dedicated librarian has not been assigned to the School.

104. Similarly, Havasupai students have been denied access to an "integral part of the overall education program" through Defendants' failure to provide access to any extracurricular activities.  There are no sports teams, student clubs, or art, music, or dance groups. Accordingly, there exist no opportunities for student participation in organized activities at the School in order to develop student leadership abilities and ensure that Havasupai students are provided with appropriate educational opportunities.

> (3)   Defendants' Failure to Provide Instructional Resources Has Denied
> Havasupai Students Access to Adequate Educational Opportunities

105. No school can function without basic instructional resources, such as textbooks and technology.  Defendants have denied Havasupai students access to these most basic learning resources, leading to a dramatic reduction in students' opportunity to learn effectively in school.  Without textbooks or access to a library and media center, students' educational universe is strictly limited to the pages of photocopied assignments or whatever limited classroom instructional materials can be provided during the school day.  These constraints on their interaction with instructional material is harmful to student outcomes and denies them access to adequate educational opportunities.

106. Access to extracurricular activities is equally critical to educational achievement and student motivation.  Extracurricular activities are beneficial for students because they enable them to learn skills in new contexts, forge connections to peers and adult mentors, and enhance their sense of identification with their schools and communities.[60]  In one study measuring the educational resilience of vulnerable youth, frequent extracurricular participation led to high school graduation and college enrollment rates two times higher than for students who participated less frequently.[61]  Other research shows that extracurricular involvement is associated with improved educational performance and social emotional health, including higher self-esteem and lower rates of depression.[62]

---

[60] Jennifer A. Fredricks & Jacquelynne S. Eccles, *Breadth of Extracurricular Participation and Adolescent Adjustment Among African-American and European-American Youth*, 20 J. OF RESEARCH ON ADOLESCENCE 307, 307-08 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3403706/pdf/nihms386169.pdf.

[61] Stephen C. Peck et al., *Exploring the Roles of Extracurricular Activity Quantity and Quality in the Educational Resilience of Vulnerable Adolescents: Variable- and Pattern-Centered Approaches*, 64 J. SOC. ISSUES 135 (2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2699299/.

[62] Jennifer A. Fredricks & Jacquelynne S. Eccles, *Is Extracurricular Participation Associated With Beneficial Outcomes? Concurrent and Longitudinal Relations*,

-37-

1634975.v1

107. Without access to extracurricular activities, Havasupai students are denied critical opportunities to cultivate their leadership abilities and develop other important skills and qualities that lead to success in the classroom.  For example, although Anna D. has a keen interest in basketball and tribal-cultural activities, there are no opportunities for her to pursue these interests through school.  She has never even been offered an opportunity to participate in a school-sponsored field trip.  The only structured activity outside of school that her mother, Elsa D. can recall was when Anna D. and her classmates picked up trash outside of the school for Earth Day.

(4)     Remedy

108. Defendants must ensure that students at the School have basic instructional materials and resources that are both necessary for learning and required by BIE regulation. These resources include access to adequate numbers of up-to-date, culturally sensitive textbooks, which are regularly assessed by a community-based review board, access to a library media center managed by a professional librarian and educational technology, as well as an opportunity for students to participate in extracurricular activities, such as sports teams, student clubs, or art, music, or dance groups.

**D.     Exclusion of the Community from School Decision-Making**

(1)     Legal Obligations of Defendants

109. Multiple statutes and regulations obligate Defendants to engage tribal community members in various areas of school decision-making.  Notably, this regulatory regime envisions the role of a local school board that participates in setting and assessing educational goals. *See, e.g.*, 25 C.F.R. § 36.10(b).  Under BIE regulations, tribal community members are provided with various opportunities for school involvement, including but not limited to, the development of the school's mission and goals,[63] the

---

42 DEVELOPMENTAL PSYCHOLOGY 698, 698 (2006),
http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.546.5178&rep=rep1&type=pdf.
[63] 25 C.F.R. § 36.10(b).

selection of appropriate curricula,[64] the integration of tribal language and culture,[65] the review of instructional materials,[66] and the evaluation of educational needs.[67]  Moreover, a critical component of community engagement involves access to student achievement information[68] and written school policies in order for parents and other community members to meaningfully evaluate school performance and ensure that schools are adopting and applying appropriate policies.[69]

(2)  Defendants Have Actively Excluded the Havasupai Community from Participating in School Decision-Making

110. Defendants have repeatedly denied Havasupai community members the requisite opportunities to participate in important areas of school decision-making, including the development of culturally relevant curricula, the review of textbooks and instructional materials, and the evaluation of educational needs and goals.  Nor have Defendants adequately informed parents and community members of school achievement results or provided access to a written handbook of current school policies.  For example, in the 2015-2016 school year, the School failed to administer a routine standardized test that students had taken in prior years and to notify families of its failure to do so.

111. Defendants have not only failed to engage the Havasupai community in school decision-making.  They have actively imposed barriers to such participation and discouraged advocacy to improve the schools and secure student rights.

112. The Havasupai Advisory School Board is composed of seven members appointed by the Havasupai Tribal Council.  Laila R., the mother of Levi R. and Leo R., and Elsa D., the mother of Anna D., have each been appointed by the Havasupai Tribal

---

[64] 25 C.F.R. §§ 36.13(a),(c), 36.12(b)(1).

[65] 25 C.F.R. § 36.20(b).

[66] 25 C.F.R. § 36.41(a).

[67] 25 C.F.R. § 36.12(b)(1).

[68] 25 C.F.R. § 36.42(a)(4).

[69] 25 C.F.R. § 36.10(e).

COMPLAINT

1634975.v1

Council to serve on the Council's Advisory School Board.  Because the School is administered and operated by the BIE, the Advisory School Board lacks authority to establish policies or make binding decisions for the school.

113. The Advisory School Board has played an important advisory role in overseeing the activities of the School and actively seeking to improve the education provided to Havasupai students, including by identifying the needs of the school, representing parent and community concerns, and participating in the hiring process for school staff.  For example, Advisory School Board members, including Laila R. in her capacity as an Advisory School Board member and later Advisory School Board President, wrote letters to BIE officials demanding that the vacant positions be filled when the School was severely understaffed and requested that the BIE provide standardized testing to students attending the School.

114. The BIE retaliated against Laila R. and other Advisory School Board members for their advocacy by demanding that all members obtain burdensome FBI background checks before allowing the Advisory School Board to meet, even though they do not meet at the school when children are present.  Advisory School Board members are prohibited from entering school grounds and otherwise participating in the work of the Advisory School Board until the background checks, which take many months, have cleared.  No other individual is prohibited from entering school grounds absent a background check. The school recently called the police when one school board member and grandparent of a student arrived on school grounds.  As a direct result of the BIE's retaliatory acts, the Advisory School Board has effectively been disbanded.  Even though the Tribal Council has continued to appoint Advisory School Board members, including appointing Elsa D. in August 2016, the Advisory School Board has not met since January 2015.

115. This is not the first time advocates seeking to improve the education to Havasupai students have been subject to retaliation.  Community leaders who advocated on behalf of families were barred from School grounds and prohibited from participating in Individualized Education Program ("IEP") meetings.  And, during the 2015-2016 school

COMPLAINT

year, the BIE terminated both a teacher and a counselor who were deeply committed to working with children in the community and who sought to advocate for additional resources for students.  In addition, Defendants do not conduct outreach sufficient to secure family or community involvement in the schools.  The School does not hold culturally relevant events or community engagement activities, such as plays, dances, or sporting events.  Parents are rarely invited onto school grounds except to pick up a student who has been suspended or otherwise subject to exclusionary discipline.

(3)   Defendants' Failure to Involve Havasupai Community Members in Education Hurts Student Outcomes

116. The complete lack of opportunity for meaningful community engagement at Havasupai Elementary School, in addition to violating a series of regulatory imperatives, has served to undermine student educational achievement.  When parents, families, and community members lack meaningful avenues of participation in their children's education, schools fail to enlist important sources of support and resources to promote student learning.  Community members, for example, can help develop culturally relevant curriculum that is an integral part of Native education.  Families, once engaged, can assist in setting educational goals and ensuring that children have adequate support with schoolwork.  As a consequence, Native education becomes embedded in Native communities and curricular approaches reflect the cultural identity of the community, which enhances student motivation and engagement with what they are learning.  Teachers and staff, particularly those from outside the community, are also able to partake of the support and resources offered by community members, who can help them integrate into the community and develop culturally sensitive practices.

(4)   Remedy

117. Defendants must fulfill their obligation to involve Havasupai community members in their children's education and to participate in various areas of decision-making at Havasupai Elementary School.  Defendants should offer culturally relevant events and community-engagement activities at the School.  In addition, a coalition of

COMPLAINT

Native American organizations has recommended creating opportunities for families and the community to be involved in developing curriculum and to provide leadership and participate in school activities on an ongoing basis.[70] Defendants must also permit families and members of the Advisory School Board to oversee the activities of the School and participate in decision-making, including identifying the needs of the school, representing parent and community concerns, and participating in the hiring process for school staff. Specifically, Advisory School Board members should not be subject to burdensome and lengthy federal background checks prior participating in this collaborative process.   In addition, Defendants must collect, analyze and disseminate data regarding student achievement, as well as provide a written handbook of school policies, to parents and community members so that there is sufficient information to assess student performance and hold Defendants accountable for providing educational policies and school resources that support an academically and culturally appropriate education.

## IV.   DEFENDANTS' FAILURE TO IMPLEMENT A SYSTEM TO DELIVER SPECIAL EDUCATION TO STUDENTS WITH DISABILITIES

118. Defendants have failed to provide basic education to all students at Havasupai Elementary School, but students with disabilities face even more formidable barriers to accessing public education.  Plaintiffs with disabilities have been denied access to even the paltry general education that is provided at Havasupai Elementary School.

119. While Defendants' systemic failure to deliver a basic education severely injures all Havasupai students, it disproportionately harms those with disabilities.  Students with disabilities are among the most vulnerable to educational deficits because they require specialized instruction in order to access the same educational benefits as other students.  As a result of their disabilities, these students are often not able to partake of incidental

---

[70] Nat'l Congress of Am. Indians ("NCAI, "), Nat'l Indian Child Welfare Ass'n ("NICWA,"), NIEA, and Nat'l Indian Health Board, *Native Children's Policy Agenda: Putting First Kids 1ˢᵗ* 17 (Aug. 2015), http://www.ncai.org/attachments/PolicyPaper_UallLEyZXrEoMnjffnqPGmmCUAPanEYeDcadGqySBSMBStvQCXo_Aug%202015%20Native%20Children's%20Policy%20Agenda.pdf.

1    learning from other sources or catch up as quickly as their peers.  The denial of a system

2    for the delivery of special education to meet their needs is therefore destructive to their

3    ability to access a basic education.

4    120. For example, as a result of Defendants' failure to ensure access to basic

5    education, special education, and related services, Plaintiff Stephen C. is far behind in all

6    academic areas.  Because Defendants have denied him access to basic education, Stephen

7    C. is in sixth grade but can barely read and write.  And despite years of advocacy by his

8    mother, Laila R., Levi R. is also behind in all academic areas, particularly in the area of

9    reading comprehension.  For example, in the fifth grade, Levi R. was reading at a second-

10   grade level.

11   121. The need for a well-functioning system of special education to address the

12   needs of students with disabilities is particularly critical at Havasupai Elementary School,

13   which serves a high proportion of students with disabilities.  Defendants and school

14   officials have long been aware of the significant need for special education services at

15   Havasupai Elementary School: the School reported to the Advisory School Board in 2014

16   that approximately half of the students in the school had been identified as students with

17   disabilities.

18   122. Section 504 of the Rehabilitation Act requires schools to provide a system—

19   including procedures, teachers, and appropriate providers—for the delivery of specialized

20   instruction and related services to meet the needs of the numerous students entitled to

21   special education.  Yet Havasupai Elementary School has no system for identifying those

22   students who have disabilities or for ensuring that such students receive the specialized

23   instruction, related services, and accommodations necessary for them to access a general

24   education curriculum.  Instead, students with disabilities are excluded from school and

25   subjected to punitive discipline and police prosecution on the basis of their disabilities.

26   Havasupai Elementary School also has no system for meeting the procedural requirements

27   of Section 504 and its implementing regulations, including identifying and assessing

28   students with disabilities and providing notice and procedural safeguards to families.

-43-
COMPLAINT

## A.    Section 504 of the Rehabilitation Act Prohibits Discrimination Against Students with Disabilities

123. Over forty years ago, Congress passed and the President signed Section 504 of the Rehabilitation Act of 1973, the first disability civil rights law in the United States. Pub. L. No. 93-112, §504, 87 Stat 355, 394 (1973).  Section 504 "is designed to eliminate discrimination on the basis of handicap in any program or activity receiving Federal financial assistance." 34 C.F.R. § 104.1 (2000).

124. Specifically, Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under . . . any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a).  A "program or activity" includes a school system, 29 U.S.C. § 794(b)(2)(B), and a disability is defined broadly to include any "physical or mental impairment that substantially limits one or more life activities," such as (but not limited to), "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, *learning, reading, concentrating, thinking*, *communicating*, and working." 42 U.S.C. §§ 12102(1)(A), (2)(A) (emphasis added).

125. The protections of Section 504 are robust and include obligations on Defendants to make certain that all children with disabilities have meaningful access to public education. "Access" to public education for students with disabilities is understood broadly to refer both to physical accessibility of the school site and the students' ability to receive a benefit from public education.

126. Under Section 504, Defendants must guarantee students with disabilities an "equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." 34 C.F.R. 104.4(b)(2).  Therefore, a federally funded education system may be found in violation of Section 504 where the entity's practices preclude students with disabilities from obtaining system benefits realized by students without disabilities. *See New Mexico*

1634975.v1

1    *Ass'n. for Retarded Citizens v. State of New Mexico*, 678 F.2d 847, 853 (10th Cir. 1982).

2         127. Provision of appropriate services and supports is key to students with

3    disabilities being able to access public education.  Just as a ramp allows a student who uses

4    a wheelchair to get into the schoolhouse door, provision of necessary services and supports

5    allows students with disabilities to participate in their classes and to learn the academic and

6    behavioral skills they will need to progress – in short, to meaningfully access the substance

7    of public education.

8         128. A variety of federal regulations impose more specific duties and obligations on

9    Defendants to ensure full compliance with Section 504.  For example, public schools that

10   receive federal funding may not, directly or through any contractual, licensing or other

11   arrangement, discriminate against students with disabilities. 34 C.F.R. § 104.4(b)(1).  In

12   addition, public schools are prohibited from utilizing criteria or methods of administration

13   that have the effect of subjecting qualified persons with disabilities to discrimination on

14   the basis of disability or that have the purpose or effect of defeating or substantially

15   impairing accomplishment of the objectives of the recipient's program or activity with

16   respect to persons with disabilities. 34 C.F.R. § 104.4(b)(4).

17        129. In the public school context, Section 504's nondiscrimination mandates

18   require federal officials to ensure access to appropriate educational settings for students

19   with disabilities; establish and conduct identification, evaluation and placement procedures

20   for students with disabilities; and establish and implement procedural safeguards for any

21   actions related to the "identification, evaluation, or educational placement" of students

22   with disabilities. 34 C.F.R. §§ 104.32, 104.34, 104.35, 104.36.

23        130. Section 504 further requires Defendants to provide educational services to

24   students with disabilities in the least restrictive environment possible and appropriate to

25   meet the students' educational needs.  This includes educating students with disabilities

26   alongside students *without* disabilities to the maximum extent appropriate.  It also includes

27   providing education to students with disabilities in their home communities.  In the rare

28   instances when the provision of needed services at school is not sufficient to meet the

-45-

COMPLAINT

needs of a student with a disability, Defendants must take into consideration the proximity of alternative settings to the student's home. 34 C.F.R. § 104.34.

131. Defendants must tailor the services made available to "meet [the] individual educational needs" of students with disabilities "as adequately as the needs of" students without disabilities. 34 C.F.R. § 104.33(b)(1).  Defendants are prohibited from offering only a predetermined universe of placement options.

132. Those students who receive special education services through an IEP, like all other students with disabilities, are protected from discrimination on the basis of disability under Section 504.  Defendants are prohibited from discriminating against Havasupai students who require an IEP.  Otherwise, the most vulnerable students would be an underclass of children with disabilities.

133. In order to safeguard the civil rights of students with disabilities, it is essential that individuals, especially parents, be empowered to advocate on behalf of students and to oppose discriminatory practices.  Section 504 prohibits retaliation against individuals who advocate on behalf of students with disabilities.  *See* 34 C.F.R. § 104.61 (incorporating the procedural provisions applicable to title VI of the Civil Rights Act of 1964).

**B.** **Defendants' Failure to Implement a System for Delivery of Special Education Excludes and Penalizes Students with Disabilities**

134. Havasupai Elementary School has no system in place to deliver special education to ensure that students with disabilities have equal access to public education. As a result, students with disabilities are denied the benefits of general education curriculum and systemically excluded from school.

135. Staffing at Havasupai Elementary School is insufficient to provide the specialized instruction and related services required by federal law.  Havasupai Elementary School does not employ, and has not employed at any time in recent years, sufficient numbers of the following personnel necessary to adequately provide special education services to students with disabilities: highly qualified special education teachers, mental health providers, occupational therapists, physical therapists, and speech therapists.  At no

1634975.v1

time in recent years has the school employed sufficient numbers of paraprofessionals or support staff.   The staffing of Havasupai Elementary School is so inadequate that the school cannot even hold IEP meetings on a timely basis.   For example, Laila R., the mother of Plaintiff Levi R., was told repeatedly that there was not sufficient staff to hold an IEP meeting.

136. The failure to provide federally mandated special education services has had devastating consequences for students with disabilities.   Even when such students are present in the classroom, Defendants' failure to provide required specialized instruction and related services denies them meaningful access to general education.   In addition, students with disabilities are routinely physically excluded from the School in various ways:

137. **Restricted Hours Schedules:** Havasupai Elementary School students with disabilities are routinely denied a full day of public instruction.   Because the school lacks the capacity to meet student needs by providing adequate specialized instruction or related services, students with disabilities are relegated to "homebound" placements or placed on restricted-hours schedules under which students receive only 3-5 hours of instruction per week.

138. For example, Plaintiff Durell P., who is currently in seventh grade, has been on a homebound or restricted-hours schedule for over four years.   He has not attended school full-time since third grade because the School cannot meet his behavioral and mental health needs.   During the 2016-2017 school year, Durell P. was relegated to a homebound placement for a significant part of the year and received only five hours of instruction per week.   Although he is also entitled to two hours of counseling per week, he has received no counseling because Defendants have not hired a counselor at the School.

139. Plaintiff Levi R. has likewise been placed on a restricted-hours schedule since September 2013, when he was in fifth grade.   From September 2013 to January 2014, he was permitted to attend school only from 3:15 to 4:15 p.m. on Monday, Tuesday, and Wednesday.   And, because Levi R. complied with those excessive scheduling restrictions,

the School informed his mother that Levi R. had been unenrolled from the School for lack of attendance.  From January 2014 through the remainder of the school year, Levi R. was permitted to attend school for only a half day on Monday, Tuesday, and Wednesday.  This pattern continued for years.  The School later unilaterally placed Levi R. on a shortened school-day schedule in which he was permitted to attend school for only half of the school day in October 2014 and again in December 2015.  Although he is also entitled to counseling under his IEP, he has received no counseling because, once again, the School has not hired a counselor.

140. Plaintiff Stephen C., who is currently in the sixth grade, was recently placed on a homebound schedule as well.  Since November 21, 2016, Stephen C. has not received any instruction, except for intermittent one-hour tutoring sessions about once per week.  Although he is also entitled to counseling under his IEP, he has received no counseling because the School has not hired a counselor.

141. **Coercion to Leave Community:** Havasupai Elementary School students with disabilities are also frequently compelled to choose between receiving the special education services to which they are entitled and staying in their community.  Defendants inform families that the school has no capacity or obligation to provide necessary support and services, and that the student's only option for receiving special education services is to transfer out of Havasupai Elementary School and into a residential placement outside of the canyon.  However, those Havasupai families who move outside the canyon often endure significant financial hardships upon leaving their jobs and other sources of support on the reservation.

142. The pressure to remove children from the community for schooling is particularly troubling in light of the history of abusive BIE boarding schools intended to destroy native language and culture, which many adults in the community endured.  Moreover, residential placements have the potential to exacerbate problems by depriving children of a stable and supportive home and community environment, and by denying families who remain on the reservation the opportunity to fully take part in their child's

-48-

1  education or to become involved on campus. Native students living in reservation
2  communities, for example, are more likely to graduate and pursue higher education than
3  peers living in non-reservation communities.[71] An education close to home is therefore
4  essential to student achievement as well as to maintaining cultural identity and community
5  well-being.

6      143. For example, Billie P., the mother of Plaintiff Durell P., was told that Durell P.
7  would not be permitted to return to Havasupai Elementary School unless Billie P.
8  consented to placing Durell P. in a residential placement in Utah for 45 days in the spring
9  and summer of 2016. Having been told that she had no other choice, Billie P. submitted,
10  even though she strongly desired for Durell P. to remain with his family in his community.
11  During the placement, Durell P. was subjected to repeated use of physical restraints and
12  was unable to communicate with his family for long periods of time. Yet, after Durell P.
13  completed his 45-day residential placement, Defendants did not live up to their end of the
14  bargain. Havasupai Elementary School again informed Billie P. that the School lacked the
15  capacity to meet Durell P.'s needs, and that the family must choose between a residential
16  placement outside of the canyon or a homebound schedule during which Durell P. would
17  receive only five hours of instruction per week.

18      144. Similarly, Plaintiff Stephen C.'s guardian, Frank C., strongly prefers to have
19  Stephen C. live with his family in his community, but Frank C. is considering sending
20  Stephen C. to a boarding school where he will have his needs met. Laila R. was compelled
21  to move her family from Havasupai in part to place both her sons Levi R. and Leo R. at a
22  public school where their needs will be met, despite the fact that Levi R. is eligible to
23  attend Havasupai Elementary School. And Jasmine A. has likewise made the difficult
24  decision to send her children with disabilities, Plaintiffs Jenny A. and Jordan A., to a BIE
25  boarding school in Oklahoma, where their educational needs will be met, even though both

---

26  [71] Cornel Pewewardy & Bruce Frey, *American Indian Students' Perceptions of Racial
27  Climate, Multicultural Support Services, and Ethnic Fraud at a Predominantly White
University*, 43 J. AM. INDIAN ED. 32, 38 (2004),
28  https://jaie.asu.edu/sites/default/files/431_2004_2_pewewardy_frey.pdf

children were eligible to attend school in their community at Havasupai Elementary School.

145.   In short, because the School does not have a system in place to ensure that these students can receive the special education services necessary to access the benefits of a public education, Defendants coerce Plaintiffs to leave their homes and communities in pursuit of adequate educational opportunities.

146. **Exclusionary Discipline and Referral to Law Enforcement:** Instead of receiving the specialized instruction and related services to which they are entitled, and as a consequence of not receiving these services, students with disabilities in Havasupai Elementary School are also excluded from the school by being referred disproportionately to punitive discipline and law enforcement as a consequence for behaviors that are manifestations of their disabilities.

147. Havasupai students with disabilities are routinely and repeatedly removed from the classroom and sent to the principal's office, suspended, and expelled in response to conduct that is a manifestation of the student's disability.  These disciplinary referrals are so pervasive that, for many students, they take place on a near-daily basis.  Yet Defendants fail to maintain accurate records of disciplinary action against students with disabilities, in clear violation of federal regulations implementing Section 504.

148. For example, because the School does not have the capacity to meet Plaintiff Stephen C.'s behavioral and mental health needs, he has been sent home from school four days per week, on average.  As a result, his grandfather and legal guardian, Frank C., estimates that he has attended school only approximately half of the time over a period of years.   The School regularly fails to provide Frank C. with any written records of disciplinary action against Stephen C. or assign him homework or remedial work when he is suspended or sent home early.  Similarly, when Plaintiff Jenny A. attended the School, she was sent home early most days, without homework or remedial work to make up for lost instructional time.

1634975.v1

149. Recently, the School excluded Stephen C. from attending class as a result of behavior that was a manifestation of his disability.  Since November 21, 2016, Stephen C. has not received any instruction, except for intermittent one-hour tutoring sessions about once per week.

150. Likewise, since third grade, Plaintiff Durell P. has been suspended so often that he has attended school only approximately 20% of the time.  On several occasions, including a four-month period in 2012 and a six-month period in 2013, the School excluded Durell P. from school altogether, without providing him with any educational or related services during his exclusion. And Plaintiff Levi R. was expelled due to behavior that was a manifestation of his disability in August 2013.  He has been placed on a shortened school day since that time, and the School has repeatedly called Laila R. to come to the School to pick up Levi R. as a means of addressing his behaviors, further depriving Levi R. of education.

151. In addition to suspensions and expulsions, children with disabilities are frequently referred to law enforcement and even prosecuted in federal court for minor misbehavior that is a manifestation of their disabilities.  There is a pervasive BIA police presence on school grounds, and BIA officers frequently escort home children who have been subject to exclusionary discipline.  In the past, as many as three armed BIA officers have stood inside the school gate during the school day.  Even very young children with disabilities are prosecuted in federal court for instances of minor misbehavior at school. When a school-based arrest takes place, the BIA police typically escort children to the Colorado River Indian Tribes Prison ("CRIT"), more than four hours driving distance from the top of the canyon—and much further from the base of the canyon where the families live.  Children may stay there up to a month while awaiting hearings in a tribal court because those hearings are held only once per month.

152. For example, eleven-year-old Plaintiff Stephen C. was indicted in federal court for pulling the cord out of the back of computer monitor.  Twelve-year-old Plaintiff Durell P., who has multiple disabilities and was the victim of sexual abuse as a young child, is

COMPLAINT

1  currently being criminally prosecuted for assault for pushing a teacher.  He spent over a
2  week at the CRIT detention facility.

3       153. In spite of the numerous challenges these children face, draconian school
4  discipline threatens to stigmatize them and exacerbate the same behaviors that led to
5  disciplinary action in the first place.  In Arizona alone, Native students were referred to the
6  principal's office at a rate three times that of white peers, and Native students face national
7  suspension rates that are more than one-and-a-half times that of white peers.[72]  These
8  suspensions and expulsions, in addition to depriving students of valuable instructional
9  time, hurt a child's academic performance and increase the likelihood that a child will
10 struggle and drop out of school.[73]  Consequently, the use of such discipline on Native
11 children is counterproductive, leading to a vicious cycle of punishment, exclusion, and low
12 achievement.[74]

13      154. These problems are compounded by the use of school arrests to address
14 routine student misbehavior. Although Native students make up only 1% of the nationwide
15 student population, they disproportionately receive 2% of all school arrests, and 3% of all
16 referrals to law enforcement.[75]  That is, Native students are twice as likely as other
17 students to be arrested and three times as likely to be referred to law enforcement.  Once

18 _____

19 [72] Carolyn A. Brown and Catherine Di Tillio, *Discipline Disproportionality among*
20 *Hispanic and American Indian Students: Expanding the Discourse in U.S. Research*, 2 J.
   EDUC. & LEARNING 47, 49, 52 (2013).

21 [73] *See, e.g.*, Prudence Carter et al., *Discipline Disparities Series: Overview* 1 (2014),
22 http://www.indiana.edu/~atlantic/wp-
   content/uploads/2014/03/Disparity_Overview_031214.pdf; Brea L. Perry & Edward W.
23 Morris, *Suspending Progress: Collateral Consequences of Exclusionary Punishment in*
   *Public Schools*, 79 American Sociological R. 1067, 1079 (2014).

24 [74] Attorney Gen.'s Advisory Comm'n on Am. Indian/Alaska Native Children Exposed to
25 Violence, *Ending Violence so Children Can Thrive* (2014) 104,
   https://www.justice.gov/sites/default/files/defendingchildhood/pages/attachments/2014/11/
26 18/finalaianreport.pdf.

27 [75] National Congress of American Indians, *Are Native Youth Being Pushed Into Prisons?* 1
   (2014), http://www.ncai.org/policy-research-center/research-data/prc-publications/School-
28 to-Prison_Pipeline_Infographic.pdf

COMPLAINT

arrested, Native youth are more likely to go to court rather than have their charges dropped, compared to all other ethnic groups.[76]  In comparison to their white peers, Native juvenile offenders are then significantly more likely to be incarcerated or transferred to the adult criminal justice system.[77]  At each step of the process, Native youth are prematurely and disproportionately pushed out of school and into prison.[78]  The consequences of this overly punitive and exclusionary school discipline for Native youth are profound and devastating to Native students' educational outcomes and life chances.

155. This Native school-to-prison pipeline feeds into larger trends relating to the disproportionate and tragic use of law enforcement against Native communities. Nationwide, Native men and women are incarcerated at rates four and six times that of white men and women.[79]  Native individuals experience the highest rates of killings by police.  Tragically, as recently as mid-November, 2016 in Supai, use of force by the BIA police resulted in the death of a member of the Havasupai Tribe.  In addition, Havasupai community members have repeatedly circulated petitions calling for the removal of BIA officers who have engaged in inappropriate behavior, including the use of excessive force and improper searches and seizures.

156. **Inadequate Procedures to Identify, Locate, Assess, and Provide Procedural Safeguards to Students with Disabilities:** Havasupai Elementary School has no system in place to identify and assess the needs of students with disabilities, nor does it adequately inform families of students with disabilities of their rights under federal anti-discrimination laws.  Havasupai Elementary School does not have the capacity to meet its obligation to identify and provide comprehensive assessments of students with disabilities.

---

[76] *Id.*

[77] *Id.* at 2.

[78] *See* Rhonda Brownstein, *Pushed Out*, 75 Educ. Digest 23, 25 (2010); Addie C. Rolnik, *Untangling the Web: Juvenile Justice in Indian Country*, 19 N.Y.U. J. LEGIS. & PUB. POL'Y 49, 51-54 (2016).

[79] Lakota People's Law Project, *Native Lives Matter* (2015) 1, http://www.docs.lakotalaw.org/reports/Native%20Lives%20Matter%20PDF.pdf.

This failure causes the responsibility to fall overwhelmingly on parents, and the School makes matters even more challenging for parents by failing to provide information required by federal statutes and regulations, including notice of procedural safeguards and information necessary to understand disabilities, participate in planning, and access educational records.  The school also does not have an adequate record-keeping system in place.  And parents and community members who do assert the rights of students with disabilities are often retaliated against by the School.

### C.   Defendants Must Establish a System for Provision of Special Education at Havasupai Elementary School

157. Section 504 requires Defendants to implement an adequate system for ensuring that students with disabilities receive the specialized instruction, related services, and accommodations necessary to access a general education curriculum and other benefits, programs, or services provided by Defendants.  In particular, early identification and evaluation of a disability is vital to ensuring that students are provided with needed educational services and supports.  Defendants must also guarantee that students have access to personnel with training in delivering special education services and other resources such as a special classroom for students with more intensive needs.  Defendants are responsible for providing a system to meet the procedural requirements of Section 504 and its implementing regulations, such as providing notice and procedural safeguards to families.  This system should be based on input from Native American education experts knowledgeable about the complexities of identifying and providing appropriate education to Native American students with disabilities.

158. Defendants must also adopt school discipline policies and practices that encourage effective and culturally responsive strategies for avoiding suspension and expulsion, such as restorative justice.  Defendants should provide specialized training for teachers and staff to appropriately and positively respond to student behavior.  In particular, they must ensure that students with disabilities are not excluded from school or subjected to punitive discipline and police prosecution on the basis of their disabilities.

COMPLAINT

159. Defendants are also obligated to implement procedures to safeguard student and parent rights, including, but not limited to, (1) parental notice of individual student progress, (2) parental notice of injuries of students on campus, (3) parental notice of law-enforcement interactions with students and law enforcement presence on campus; and (4) student and parental notice of disciplinary actions and access to disciplinary records.

160. There is no administrative procedure for challenging Defendants' school-wide failure to provide a system for serving students with disabilities.  Indeed, the BIE has not even promulgated regulations for challenging individual denials of access to education for students with disabilities.  Even if a family could somehow obtain an individual remedy through a due process proceeding or some other form of administrative process, Defendants could not implement that remedy at Havasupai Elementary School because they have no system in place for doing so.

## V. DEFENDANTS' FAILURE TO PROMOTE WELLNESS AND MEET MENTAL HEALTH NEEDS

161. As a result of centuries of U.S. government policies that have oppressed and discriminated against Native communities, Havasupai youth—like many Native youth across the nation—are exposed to childhood adversity that, absent appropriate intervention and support, denies students full opportunity to learn and receive the benefits of a public education.  Native educators have thus concluded that promoting wellness and providing mental health services are required to ensure that students have meaningful access to public education.  Yet Havasupai Elementary School lacks programming to promote wellness as well as culturally sensitive mental health and support services.  Defendants have also failed to provide appropriate training to ensure that teachers can support students' mental health and social-emotional needs in the classroom.

### A. As a Consequence of U.S. Policies, Havasupai Youth Experience Significant Childhood Adversity and Trauma

162. Like many Native communities, the Havasupai bear the burden of generations of historical trauma stemming from a legacy of chronic discrimination—forced

COMPLAINT

relocations, loss of homes, families, and culture—and unresolved grief. [80]   The term "historical trauma" captures "the extensive, cumulative, and intergenerational experiences of trauma" endured by Native communities.[81]   In particular, the historical and widespread use of Native American boarding schools, as discussed above, constituted a form of forcible assimilation that was designed to stamp out a child's tribal affiliations and cultural identity at an early age.

163. Despite the resistance and resilience of Native communities, the lengthy legacy of cultural deracination, dispossession, and disenfranchisement has adversely impacted these communities, and children in particular.   As the Center for Native American Youth ("CNAY") has found, "[h]istorical trauma, chronically underfunded federal programs, ineffective government policies, and failure to meet trust responsibilities have all contributed to negative health, education, and economic disparities in Indian Country relative to the general population."[82]   Native advocacy groups, including as the National Congress of American Indians ("NCAI") Policy Research Center, the National Indian Child Welfare Association ("NICWA"), and the National Indian Educators Association ("NIEA") have documented a number of concrete ways in which the consequences of discriminatory U.S. government policies continue to affect Native communities, including higher rates of criminal justice involvement, family disruption, poverty, alcoholism and substance abuse, and violence.   Overall, NICWA reports that

---

[80] Kathleen Brown-Rice, *Examining the Theory of Historical Trauma Among Native Americans*, 3:3 The Professional Counselor117, 119 (2013) ("The theory of historical trauma has been considered clinically applicable to Native American individuals by counselors, psychologists, and psychiatrists.").

[81] NCAI Policy Research Center, *Resilience & Trauma* 2 (Oct. 2015), http://www.ncai.org/policy-research-center/research-data/prc-publications/Backgrounder-Resilience.pdf; *see also* Maria Yellow Horse Brave Heart & Lemyra M. DeBruyn, *The American Indian holocaust: Healing historical unresolved grief*, 8 AM. INDIAN & ALASKA NATIVE RESEARCH 60, 60-61 (1998).

[82] CNAY, *Native American Youth 101* 2 (2012), *available at* https://cnayblog.files.wordpress.com/2016/06/native-american-youth-101_final_2012.pdf (hereinafter "Native American Youth 101").

COMPLAINT

1  Native children are 2.5 times more likely to experience one or more of these conditions as

2  compared to their non-Native peers.[83]

3       164. As a result of the long shadow cast by centuries of discriminatory federal

4  policies, Native children are disproportionately exposed to the chronic effects of

5  unaddressed and unresolved historical trauma and adversity in their communities.  Despite

6  Native communities' persistent efforts to heal, many Native children continue to grow up

7  today in conditions marked by poverty, family disruption, violence, and substance abuse.

8  These conditions are reflective of deep-seeded adversity experienced by Native people in

9  the past, and the cause of ongoing re-traumatization for Native communities in the present,

10  thereby delaying the healing process.

11       165. Native children are forced to grow up in poverty at alarming rates, and they

12  experience profound disruptions in their home environment due to the absence or death of

13  family members.  Havasupai children, in particular, experience poverty at almost double

14  the rate of Native children nationally—and nearly triple that of all children.    An

15  overwhelming 61% of Havasupai children under 18 live below the poverty line,[84] as

16  compared to 32.4% of all Native children,[85] and 21% of all children nationwide.[86]  Native

17  children, and Havasupai children in particular, also disproportionately experience

18  disruption of their families, such as the absence or loss of a parent, leading to lowered

19

20

21

_____

22  [83] NICWA, *Trauma-Informed Care Fact Sheet*, at 1, (Apr. 2014), *available at*
http://mecptraining.org/wp-content/uploads/2015/03/Trauma-Informed-Care-Fact-

23  Sheet.pdf (citing Nat'l Ctr. for Children in Poverty, *Facts About Trauma for Policymakers*
(2007), www.nccp.org/publications/pub_746.html).

24  [84] Arizona Rural Policy Institute et al., *Demographic Analysis of the Havasupai Tribe*

25  *Using 2010 Census and 2010 American Community Survey Estimates* 18, 32,
http://azcia.gov/Documents/Links/DemoProfiles/Havasupai%20Tribe.pdf.

26
[85] Native American Youth 101, *supra* note 82, at 2.

27
[86] Nat'l Ctr. for Children in Poverty, *Child Poverty*, (2016),

28  http://www.nccp.org/topics/childpoverty.html.

COMPLAINT

household incomes.  In Supai, over 42% of all households with children are led by single mothers.[87]

166. This family disruption stems, in part, from the elevated incidents of incarceration, drug or alcohol abuse, and violence experienced and witnessed by Native individuals.  These conditions are powerful indicators of the cumulative and intergenerational impact of childhood adversity and historical trauma.  Native youth, themselves shaped through repeated and early exposure to these conditions, and lacking adequate mental health resources or support, turn to alcohol or drugs as a coping mechanism or begin to act out in school and become involved with law enforcement.  The NICWA has reported that alcohol abuse is more likely to be reported for Native families,[88] and the National Indian Education Association ("NIEA") has reported that Native youth suffer from alcohol and drug abuse rates higher than any other racial group.[89]  Moreover, research has shown that "abuse, domestic violence, and other family dysfunction . . . [are] substantially more common in alcoholic households," and that children growing up in these contexts are more likely to experience adversity and exhibit depression or alcoholism as adults.[90]  This is a serious problem among Havasupai youth who live on the reservation, where drinking alcohol is prohibited.  Recently, two students drank alcohol-based hand sanitizer at school.  One was airlifted out of the canyon for medical treatment, and the other was handcuffed and taken to the local medical clinic.

---

[87] *See* Demographic Analysis, *supra* note 11.

[88] *See* NICWA, Trauma-Informed Care Fact Sheet, *supra* note 83, at 1 (citing Earle, K. and A. Cross, *Child Abuse and Neglect Among American Indian/Alaska Native Children: An Analysis of Existing Data* (2001), *available at* http://muskie.usm.maine.edu/helpkids/rcpdfs/B060041.pdf).

[89] NIEA, *Native Nations and American Schools: The History of Natives in the American Education System* 26 (2016), *available at* http://www.niea.org/nieaflipbook/mobile/index.html#p=26.

[90] Robert F. Anda et al. *Adverse childhood experiences, alcoholic parents, and later risk of alcoholism and depression*. 8 PSYCHIATRIC SERVICES 1001, 1005-06 (2002); Shanta R. Dube et al., *Growing up with Parental alcohol abuse: Exposure to Childhood Abuse, Neglect and Household Dysfunction*. 25 CHILD ABUSE AND NEGLECT 1627, 1628 (2001).

COMPLAINT

167. Due in part to systemic discrimination and lack of access to mental health resources, Native American men and women experience significantly higher numbers of encounters with law enforcement.  They are incarcerated at rates four to six times that of other groups,[91] "making it more likely that [American Indian/Alaskan Native ("AI/AN")] youth live with the trauma of having an incarcerated parent."[92]  As discussed in paragraphs 146-155, *supra*, this disproportionality in the criminal justice system begins with the school-to-prison pipeline, where Native children are singled out for exclusionary discipline, school-based arrest, and referral to law enforcement.  The NCAI has reported that, "[c]ompared to white juvenile offenders, Native youth are 1.5x more likely to be incarcerated and referred to the adult criminal system."[93]  This problem plagues the Havasupai as well.

168. Within Native communities, violence is a manifestation of embedded historical trauma, compounded by poverty, family disruption, substance abuse, and a broken system of criminal justice.  The NCAI reported that Native Americans are 2.5 times more likely to experience violent crimes as compared to all other races,[94] and "violence is more likely to be reported among AI/AN families."[95]  Native women disproportionately

---

[91] Lakota People's Law Project, *Native Lives Matter*, *supra* note 79, at 1.

[92] NICWA, *Trauma-Informed Care Fact Sheet*, *supra* note 83, at 1 (citing The Henry J. Kaiser Family Foundation, *Incarceration Rate per 100,000 men, by state and race/ethnicity,* 2008).

[93] NCAI, *Are Native Youth Being Pushed Into Prisons?*, *supra* note 75, at 2 (citing Arya, N. & Rolnick, A., *A Tangled Web of Justice: American Indian and Alaska Native Youth in Federal, State, and Tribal Justice Systems* (2011)).

[94] NCAI Policy Research Center, *Statistics on Violence Against Native Women* 3 (Feb. 2013), http://www.ncai.org/attachments/PolicyPaper_tWAjznFslemhAffZgNGzHUqIWMRPkCDjpFtxeKEUVKjubxfpGYK_Policy%20Insights%20Brief_VAWA_020613.pdf.

[95] *See* NICWA, Trauma-Informed Care Fact Sheet, *supra* note 83 at 1 (citing Earle, K. and A. Cross, *Child Abuse and Neglect Among American Indian/Alaska Native Children: An Analysis of Existing Data* (2001)).

COMPLAINT

1634975.v1

experience violence, including by non-Natives.[96]  Native youth between the ages of 12 and 17 are exposed to violence at a rate that is 32% higher than the national average,[97] and violence is the leading cause of death among Native youth.[98]  In spite of the efforts of many Native organizations to address these incidents of violence, they are often under-resourced.  Moreover, these incidents are too often cumulative and intergenerational, extending the cycle of suffering and making it harder for Native communities to heal.

169. This data is tragically consistent with the experiences of Plaintiffs.  Havasupai youth have been subject to violence in the classroom.  Plaintiff Levi R., for example, was forcibly restrained in his classroom on August 27, 2013, when he was ten years old and in fifth grade.  During this incident, a teacher sat and lay on Levi R. while he repeatedly cried out and yelled, "I can't breathe.  Get off of me, you're hurting me."[99]  As a young child, Plaintiff Durell P. experienced sexual abuse by a family member who is now incarcerated.

170. Research has documented the extensive mental health needs among Native children that stem from the failure to address historical trauma, discrimination and oppression, and adverse childhood experiences.  Suicide is the second leading cause of

---

[96] NCAI Policy Research Center, *Human & Sex Trafficking: Trends and Responses across Indian Country*, (2016), *available at* http://www.ncai.org/policy-research-center/research-data/prc-publications/TraffickingBrief.pdf  ("Native women experience violent victimization at a higher rate than any other US population . . . more than 1 in 3 (34%) of Native American and Alaska Native women will be raped in their lifetime . . . more than 6 in 10 (61%) will be physically assaulted.").  *See also* NCAI Policy Research Center, *Statistics on Violence Against Native Women*, *supra* note 94, at 3 ("39% of American Indian and Alaska Native women will be subjected to violence by an intimate partner in their lifetimes.").

[97] Ryan Seelau, *Regaining Control Over the Children: Reversing the Legacy of Assimilation Policies in Education, Child Welfare, and Juvenile Justice That Targeted Native American Youth*, 37 AM. INDIAN L. REV., 63, 81 (2013).

[98] *See* CNAY, Fast Facts on Native American Youth and Indian Country 3 (2011), *available at* https://assets.aspeninstitute.org/content/uploads/files/content/images/Fast%20Facts.pdf.

[99] Although the mother of Levi R., Laila R., filed a Suspected Child Abuse/Neglect (SCAN) report in response to the incident, BIE officials have failed to comply with internal agency procedures in investigating and responding to the SCAN report. *See BIE, Suspected Child Abuse/Neglect (SCAN) & Employee Incident Reporting Protocol* (rev. 2009), http://www.rrds.bie.edu/Reporting%20Protocol.pdf.

COMPLAINT

1   death among Native youth, who take their own lives at rates at least 2.5 times the national

2   average.[100]   This challenge affecting many Native communities unfortunately is faced by

3   the Havasupai as well.  Plaintiff Leo R., Levi R.'s brother, has expressed suicidal thoughts.

4/5   ### B.   The Impact of Childhood Adversity and Trauma on Child Development and the Ability to Learn

6   171. As a clinical designation, trauma arises from a multitude of causes—including

7   systemic racism or discrimination; the extreme stress of poverty resulting in the absence of

8   basic necessities; family disruption, such as the absence of a parent due to incarceration,

9   alcoholism or substance abuse; and exposure to violence—and the wide-raging, long-term

10   impacts of this exposure.  Complex trauma stems from an individual child's exposure to

11   multiple persistent sources of violence, loss, and other adverse childhood experiences

12   ("ACEs"), and describes children's exposure to these events and the impact of this

13   exposure.[101]   Unaddressed exposure to trauma can incapacitate a child's ability to learn by

14   altering the sensitive physiology of his or her brain.  The cumulative effect of trauma is to

15   impair the core processing abilities of the brain in areas critical to learning, such as

16   thinking, reading, concentrating, communicating, and regulating emotions.

17   172. Decades of medical research has established that *unaddressed* trauma has

18   profound effects on a child's developing brain.  Research has shown that a substantial

19   percentage of children exposed to violence develop post-traumatic stress disorder

20   ("PTSD") and has linked trauma with mental health conditions such as somatoform

21   disorders, major depression, schizophrenia, and substance abuse and dependence.[102]   But

---

[100] NCAI, *Alcohol & Substance Abuse*, http://www.ncai.org/policy-issues/education-health-human-services/alcohol-substance-abuse.

[101] The terms "trauma" and "complex trauma" are often used interchangeably in this complaint.  Although a child can be profoundly affected by one traumatic experience, Plaintiffs have all experienced complex trauma, which is the subject of most of the academic literature cited.

[102] Bradley D. Stein et al., *A Mental Health Intervention for Schoolchildren Exposed to Violence: A Randomized Control Trial*, 290 J. Am. Med. Ass'n 603, 603 (2003); Bruce D. Perry & Ronnie Pollard, *Homoeostasis, Stress, Trauma, and Adaptation: A Neurodevelopmental View of Childhood Trauma*, 7 Child Adolesc. Psychiatr. Clin. N. Am. 33, 36 (1998).

exposure to traumatic stressors can also cause developmental disruption and consequent educational loss for children, even if they do not meet the threshold for a diagnosable mental health disorder.

173. Researchers have concluded that youth exposed to trauma "experience disrupt[tion] and interfere[nce] with emotional, behavioral, cognitive, social and physical development lead[ing] to important secondary and tertiary effects on the child."[103]  In other words, trauma can lead to palpable, physiological harm to a young person's developing brain.

174. Trauma impairs a child's ability to learn when the resultant brain changes induce behaviors that result from an inability to emotionally self-regulate—including aggression, disproportionate reactivity, impulsivity, distractibility, or withdrawal and avoidance.[104]  These trauma-induced behaviors disrupt the learning environment and frequently lead to exclusionary school-discipline measures or absence from school.

175. Students who are reliving trauma in the classroom or who cannot self-regulate as a result of trauma, and who have not been given access to appropriate resources, may not be able to sit still or concentrate.  They may act out or overreact.  Children affected by trauma are far more likely to be suspended or expelled than children who are not affected by trauma.  As a result, untrained school administrators often suspend and expel those children who most need a supportive school environment.

176. Medical, mental health, and education research has confirmed that unaddressed trauma affects a student's ability to participate and succeed in school. Numerous studies have shown that children exposed to violence demonstrate significantly lower reading ability and grade-point averages, increased absences from school, and overall lower rates of high school graduation.[105]  Research reveals that children exposed to

---

[103] *Id.*

[104] *See* Ray Wolpow et al., *The Heart of Learning and Teaching: Compassion, Resiliency, and Academic Success* 12, 13 (Wa. State Off. of Superintendent of Pub. Instr., 3d prtg. 2016).

[105] *E.g.*, Sheryl Kataoka et al., *Effects on School Outcomes in Low-Income Minority Youth: Preliminary Findings from a Community-Partnered Study of a School Trauma*

Adverse Childhood Experiences ("ACEs")[106] are subject to an escalating array of detrimental educational impacts.  Exposure to two or more such traumas, for example, makes a student 2.67 times more likely to repeat a grade or become disengaged with school.[107]   Exposure to three or more traumas makes a student 4 times more likely to experience academic failure,[108] and 5 times more likely to have serious attendance problems.[109] Students who have witnessed violence, in particular, meet state academic-performance standards only half as often as peers who have not.[110]   As a result, unaddressed trauma is a powerful driver of academic failure.

C.   **Defendants' Failure to Provide Meaningful Access to Education to Havasupai Youth Impacted by Childhood Adversity and Trauma**

177. Defendants have failed to ensure that children impacted by adversity and children with mental health needs are provided meaningful access to public education at Havasupai Elementary School.   As discussed, Havasupai Elementary School has no culturally responsive programming to promote wellness.   It does not train or sensitize

---

*Intervention*, 21 ETHN. DIS. 7 (2011); Nadine J. Burke et al., *The Impact of Adverse Childhood Experiences*, 35 CHILD ABUSE & NEGLECT 408 (2011): Jeffrey Grogger, *Local Violence and Educational Attainment*, 32 J. OF HUMAN RESOURCES 659 (1997).

[106] ACEs are "inherently disruptive experiences in childhood that produce significant and potentially damaging level[s] of stress and associated physical changes." Christopher Blodgett, *Adopting ACES Screening and Assessment in Child Servicing Systems* 1 (working paper, July 2012), https://del-public-files.s3-us-west-2.amazonaws.com/Complex-Trauma-Research-ACE-Screening-and-Assessment-in-Child-Serving-Systems-7-12-final.pdf.

[107] Christina D. Bethel et al., *Adverse Childhood Experiences: Assessing the Impact on Health and School Engagement and the Mitigating Role of Resilience*, 33:12 Health Affairs 2106, 2111 (2014).

[108] *Id.*

[109] Christopher Blodgett, *No School Alone: How Community Risks and Assets Contribute to School and Youth Success, Report to the WA State Office of Financial Management in response to Substitute House Bill 2739* 25 (March 2015).

[110] Christopher C. Henrich et al., *The Association of Community Violence Exposure with Middle-School Achievement: A Prospective StudyProspective Study*, 25 J. APPL. DEV. PSYCHOL. 327 (2004).

teachers or administrative personnel to recognize, understand, and address the complex effects of childhood adversity and trauma in children.  Without such training, school staff are unable to appropriately identify students in need of support, notify their families, or provide adequate interventions that may reduce the impact of trauma and other mental health challenges on learning and student outcomes.  Moreover, culturally sensitive mental health and support services are either entirely unavailable or grossly insufficient to meet student needs.

178. Instead of receiving these and other appropriate resources Havasupai children are subjected to punitive and counter-productive suspensions, expulsions, and referrals to law enforcement that push them out of school, off the path to graduation, and into the criminal justice system.

**D.      Section 504 Requires Defendants to Provide Culturally Responsive Wellness Programming and Mental Health Services at Havasupai Elementary School**

179. Under Section 504, schools are required to meet the needs of those students who are denied meaningful access to the benefits of public education as a result of the effects of childhood adversity.  Appropriate efforts to ensure these children access to educational opportunities must be culturally responsive and consistent with professional standards to ensure childhood adversity does not determine a young person's educational attainment and life chances.

180. Tribal communities, and the Havasupai in particular, have embraced policies and practices to promote wellness which draw on indigenous knowledge and healing practices and the resilience of young people.  For example, Native clinicians working with Havasupai youth, like Mark Standing Eagle Baez, have adopted the Sweetgrass Method, which integrates traditional methodologies into a holistic approach to battling historical trauma and adversity.[111]   This method rests on three core pillars, including cultural

---

[111] Mark Standing Eagle Baez, et al., *H.O.P.E. for Indigenous People Battling Intergenerational Trauma: The Sweetgrass Method*, 5 J. Indigenous Research 1 (2016), http://digitalcommons.usu.edu/kicjir/vol5/iss2/2.

1634975.v1

1  sensitivity, community collaboration, and continuity in the development of relationships

2  between Native communities and wellness professionals.

3      181. Particularly in schools like Havasupai Elementary School that serve

4  populations of students who disproportionately have been impacted by adversity and/or

5  have significant mental health needs, comprehensive school-wide practices are required to

6  address childhood trauma and to create an environment in which all students are able to

7  learn.  Such interventions can effectively address the disabling impact of adverse

8  childhood experiences and give students the meaningful access to the public education to

9  which they are entitled.

10     182. The key components of these school-wide practices include (1) training

11  educators to recognize, understand, and proactively address the effects of complex trauma

12  and childhood adversity, in part through building children's self-regulation and social-

13  emotional learning skills; (2) developing restorative practices that build healthy

14  relationships, peacefully resolve conflicts, and avoid re-traumatizing students through

15  punitive discipline; (3) ensuring the availability of consistent mental health support to meet

16  student needs, and (4) adopting practices and interventions that are responsive to

17  Havasupai cultural beliefs and traditions and are created in partnership with community

18  members.

19     183. Together, these school-wide practices create a safe, consistent, and supportive

20  learning environment that allows students impacted by childhood adversity to learn.

21  Schools that have put such practices in place have shown impressive improvements in

22  student outcomes, with those children receiving appropriate intervention and support at

23  school receiving higher grades and demonstrating better behavior and concentration.[112]

24

---

25  [112] Kataoka, et al., *Effects on School Outcomes*, *supra* note 105, at 6-7; University of

26  California, San Francisco, *UCSF HEARTS Program: Healthy Environments and Response to Trauma in Schools*,  http://coe.ucsf.edu/coe/spotlight/ucsf_hearts.html (last visited May

27  17, 2015); Jane Ellen Stevens, *San Francisco's El Dorado Elementary uses trauma-informed & restorative practices, suspensions drop 8%*, ACES Too High News, (Jan. 28,

28  2014), http://acestoohigh.com/2014/01/28/hearts-el-dorado-elementary.

Research has also indicated that appropriate remedial methods and supports can help mitigate the effects of ACEs.[113]  With this support, Havasupai students can partake in a system of education that allows them to learn effectively in the classroom and meaningfully access a public education.

## VI.   CONSEQUENCES OF DEFENDANTS' FAILURE TO ENSURE ACCESS TO EDUCATION AT HAVASUPAI ELEMENTARY SCHOOL

184. Defendants' failure to provide basic education at Havasupai Elementary School, their failure to establish a system to provide special education and related services so that students with disabilities may access public education, and their failure to support wellness for students who have experienced trauma has had devastating consequences for the educational achievement and life chances of Havasupai students.

185. The federal government's failure to invest in and provide for Native education and wellness in the face of trauma has resulted in stark educational deprivations for Native youth in all educational settings.  According to data released in 2007, an estimated "81% of Indian students read below grade level"[114] and 84% score below "proficient" in math.[115] Native youth "are among the most likely of any group to drop out of school"[116] and Native American adults "have the lowest education levels of any group, and are only half as likely to graduate from high school or college as other adults."[117]  Native American high school graduates are also only half as likely to pursue post-secondary education.[118]  And, of the

---

[113] Bethel, et al., *Adverse Childhood Experiences*, *supra* note 107, at 2112.

[114] S. Rep. No. 91-501, *supra* note 24, at 360.

[115] Jason Amos, *National Indian Education Study: Fewer than One in Five American Indian and Alaska Native Eighth Graders Read at or Above Grade Level*, Alliance For Excellent Education (May 19, 2008), *available at* http://all4ed.org/articles/national-indian-education-study-fewer-than-one-in-five-american-indian-and-alaska-native-eighth-graders-read-at-or-above-grade-level/.

[116] *Cheyenne River Sioux*, 496 F. Supp. 2d at 1066.

[117] *Id.*

[118] The Education Trust, *The State of Education for Native Students* 9, http://edtrust.org/wp-content/uploads/2013/10/NativeStudentBrief_0.pdf.

COMPLAINT

students who do attend college, only 39% complete their degrees, as compared to 62% of white students.[119]

186. Native children at BIE schools have fallen even further behind their peers.[120] Data shows that students in BIE schools perform at levels "far below" Native students at public schools on standardized tests, and that only 40% of BIE students satisfy English proficiency standards.[121]   Compared to an overall Native graduation rate of 69%, only slightly more than half of Native students at BIE schools graduate from high school.[122]

187. Students who attend Havasupai Elementary School are among the most disadvantaged and furthest behind, even among students attending BIE-funded and -operated schools.  Havasupai students perform many years below grade-level, even in the limited content areas such as reading, writing, and mathematics in which curriculum is provided.  For example, Plaintiff Levi R. tested at a second-grade reading level when he was in fifth grade.  Plaintiff Stephen C., who is in sixth grade, can barely read or spell.  It is estimated that fewer than 20% of Havasupai students eventually graduate from high school.

188. According to a graduate of the School, out of the approximately 18 to 21 students in his kindergarten class, only about 5 students graduated from the eighth grade at Havasupai Elementary School.  Of those 5 students, only 3 graduated from high

---

[119] Bruce Covert, *Achievement Gap Widens For Native American Students Amid Progress For Other Groups*, Think Progress (Aug. 14, 2013), http://thinkprogress.org/education/2013/08/14/2465711/achievement-gap-native-americans/.

[120] BIE Study Group: *Blueprint for Reform, BIE Progress Report 2015*, 4-5, *available at* http://www.bie.edu/cs/groups/xbie/documents/document/idc1-030931.pdf.

[121] Robert McCarthy, *The Bureau of Indian Affairs and the Federal Trust Obligation to American Indians*, 19 BYU J. Pub. L. 1, 132 (2004) (citing U.S. Gen. Accounting Office, *BIA and DOD Schools: Student Achievement and Other Characteristics Often Differ from Public Schools*, at 2 (2001)).

[122] BIE, "Blueprint for Reform Implementation: Synopsis of the Reprograming," *available at* http://www.bie.edu/BFRI/index.htm (last visited May 20, 2016) (hereinafter "Synopsis of the Reprogramming").

1634975.v1

1  school, and none attended college.  Two of those 5 students have served time in prison,

2  including one who is still in prison now.

3      189. Although the BIE has failed to adequately collect and disseminate publicly

4  available performance data for the School, available BIE data shows that in the 2012-2013

5  school year, Havasupai Elementary School students performed at the **1st percentile in

6  reading and 3rd percentile in math**, based on a median percentile rank of 1 to 100.[123]

7  Moreover, BIE data reflects that Havasupai Elementary School students experienced a

8  ***large negative growth index*** of **-.72** and **-.71** in reading and math, respectively, meaning

9  that the academic progress made by individual Havasupai Elementary School students as

10  they continued to attend the School was approximately 0.7 standard deviations lower than

11  expected.[124]  The BIE itself characterizes -0.8 as "a large difference between the student's

12  actual gains and his or her growth projections," that is, "***well-below average gains made by***

13  ***the student.***"[125]  This performance placed the School dead last in both reading and math

14  achievement out of nearly 60 BIE schools surveyed.  Moreover, BIE data from two

15  consecutive school years running from 2011 through 2013 indicate that only about 15% of

16  Havasupai students achieved grade-level proficiency in reading, and that not a single one

17  achieved grade-level proficiency in math.[126]

18      190. As a result, Havasupai students arrive at the secondary-school level

19  unprepared for high school-level work and years behind their peers who were provided

20  appropriate education in the elementary and middle school years.  Because no high school

21  instruction is available for Havasupai students in the community, students who have

22  completed eighth grade must apply to BIE high schools—most of which are boarding

23  _____

24  [123] Northwest Education Evaluation Association, *BIE Report on Student Achievement and Growth*, *supra* note 3, at 56, 58.

25  [124] *Id.*

26  [125] *Id.* at 17.

27  [126] BIE Division of Performance and Accountability, *Annual Report: Havasupai*

28  *Elementary School* 2,3 (2013), http://www.bie.edu/cs/groups/xbie/documents/text/idc1-026335.pdf.

1634975.v1

schools with entrance requirements—or seek transfers to public schools outside of the canyon.  Because of the substandard education provided at Havasupai Elementary School, students have repeatedly been unable to meet coursework and credit requirements or the basic proficiency standards necessary to attend BIE high schools.

191. Havasupai Elementary School students who are admitted to a secondary school typically struggle academically because they lack basic elementary education.  For example, Plaintiff Leo R. is currently enrolled in an Arizona public high school, after completing grades kindergarten through eighth grade at Havasupai Elementary School.  In ninth grade, his first year in public high school, he struggled academically, failing multiple classes and passing others with D's.

192. Families in the Havasupai community fear that children attending Havasupai Elementary School will not be able to gain admission to a secondary school or that they will not successfully complete high school as a result of the educational deprivations at Havasupai Elementary School.  As a result, multiple families with young children in kindergarten through eighth grade who otherwise would have attended Havasupai Elementary School have been compelled to leave their community in order to provide their children meaningful access to education.

**VII.  THE FEDERAL GOVERNMENT'S KNOWLEDGE OF ITS FAILURE TO DELIVER GENERAL AND SPECIAL EDUCATION, AND ITS DELIBERATE INDIFFERENCE TOWARD EDUCATIONAL NEEDS**

193. For decades, the federal government has stood witness to profound disparities in the educational resources and outcomes of Native students.  These disparities were created and exacerbated by a long history of federal failings in tribal education, notably through the systemic devastation and anguish of the boarding-school era.

194. In the words of a 2014 White House report, "there is a history of deeply troubling and destructive federal policies and actions that have hurt Native communities, exacerbated severe inequality, and accelerated the loss of tribal cultural traditions.  The

1634975.v1

repudiated federal policies regarding the education of Indian children are among those with a devastating and continuing effect on Native peoples."[127]

195. As First Lady Michelle Obama acknowledged in a 2015 speech at the White House, "given this history, we shouldn't be surprised at the challenges that kids in Indian Country are facing today.  And we should never forget that we played a role in this.  Make no mistake about it – we own this."[128]

196. Numerous current and former DOI and BIE leaders have acknowledged the failures in tribal education.  They have also been made specifically aware of the problems at Havasupai Elementary school.  Yet they have not acted to meaningfully correct them.  This amounts to deliberate indifference to the educational needs of all Native students, and particularly to the needs of Native students who require special education services.

### A.   Defendants are aware of and have acknowledged their longstanding failure to provide Native youth with basic education.

197. The failure of BIE schools to provide Native students with adequate educational opportunities is widely recognized by Defendants and the federal government more broadly.

198. Top officials at the Department of Education have acknowledged the longstanding nature of the problem.  In 2015, Secretary of Education John King declared that "[t]here is a painful history and a failure on the past [*sic*] of the country to serve

---

[127]  Executive Office of the President, *2014 Native Youth Report*, 4 (Dec. 2014), https://www.whitehouse.gov/sites/default/files/docs/20141129nativeyouthreport_final.pdf.

[128]  Michelle Obama, *Prepared Remarks of First Lady Michelle Obama for White House Convening on Creating Opportunity for Native Youth* (Apr. 8, 2015,), https://www.whitehouse.gov/the-press-office/2015/04/08/prepared-remarks-first-lady-michelle-obama-white-house-convening-creatin.

1634975.v1

1   Native youth well."[129]   His predecessor, former Secretary Arne Duncan, declared bluntly

2   that the BIE educational system was "the epitome of broken . . . just utterly bankrupt."[130]

3   199. So, too, have BIE officials.  During a 2013 hearing before the Senate Indian

4   Affairs Committee, Defendant Jewell openly acknowledged, "Indian education is an

5   embarrassment to you and us."[131]   Deputy Assistant Secretary – Indian Affairs, Anne

6   Marie Bledsoe Downs, who was also until November acting director of the BIE, admitted,

7   "We have some pretty dire statistics out there on graduation rates across all of Indian

8   Country, but in particular within our schools."[132]   As Monty Roessel, the previous director

9   of the BIE, recognized, the "BIE has been a big failure. I don't think you can find success

10   in BIE in anything."[133]

11   200. The BIE acknowledged only last year, "[t]he DOI has a longstanding and

12   troubling history of failing to provide a high quality education to American Indian students

13   in BIE-funded schools."[134]   In outlining the extent of the problems facing Native students,

14   the BIE rattled off a litany of alarming facts: that "Native youth have the lowest high

15   school graduation rate of students across all schools," that "the American Indian/Alaskan

16   Native high school graduation rate is 69 percent, far below the national average of

17   81 percent," and that "the situation for the eight percent of Native students attending [BIE]

18

19   [129] Lauren Camera, *Native American Students Left Behind*, U.S. News (Nov. 6 2015,), http://www.usnews.com/news/articles/2015/11/06/native-american-students-left-behind.

20
21   [130] Maggie Severns, *How Washington Created Some of the Worst Schools in America*, Politico (Nov. 25, 2015,), http://www.politico.com/story/2015/11/how-washington-created-the-worst-schools-in-america-215774.

22
23   [131] *Receiving the Views and Priorities of Interior Secretary Sally Jewell with Regard to Matters of Indian Affairs*, 113th Cong. 113-92 (2013) (statement of Sally Jewell, Secretary of the Interior), https://www.gpo.gov/fdsys/pkg/CHRG-113shrg85178/html/CHRG-113shrg85178.htm.

24
25   [132] Corey Mitchell, *Bureau of Indian Education Extends Search for New Leader*, Education Week (Jul. 12, 2016,), http://blogs.edweek.org/edweek/learning-the-language/2016/07/bureau_of_indian_education_ext.html.

26
27   [133] Carrie Jung, *BIE Officials Hope School Reform Will Lead To Better Student Outcomes*, KJZZ (Dec. 3, 2015,), http://kjzz.org/content/226933/bie-officials-hope-school-reform-will-lead-better-student-outcomes.

28   [134] BIE, *Synopsis of the Reprogramming*, *supra* note 122.

COMPLAINT

schools is much worse with an average graduation rate of 53 percent."[135]  It summarized the problem as follows: "Failing schools, crumbling infrastructure, failure to include tribal nations in the decision-making process and lack of access to broadband and teachers and principals shortages contribute to the urgency of the situation."[136]

201. Other federal government reports have similarly recognized the problem.  A 2014 White House report highlighted pervasive educational failures in Native education, noting that "American Indians and Alaska Natives continue to have worse educational outcomes than the general population by nearly all measures."[137]  According to 2014 DOE data, Native kindergarteners are held back at a rate twice that of white kindergarteners.[138] Moreover, the report observed  that "Native students score far lower than other students on national tests; [and] the gap in reading and math test scores between Native and white students is more than half of a standard deviation throughout their educational careers."[139]

202. The White House report then turned to the specific problems at BIE schools. It noted that over one-third of BIE schools are in poor condition, and nearly 30% are over 40 years old.[140] In addition, a staggering 60% of BIE-funded schools still lack "adequate digital bandwidth or computers to meet the requirements of new assessments aligned to college and career ready standards."[141]  As a consequence, students at BIE-funded schools significantly underperformed, even compared to Native students attending public schools.

203. As discussed at length in the 2013 GAO report, comprehensive data from the DOE's National Center for Education Statistics reveal that "in 4th grade, BIE students on average scored 22 points lower for reading and 14 points lower for math" than Native

---

[135] *Id.*

[136] *Id.*

[137] Executive Office of the President, *2014 Native Youth Report*, *supra* note 127, at 14.

[138] *Id.* at 16.

[139] *Id.* at 15.

[140] *Id.* at 16-17.

[141] *Id.* at 17.

COMPLAINT

students in public schools."[142]  This pattern of underperformance held true even in a range of state educational assessments, where students at BIE schools consistently scored less than Native students at public schools.[143]

204. These problems are longstanding, and Defendants have been aware of them for more than a decade.  A 2001 investigative report by the GAO, for example, found that students in BIE schools performed "far below the performance" levels of Native public school students on standardized tests, that approximately 60% of BIE students had limited English proficiency, and that one in five BIE students were enrolled in special education.[144]  Moreover, drop-out rates for BIE students were twice as high as the national average.[145]

205. At the root of these problems is a severe and recognized shortage in BIE staffing.  The GAO found that approximately 40 percent of BIE regional facility jobs, including key administrative and technical support staff, remained vacant in 2015, forcing other staff members with limited expertise and training to fill the gaps.[146]  The result is that the BIE is unequipped to provide critical administrative support services to its schools, leading to "confusion among schools about whom to contact about problems, as well as delays in the delivery of key educational services and supplies, such as textbooks."[147]

206. The BIE's inability to provide administrative support to reinforce core

---

[142] GAO Report, *Indian Affairs: Better Management and Accountability Needed to Improve Indian Education* 6, GAO-13-774 (Sept. 2013), http://www.gao.gov/assets/660/658071.pdf (hereinafter "2013 GAO Report").

[143] *Id*. at 8.

[144] GAO, *BIA and DOD Schools: Student Achievement and Other Characteristics Often Differ from Public Schools'* 10, 12, GAO-01-934 (2001), http://www.gao.gov/new.items/d01934.pdf.

[145] *Id*. at 14.

[146] GAO, *Further Actions on GAO Recommendations Needed to Address System Management Challenges in Indian Education*, GAO-15-539T (Apr. 2015), http://www.gao.gov/assets/670/669784.pdf (hereinafter, "2015 GAO Report").

[147] 2015 GAO Report, *supra* note 146.

educational functions is particularly troubling.  For example, the GAO concluded in 2015 that BIE schools were not complying with binding special education regulations due to the BIE's failure to provide those schools with sufficient administrative guidance and support.[148]  Similarly, the 2013 GAO report highlighted the BIE's failure to provide its schools with Adequate Yearly Progress (AYP) scores, which are used to measure student performance and guide federal funding decisions.[149]  In some cases, BIE officials wholly failed to administer the appropriate assessments.  The GAO concluded that the BIE's inability to comply with these national testing and reporting requirements impaired the ability of its schools to assess student progress and implement academic reforms.

207. For years, the GAO has also flagged the absence of effective BIE oversight or accountability, leading to the misappropriation of millions of dollars in federal funds earmarked for improvements to BIE schools.  In a 2015 report, the GAO concluded that the "BIE's oversight did not ensure that school funds were spent appropriately on educational services, although external auditors had determined that there were serious financial management issues at some schools.  Specifically, auditors identified $13.8 million in unallowable spending by 24 BIE schools as of [the first half of 2014]."[150]

208. This lack of financial oversight exacerbates the severe budgetary needs of many BIE schools, whose physical infrastructure is crumbling, unsafe, and unsanitary.[151] The GAO reported that funding shortfalls sometimes have forced schools to spend their

---

[148] 2015 GAO Report at 14-16.

[149] 2013 GAO Report, *supra* note 142, at 1.

[150] 2015 GAO Report, *supra* note 146, at 20.

[151] GAO, *Preliminary Results Show Continued Challenges to the Oversight and Support of Education Facilities* 11-13, GAO-15-389T (2015), http://www.gao.gov/assets/670/668746.pdf ("At another school, we observed a dormitory for elementary school students built in 1941 with cramped conditions, no space for desks, poor ventilation, and inadequate clearance between top bunks and sprinkler pipes in sleeping areas. School officials noted that students had received head injuries from bumping their heads on the pipes and some students had attempted suicide by hanging from them.").

educational funds on urgent maintenance or to defer much-needed maintenance just to keep the lights on and heat running in the winter.[152]   At one BIE school, the GAO documented the existence of a leaking ceiling that continued unabated for four years, causing mold to take hold in several classrooms.[153]

209. As Defendants have been long aware, their chronic failure to deliver adequate educational opportunities to Native children has devastating consequences on Native communities. In 2015, the GAO specifically admonished the BIE that "[u]nless steps are promptly taken to address these challenges to Indian education, it will be difficult for Indian Affairs to ensure the long-term success of a generation of students."[154]   Yet the GAO's detailed recommendations to address these challenges, which Defendants generally agreed with, still remain unimplemented. This is a textbook example of deliberate indifference to student needs.

### B. The federal government has acknowledged the harmful impacts of complex trauma and childhood adversity on education in Native communities.

210. The federal government has repeatedly recognized the impacts of complex trauma on Native youth and the need for wellness and mental health services as a result of trauma.  Most recently, a BIA official testifying before the Senate Committee on Indian Affairs acknowledged the persistence of these problems and the need to address trauma and mental health challenges in Native communities, including historical trauma.[155]   As part of this testimony, the BIA openly declared, "[t]here is no more important issue than addressing the high suicide rate in Indian Country, particularly among youth, which is

---

[152] 2015 GAO Report, *supra* note 146, at 13-14.

[153] *Id.* at 16.

[154] *Id.* at 21.

[155] *Senate Committee on Indian Affairs Oversight Field Hearing on "Addressing Trauma and Mental Health Challenges in Indian Country,"* 114th Cong. (Aug. 17, 2016) (statement of Darren Cruzan, Director, Office of Justice Services, Bureau of Indian Affairs, DOI), http://www.bia.gov/cs/groups/xocl/documents/text/idc2-042403.pdf.

often the result of an individual's exposure to trauma."[156]

211. As early as 2001, the BIE and the Centers for Disease Control conducted a study evaluating tobacco, alcohol, and other drug use among students in BIE-funded high schools and found that "a substantial number of high school students at BIA-funded schools engage in behaviors that put them at risk for premature death and disability."[157]

212. Subsequent congressional findings in the 2010 Tribal Law and Order Act only reinforced the urgency to combat the prevalence of sources of adversity within Native communities.  These findings highlighted "significant increases in instances of domestic violence, burglary, assault, and child abuse as a direct result of increased methamphetamine use on Indian reservations."[158]  In addition, the findings announced that violence against Native women had "reached epidemic proportions," declaring that "34 percent of American Indian and Alaska Native women will be raped in their lifetimes," and that "39 percent of American Indian and Alaska Native women will be subject to domestic violence."[159]

213. Further federal reports illustrate the harmful consequences of childhood adversity for Native communities.  According to a 2014 report issued by the Justice Department, "[t]he immediate and long-term effects of this exposure to violence include[] increased rates of altered neurological development, poor physical and mental health, poor school performance, substance abuse, and overrepresentation in the juvenile justice system.  This chronic exposure to violence often leads to toxic stress reactions and severe

---

[156] *Id.* at 3.

[157] BIA & Centers for Disease Control, *Tobacco, Alcohol, and Other Drug Use Among High School Students in Bureau of Indian Affairs--Funded Schools --- United States, 2001,* (Nov. 7, 2003)*,* http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5244a3.htm.

[158] Tribal Law and Order Act of 2010, Pub. L. 111–211, § 202(a)(5)(A), 124 Stat. 2261, 2262,
 https://www.congress.gov/111/bills/hr725/BILLS-111hr725enr.pdf.

[159] *Id*., § 202(a)(5)(C).

COMPLAINT

1634975.v1

trauma; which is compounded by historical trauma."[160]   Because of the overwhelmingly high rates of violence, and the lack of resources available to those communities, the report concluded that "service providers and policy makers should assume that *all* AI/AN children have been exposed to violence."[161]

214. To address this situation, the Justice Department report specifically recommended that schools conduct trauma screenings, implement culturally sensitive and trauma-informed practices, and offer behavioral health services.[162]   A 2014 White House report echoed these same recommendations and advised expanding mental health services in Native communities to combat the persistence of youth suicides.[163]

215. In light of these findings, Defendants are well acquainted with the serious consequences associated with complex trauma and childhood adversity in Native communities and with the critical need for improved practices and increased resources to effectively address them.   Defendants have not, however, adopted better practices or increased resources.

C.   **The federal government is aware of the chronic educational needs of students at Havasupai Elementary School.**

216. These same widespread and longstanding problems have plagued the ability of Havasupai Elementary School to provide even a basic and minimally adequate education to Havasupai students.

217. Defendants have long been aware of the inadequacy of the education delivered to students at the School.   Members of the Havasupai Tribal Council have traveled to Washington, D.C. to meet with top BIE and DOI officials on multiple occasions including, most recently, for a face-to-face meeting in April 2016 with the then-Acting Director of

---

[160] Attorney Gen.'s Advisory Comm'n, *Ending Violence so Children Can Thrive*, *supra* note 74, at 16.

[161] *Id.*

[162] *Id.* at 23-24, 41.

[163] Executive Office of the President, *2014 Native Youth Report*, *supra* note 127, at 35-36.

1634975.v1

the BIE, Ann Marie Bledsoe Downes.  The former Director of the BIE has also visited Havasupai within the last several years, as have many other BIE and DOI officials from Washington and regional offices.  During all of these meetings, members of the Havasupai Tribe have explained the problems facing the school and the need for the BIE to act.

218. In addition, the BIE's Division of Performance and Accountability recently engaged in a "discussion on schools with intensive needs such as Havasupai."[164]  Over the years, Havasupai parents and families, as well as members of the School Advisory Board and tribal council, have also complained to the BIE about the inadequacy of their children's education and the mismanagement of the school by BIE staff.  For example, Laila R., the mother of Plaintiffs Leo R. and Levi R., has helped draft and circulate written grievances concerning the school to BIE officials, including former BIE director Monty Roessel, Arizona BIE education program administrator Jim Hastings, and former school principal Coleen Maldonaldo.

219. Although Defendants have been responsible for running the School, they have taken no discernable steps to address significant disparities in the quality of the educational opportunities afforded to Havasupai students.

220. For example, while Defendants are aware of the failure to offer a comprehensive general education curriculum, including culturally relevant instruction, at the School they have done nothing to provide more than basic instruction in reading, writing, and math to students.

221. Defendants are aware, and have been aware for years, of the disproportionately high teacher turnover at the School and its destructive consequences for student learning. Yet they continue to allow students to lose significant learning time due to chronic shortages and instability in the teaching staff.

222. Defendants are aware of the severe lack of textbooks and basic learning materials at the School. They are aware that students must rely instead on photocopied

---

[164]  BIE Special Education Advisory Board, *Regular Meeting Minutes* 2, (Sept. 17-18, 2015), http://www.bie.edu/cs/groups/xbie/documents/text/idc1-032733.pdf.

1634975.v1

sheet of papers for homework and that the school offers no library access for students. Despite this knowledge, Defendants have taken no affirmative steps to address these deficiencies.

223. While Defendants are aware that the School lacks a system for the identification and assessment of students with disabilities and the capacity to provide special education, it has done nothing to remedy the situation. Defendants are aware that there are straightforward remedial measures, including employing personnel with training in delivering special education services or providing a special classroom for students with more intensive needs. Yet Defendants have failed to take such steps and has instead allowed the loss of learning time and adequate instruction for students with disabilities to continue unabated.

224. Defendants are aware that the School is located in an area where children experience elevated rates of violence, family disruption, substance abuse, and poverty, and that such adverse conditions create mental health effects on students that the School is not equipped to address. Despite this knowledge, Defendants have failed to take affirmative steps to address these deficiencies. Instead of providing resources to address students' unmet mental and social-emotional needs, the School has often deprived those students of valuable instruction through punishment, expulsion, and suspension.

225. Defendants' actions and inactions resulting in the creation and exacerbation of these educational deficiencies are deliberate and conscious, in that they are aware of the causes of these deficiencies, yet have failed to establish any system to monitor, identify, and remedy identified inadequacies.

226. The BIE's failure to address educational disparities at Havasupai Elementary School violates its duty as the ultimate guarantor of the fundamental educational rights of Native children.

227. In February 2016, Secretary of Education King declared before the National Congress of American Indians that, "We cannot afford to throw away any of our

1634975.v1

children."[165]   Yet Defendants' persistent indifference to the plight of Havasupai children does precisely that.  Reforms and remedial practices must be implemented by Defendants to ensure that Havasupai students have access to the educational opportunities that they deserve and to remedy the harmful deprivation of educational opportunities that they have endured.  It is equally critical that these remedial efforts are conducted in a manner that is consistent with tribal beliefs, thought, and philosophy and respectful of cultural standards.

## STANDING OF THE NATIVE AMERICAN DISABILITY LAW CENTER

228. Plaintiff NADLC has standing to sue. NADLC is a non-profit corporation headquartered in Farmington, New Mexico.

229. NADLC is a Protection and Advocacy Organization authorized by the Protection and Advocacy for Individuals with Developmental Disabilities Act, 42 §§ U.S.C. 15041 *et seq*.

230. Since 1995, the NADLC has been the only Protection and Advocacy Organization in the United States established pursuant to designation by Native American tribes, rather than by a State.

231. NADLC serves Native Americans with disabilities who reside in the Four Corners area of the United States, roughly comprising the states of New Mexico, Arizona, Utah and Colorado.

232. NADLC's mission is to advocate for Native Americans with disabilities in order to strengthen and enforce their rights and bring them into harmony with their communities.

233. NADLC is managed and controlled by a Board of Directors.  The current Board includes seven persons who are enrolled members of a federally recognized Native American Tribe, four persons who have least one family member with a mental illness, two persons with a disability, and two persons who are mental health professionals.  At

---

[165] NCAI, *2016 Executive Council Winter Session Newsletter* 2 (Feb. 22-24, 2016), http://www.ncai.org/conferences-events/ncai-events/ECWS2016_Final_Wrap_Up_Newsletter.pdf.

COMPLAINT

1634975.v1

least three members of NADLC's Board have children who now receive or have in the past received special education and related services.

234. Six members of NADLC's Board of Directors constitute the Advisory Council mandated by the Protection and Advocacy for Mentally Ill Individuals Act of 1986, 42 U.S.C. §§ 10801 *et. seq*. As required by law, 60% of the members of that Advisory Council, including its chairperson, are individuals who have received or are receiving mental health services or are family members of such individuals.

235. Helping students with disabilities obtain access to public education and a general education curriculum, specialized instruction, and related services has always been a high priority service for NADLC, and it has consumed a substantial portion of NADLC's resources. In Fiscal Year 2015, for example, more than 25% of the requests for services received by NADLC related to special education. Those services have included advocating for students in the school setting, representing students in administrative and judicial proceedings, and other education, outreach, investigation, and advocacy efforts.

236. Havasupai students whose families have sought assistance from NADLC have been denied access to public education by Defendants, including access to the required general education curriculum, special education and related services, and needed mental health services. Defendants' practices therefore frustrate NADLC's mission to guarantee such students the right to an adequate public education.

237. NADLC has received at least eight requests for assistance concerning the failure of Havasupai Elementary School to provide special education instruction, related services, and appropriate resources to enable students with disabilities to participate in public education. NADLC provided legal assistance to a student with a disability in four of those cases.

238. NADLC has filed two administrative "due process" complaints relating to Havasupai Elementary School's failure to provide appropriate special education and related services. Both of those cases were settled, and in both cases the BIE failed to provide the student with the services promised in the Settlement Agreement.

239. NADLC then represented one of those students, Plaintiff Levi R., in filing a formal complaint against the BIE for its failure to implement the Settlement Agreement. The administrative body hearing that complaint found that the BIE had in fact failed to honor its commitment contained in the Settlement Agreement and ordered the BIE to take corrective action.  To date, 13 months later, the BIE has failed to do so.

240. In another instance, School staff retaliated against an NADLC client for advocating for her child.  NADLC sent formal notice to the School's then-principal, BIE officials, and the BIE's attorney in October 2015 putting the BIE on notice that it was unlawful under federal law to retaliate against a parent advocating for a child.

241. In addition to such individual advocacy that NADLC has provided its clients, NADLC filed a Freedom of Information Act ("FOIA") request to obtain public records from the BIE about Havasupai Elementary School. NADLC filed the FOIA request on May 21, 2015.  To date, NADLC has received only a partial response from the BIE.  In July 2016, NADLC requested assistance from the U.S. Office of Government Information Services ("OGIS") in obtaining a substantive response from the BIE.  OGIS indicated in August 2016 that the BIE anticipated providing a complete response to the FOIA request by September 16, 2016.  To date, despite the BIE's assurances to OGIS, NADLC has not received anything further from the BIE in response to the FOIA request.  On October 31, 2016, NADLC filed a formal appeal before the Department of Interior's FOIA and Privacy Act Appeals Office challenging the federal government's failure to respond to its May 21, 2015 FOIA request.

242. NADLC has devoted significant organizational resources to identifying and counteracting Defendants' practices, including investigation, education, outreach, and advocacy.  As a direct consequence, Defendants' practices have caused NADLC to divert its scarce resources from other efforts to promote and protect the rights of Native Americans with disabilities.  Continued advocacy on behalf of Havasupai students with disabilities against Defendants will significantly diminish NADLC's resources and impact its ability to serve other Native Americans with disabilities in the Four Corners area.

1634975.v1

243. NADLC is authorized under the Protection and Advocacy for Individuals with Developmental Disabilities Act to initiate legal action designed to protect the rights of persons with developmental disabilities. 42 U.S.C. §§ 15041-15045.

244. NADLC is also authorized under the Protection and Advocacy of Individuals with Mental Illness Act to initiate legal action designed to protect the rights of persons with mental illness. 42 U.S.C. §§ 10801-10807, 10821-10827.  NADLC is governed by representatives of its client community and is committed to ensuring access to public education for Native students with disabilities.

## FIRST CAUSE OF ACTION

## (FAILURE TO TAKE ACTION REQUIRED TO PROVIDE BASIC EDUCATION

## (5 U.S.C. §  706(1)))

### (All Plaintiffs against All Defendants)

245. Plaintiffs incorporate and reallege the allegations set forth in paragraphs 1 through 244 as if set forth fully here.

246. Under the Administrative Procedure Act, 5 U.S.C. § 706(1), a party aggrieved by agency action may bring an action requiring a court to "compel agency action unlawfully withheld or unreasonably delayed."

247. Havasupai Elementary School is operated by the Defendants.  Defendants are obligated to provide an education to Havasupai children that meets basic educational standards and enables students to access post-secondary educational opportunities.

248. Defendants must provide Native American children with "with educational opportunities that equal or exceed those for all other students in the United States." 25 U.S.C.  §  2001(a)(1).   They  must  also  provide  education  that  is  "adequate,"[166] "comprehensive,"[167] "of the highest quality,"[168] and offers "the basic elementary and

---

[166] 25 C.F.R. § 32.4(r).

[167] 25 C.F.R. § 32.3 (codified into law under 25 U.S.C. § 2003).

[168] 25 U.S.C. § 2000.

COMPLAINT

1634975.v1

1  secondary educational needs."[169]   Providing an education meeting these standards is a

2  critical component of Defendants' trust responsibility for Native American students.  *See*

3  *Navajo Nation*, 537 U.S. at 506.

4       249. Defendants must provide a program at Havasupai Elementary School that

5  complies with regulations specifically setting forth the governing educational philosophy,

6  enumerating the instructional content that must be covered, and describing the educational

7  concepts that must be incorporated into the curriculum.

8       250. Defendants must comply with 25 C.F.R. § 36.20, which requires providing an

9  educational program including multi-culture and multi-ethnic dimensions designed to

10 enable students to function effectively in a pluralistic society; assessing students' language

11 abilities and providing instruction in English and the primary native language of the

12 students, as appropriate; including aspects of the native culture in each aspect of the

13 curriculum; assessing the learning styles of students and providing instruction based on

14 that assessment; and scheduling at least one field trip per student per year.

15      251. Defendants must comply with 25 C.F.R. § 36.21, which outlines the minimum

16 requirements for kindergarten, including, *inter alia*, a curriculum that emphasizes language

17 development and the development of positive feelings as well as instruction in

18 "exploration of the environment (number, space and time relationships, natural science)"

19 and "psychomotor and socialization development."

20      252. Defendants must comply with 25 C.F.R. § 36.22, which outlines the minimum

21 requirements for grades one through six.  Thus, Defendants must provide instruction in six

22 subjects, including language arts, social studies, and fine arts, as well as five content areas

23 that must be integrated into the curriculum, such as computer literacy and metric

24 education.

25      253. Defendants must comply with 25 C.F.R. § 36.23, which outlines the minimum

26 requirements for grades 7 and 8.  Thus, Defendants must provide instruction in five general

27

28 [169] *Id.*

COMPLAINT

1634975.v1

1   content areas, such as "career exploration and orientation," and seven instructional content

2   areas.  Among other requirements, "one unit [of science] shall be required of each student

3   every year."

4       254. Defendants must also comply with other regulations governing staffing and

5   administrative      requirements,[170]      grading      requirements,[171]      student      promotion

6   requirements,[172] additional programming requirements (e.g. "each school shall provide a

7   library/media program"),[173] textbooks,[174] behavioral health services,[175] extracurricular

8   activities,[176] evaluation and monitoring requirements,[177] and student rights and due process

9   protections.[178]

10      255. Defendants have failed to take required discrete actions to comply with these

11  regulations and to satisfy their obligations to provide an adequate education to Havasupai

12  children.

13      256. These unlawful failures to act include, but are not limited to, the following:

14          a.    Defendants have not provided instruction in social studies;

15          b.    Defendants have not provided instruction in fine arts;

16          c.    Defendants have not provided instruction in science;

17          d.    Defendants have not provided instruction in computer literacy;

---

[170] 25 C.F.R. § 36.11.

[171] 25 C.F.R. § 36.30.

[172] 25 C.F.R. § 36.31.

[173] 25 C.F.R. § 36.40.

[174] 25 C.F.R. § 36.41.

[175] 25 C.F.R. §§ 36.42, 36.42(b) ("Each school shall offer student counseling services concerned with physical, social, emotional, intellectual, and vocational growth for each individual. Counseling services shall be included in a school-wide assessment program" and "each counseling program shall provide . . . [p]reventative and crisis counseling on both individual and group bases . . .").

[176] 25 C.F.R. § 36.43.

[177] 25 C.F.R. §§ 36.50, 36.51.

[178] 25 C.F.R. § 42.1, *et seq.*

1634975.v1

1             e.      Defendants have not provided instruction in career exploration and
2 orientation;

3             f.      Defendants have not provided a library/media program;

4             g.      Defendants have not provided adequate textbooks and instructional
5 materials;

6             h.      Defendants have not provided behavioral health services;

7             i.      Defendants have not provided extracurricular activities;

8             j.      Defendants have not adequately staffed Havasupai Elementary
9 School;

10             k.      Defendants have not assessed the English and native language
11 abilities of students at Havasupai Elementary School;

12             l.      Defendants have not provided instruction in the Havasupai language;

13             m.      Defendants have not included aspects of the Havasupai culture in all
14 aspects of the curriculum;

15             n.      Defendants have not evaluated the learning styles of students at
16 Havasupai Elementary School;

17             o.      Defendants have not provided one field trip, per student, per year at
18 Havasupai Elementary School;

19             p.      Defendants have not developed a student handbook including policies
20 and disciplinary procedures or communicated those policies and procedures to students
21 and their families;

22             q.      Defendants have not established dispute resolution procedures to be
23 used in lieu of formal student discipline; and

24             r.      Defendants have not established a procedure for formal disciplinary
25 hearings that provides notice and a hearing.

26       257. Plaintiffs, including NADLC, have been aggrieved by these failures to act
27 because Havasupai children have been deprived of the educational opportunities to which
28 they are entitled, and they have not been adequately prepared for the transition to high

COMPLAINT

1  school.

2      258. Plaintiffs have suffered an irreparable injury that could not be adequately

3  compensated by a remedy at law, the balance of the hardships between the parties warrant

4  an equitable remedy, and the public interest would not be disserved by an equitable

5  remedy.

6      259. Plaintiffs were not required to exhaust administrative remedies in order to

7  bring this claim.  Under 5 U.S.C. § 704, agency action is final and subject to an APA

8  challenge in court, unless the agency by rule requires an administrative challenge "and

9  provides that the action meanwhile is inoperative."  BIA regulations permit administrative

10 appeals, but they do not require such appeals before filing suit, and they do not make

11 decisions inoperative pending appeal.  Rather, agency decisions are final if they have not

12 been appealed within 30 days. 25 C.F.R. §§ 2.6, 2.8.  Moreover, exhaustion cannot be

13 required on a claim that, like this one, arises under § 706(1) of the Administrative

14 Procedure Act.  Section 706(1) is meant to address situations in which there has been no

15 formal request for agency action, whereas § 706(2) applies when agency action has been

16 requested and rejected.

17     260. Plaintiffs are entitled to appropriate relief.

18              **SECOND CAUSE OF ACTION**

19  **(FAILURE TO PROVIDE BASIC EDUCATION (5 U.S.C. §  706(2)))**

20          **(All Plaintiffs against All Defendants)**

21     261. Plaintiffs incorporate and reallege the allegations set forth in paragraphs 1

22 through 260 as if set forth fully here.

23     262. Under the Administrative Procedure Act, 5 U.S.C. § 706(2), a party aggrieved

24 by agency action may bring an action requiring a court to "hold unlawful and set aside

25 agency action, findings, and conclusions found to be . . .  arbitrary, capricious, an abuse of

26 discretion, or otherwise not in accordance with law."

27     263. Havasupai Elementary School is operated by Defendants.  Defendants are

28 obligated to provide an education to Havasupai children that meets basic educational

-87-
COMPLAINT

1634975.v1

1    standards and enables students to access post-secondary educational opportunities.

2         264. Defendants must provide Native American children with "with educational

3    opportunities that equal or exceed those for all other students in the United States."

4    25 U.S.C. § 2001(a)(1).    They must also provide education that is "adequate,"[179]

5    "comprehensive,"[180] "of the highest quality,"[181] and offers "the basic elementary and

6    secondary educational needs."[182]    Providing an education meeting these standards is a

7    critical component of Defendants' trust responsibility for Native American students.  *See*

8    *Navajo Nation*, 537 U.S. 506.

9         265. Defendants must provide a program at Havasupai Elementary School that

10   complies with regulations specifically setting forth the governing educational philosophy,

11   enumerating the instructional content that must be covered, and describing the educational

12   concepts that must be incorporated into the curriculum.

13        266. Defendants must comply with 25 C.F.R. § 36.20, which requires providing an

14   educational program including multi-culture and multi-ethnic dimensions designed to

15   enable students to function effectively in a pluralistic society; assessing students' language

16   abilities and providing instruction in English and the primary native language of the

17   students, as appropriate; including aspects of the native culture in each aspect of the

18   curriculum; assessing the learning styles of students and providing instruction based on

19   that assessment; and scheduling at least one field trip per student per year.

20        267. Defendants must comply with 25 C.F.R. § 36.21, which outlines the minimum

21   requirements for kindergarten, including, *inter alia*, a curriculum that emphasizes language

22   development and the development of positive feelings as well as instruction in

23   "exploration of the environment (number, space and time relationships, natural science)"

24   and "psychomotor and socialization development."

25   _____

[179] 25 C.F.R. § 32.4(r).

26   [180] 25 C.F.R. § 32.3 (codified into law under 25 U.S.C. § 2003).

27   [181] 25 U.S.C. § 2000.

28   [182] *Id.*

COMPLAINT

1634975.v1

268. Defendants must comply with 25 C.F.R. § 36.22**,** which outlines the minimum requirements for grades one through six.  Thus, Defendants must provide instruction in six subjects, including language arts, social studies, and fine arts, as well as five content areas that must be integrated into the curriculum, such as computer literacy and metric education.

269. Defendants must comply with 25 C.F.R. § 36.23, which outlines the minimum requirements for grades 7 and 8.  Thus, Defendants must provide instruction in five general content areas, such as "career exploration and orientation," and seven instructional content areas.  Among other requirements, "one unit [of science] shall be required of each student every year."

270. Defendants must also comply with other regulations governing staffing and administrative requirements,[183] grading requirements,[184] student promotion requirements,[185] additional programming requirements (e.g. "each school shall provide a library/media program"),[186] textbooks,[187] behavioral health services,[188] extracurricular activities,[189] evaluation and monitoring requirements,[190] and student rights and due process protections.[191]

271. Defendants have acted in a manner that is arbitrary, capricious, an abuse of

---

[183] 25 C.F.R. § 36.11.

[184] 25 C.F.R. § 36.30.

[185] 25 C.F.R. § 36.31.

[186] 25 C.F.R. § 36.40.

[187] 25 C.F.R. § 36.41.

[188] 25 C.F.R. §§ 36.42, 36.42(b) ("Each school shall offer student counseling services concerned with physical, social, emotional, intellectual, and vocational growth for each individual.  Counseling services shall be included in a school-wide assessment program" and "each counseling program shall provide . . . [p]reventative and crisis counseling on both individual and group bases . . .").

[189] 25 C.F.R. § 36.43.

[190] 25 C.F.R. §§ 36.50, 36.51.

[191] 25 C.F.R. § 42.1, *et seq.*

1   discretion, or otherwise not in accordance with the law in their administration of

2   Havasupai Elementary School.

3       272. The actions of Defendants that are arbitrary, capricious, an abuse of discretion,

4   or otherwise not in accordance with the law include, but are not limited to, the following:

5               a.      Defendants have not provided instruction in social studies;

6               b.      Defendants have not provided instruction in fine arts;

7               c.      Defendants have not provided instruction in science;

8               d.      Defendants have not provided instruction in computer literacy;

9               e.      Defendants have not provided instruction in career exploration and

10  orientation;

11              f.      Defendants have not provided a library/media program;

12              g.      Defendants have not provided adequate textbooks and instructional

13  materials;

14              h.      Defendants have not provided behavioral health services;

15              i.      Defendants have not provided extracurricular activities;

16              j.      Defendants have not adequately staffed Havasupai Elementary

17  School;

18              k.      Defendants have not assessed the English and native language

19  abilities of students at Havasupai Elementary School;

20              l.      Defendants have not provided instruction in the Havasupai–Hualapai

21  language;

22              m.      Defendants have not included aspects of the Havasupai culture in all

23  aspects of the curriculum;

24              n.      Defendants have not evaluated the learning styles of students at

25  Havasupai Elementary School;

26              o.      Defendants have not provided one field trip, per student, per year at

27  Havasupai Elementary School;

28              p.      Defendants have not developed a student handbook including policies

and disciplinary procedures or communicated those policies and procedures to students and their families;

        q.    Defendants have not established dispute resolution procedures to be used in lieu of formal student discipline; and

        r.    Defendants have not established a procedure for formal disciplinary hearings that provides notice and a hearing.

273. Plaintiffs, including NADLC, have been aggrieved by these actions because Havasupai children have been deprived of the educational opportunities to which they are entitled, and they have not been adequately prepared for the transition to high school.

274. Plaintiffs have suffered an irreparable injury that could not be adequately compensated by a remedy at law, the balance of the hardships between the parties warrant an equitable remedy, and the public interest would not be disserved by an equitable remedy.

275. Plaintiffs were not required to exhaust administrative remedies in order to bring this claim.  Under 5 U.S.C. § 704, agency action is final and subject to an APA challenge in court, unless the agency by rule requires an administrative challenge "and provides that the action meanwhile is inoperative."  BIA regulations permit administrative appeals, but they do not require such appeals before filing suit, and they do not make decisions inoperative pending appeal.  Rather, agency decisions are final if they have not been appealed within 30 days. 25 C.F.R. §§ 2.6, 2.8.

276. Plaintiffs are entitled to appropriate relief.

## THIRD CAUSE OF ACTION

### (FAILURE TO PROVIDE A SYSTEM ENABLING STUDENTS WITH DISABILITIES TO ACCESS PUBLIC EDUCATION (29 U.S.C. § 794))

**(Plaintiffs Stephen C., Durell P., Levi R., Jenny A., Jordan A., and NADLC against Defendants Jewell, Roberts, Dearman, and Williamson)**

277. Plaintiffs incorporate and reallege the allegations set forth in paragraphs 1 through 276 as if set forth fully here.

278. Under Section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a disability. . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under . . . any program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 794(a).

279. Havasupai Elementary School is a "program or activity," which term is defined to include school systems. 29 U.S.C. § 794(b)(2)(B).

280. The definition of "disability" is a "physical or mental impairment that substantially limits one or more life activities," such as (but not limited to), "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, *learning, reading, concentrating, thinking, communicating*, and working." 42 U.S.C. §§ 12102(1)(A), (2)(A) (emphasis added).

281. Thus, Defendants Jewell, Roberts, Dearman, and Williamson are required to provide special education instruction, related services, and appropriate resources to Havasupai students with physical or mental impairments that substantially limit them with respect to learning, reading, concentrating, thinking, and/or communicating; and they must put into place a system—including procedures, teachers, and appropriate providers—for delivery of specialized instruction and services in order to ensure that those students have access to the benefits of a public education.

282. There are a disproportionately large number of Havasupai students who have physical or mental impairments that substantially limit them with respect to learning, reading, concentrating, thinking, and/or communicating. Havasupai Elementary School reported to the Advisory School Board in 2014 that approximately half of the students in the school had been identified as students with disabilities.

283. Defendants Jewell, Roberts, Dearman, and Williamson have failed to establish a system to ensure that students with disabilities receive the special education, related services, and other resources necessary to access to the benefits of a public education.

284. At Havasupai Elementary School, there is not a sufficient number qualified special education teachers, and there are no special education classrooms; no occupational

COMPLAINT

therapists, physical therapists, or speech therapists; and either no or insufficient mental health staff and support staff.

285. Students with disabilities are also either not given a full day of instruction or are channeled into residential schools.  Students and their families must choose between leaving home to obtain adequate schooling with the services they need, or living at home in their own community without access to basic education.

286. Defendants have compounded their failure to provide education to students with disabilities by relying on police and the criminal justice system, or repeated suspension, instead of counseling and support.  Students miss such a significant amount of school—either while on suspension or awaiting court hearings—that they fall far behind their peers from an educational perspective.

287. Plaintiffs, including NADLC, have been damaged by the failure to provide a system for serving Havasupai students with disabilities, which has deprived those students of access to public education.

288. Plaintiffs have suffered irreparable injury that could not be adequately compensated by a remedy at law, the balance of the hardships between the parties warrant an equitable remedy, and the public interest would not be disserved by an equitable remedy.

289. Plaintiffs do not need to administratively exhaust their claim.  There is no administrative procedure for challenging Defendants' school-wide failure to provide a system for serving students with disabilities.  Indeed, the BIE has not even promulgated regulations for challenging individual denials of access to education for students with disabilities.  Even if a family could somehow obtain an individual remedy through a due process proceeding or some other form of administrative process, Defendants could not implement that remedy at Havasupai Elementary School because they have no system in place for doing so.

290. Moreover, declaratory relief, which is essential to this claim, is not available under IDEA.  Thus, the exhaustion requirement in IDEA cannot be applied to this claim

COMPLAINT

1  under 29 U.S.C. § 794(a).

2  291. Plaintiffs are entitled to appropriate relief.

3  **FOURTH CAUSE OF ACTION**

4  **(FAILURE TO PROVIDE A SYSTEM ENABLING STUDENTS WHO HAVE**

5  **SUFFERED ADVERSITY AND COMPLEX TRAUMA TO ACCESS PUBLIC**

6  **EDUCATION (29 U.S.C. § 794))**

7  **(All Plaintiffs against Defendants Jewell, Roberts, Dearman, and Williamson)**

8  292. Plaintiffs incorporate and reallege the allegations set forth in paragraphs 1

9  through 291 as if set forth fully here.

10  293. Under Section 504 of the Rehabilitation Act, "[n]o otherwise qualified

11  individual with a disability . . . shall, solely by reason of her or his disability, be excluded

12  from the participation in, be denied the benefits of, or be subjected to discrimination under

13  . . . any program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 794(a).

14  294. Havasupai Elementary School is a "program or activity." 29 U.S.C.

15  § 794(b)(2)(B).

16  295. The definition of "disability" is a "physical or mental impairment that

17  substantially limits one or more life activities," including, but not limited to, "caring for

18  oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing,

19  lifting, bending, speaking, breathing, *learning, reading, concentrating, thinking,*

20  *communicating*, and working." 42 U.S.C. §§ 12102(1)(A), (2)(A) (emphasis added).

21  296. Experiencing complex trauma causes impairment that limits a student's ability

22  to learn, read, concentrate, think, communicate, and generally receive an education and

23  have the opportunity to succeed in school.

24  297.  Havasupai students are exposed to adversity and historical trauma within their

25  community.  As a result, individual Havasupai students are at risk of experiencing complex

26  trauma, or have experienced trauma, that substantially limits them with respect to learning,

27  reading, concentrating, thinking, and/or communicating.

28  298. This historical and individual trauma requires additional behavioral and mental

-94-
COMPLAINT

health resources, as well as culturally relevant interventions, in order for students to have meaningful access to education.   In order to meaningfully access public education, Havasupai students require a system that is responsive to and capable of addressing the impact of complex trauma.

299. Defendants have failed to establish a system to ensure that students who have suffered adversity and complex trauma receive the specialized instruction, related services, and other resources necessary to access to the benefits of a public education.

300. Defendants Jewell, Roberts, Dearman, and Williamson are required to provide specialized instruction, related services, and other resources to Havasupai students who have suffered adversity and complex trauma, and they must put into place a system—including procedures, teachers, and appropriate providers—for delivery of specialized instruction and services in order to ensure that those students have access to the benefits of a public education.

301. Plaintiffs, including NADLC, have been damaged by the failure to provide a system for serving Havasupai students who have suffered adversity and complex trauma, which has deprived those students of access to public education.

302. Plaintiffs have suffered an irreparable injury that could not be adequately compensated by a remedy at law, the balance of the hardships between the parties warrant an equitable remedy, and the public interest would not be disserved by an equitable remedy.

303. Plaintiffs do not need to administratively exhaust their claim.   There is no administrative procedure for challenging Defendants' school-wide failure to provide a system to address the needs of students who have been exposed to adversity and complex trauma.   Indeed, the BIE has not even promulgated regulations for challenging individual denials of access to education for such students.   Even if a family could somehow obtain an individual remedy through a due process proceeding or some other form of administrative process, Defendants could not implement that remedy at Havasupai Elementary School because they have no system in place for doing so.

1634975.v1

304. Moreover, declaratory relief, which is essential to this claim, is not available under IDEA.  Thus, the exhaustion requirement in IDEA cannot be applied to this claim under 29 U.S.C. § 794(a).

305. Plaintiffs are entitled to appropriate relief.

## FIFTH CAUSE OF ACTION

### (VIOLATION OF DEPARTMENT OF EDUCATION REGULATIONS REGARDING "LOCATION AND NOTIFICATION," 34 C.F.R. § 104.32)

**(Plaintiffs Stephen C., Durell P., Levi R., Jenny A., Jordan A., and NADLC against Defendants Jewell, Roberts, Dearman, and Williamson)**

306. Plaintiffs incorporate and reallege the allegations set forth in paragraphs 1 through 305 as if set forth fully here.

307. DOE regulations require a recipient of DOE funding to identify and locate students who are not properly receiving an adequate public education as a result of their disabilities.

308. DOE regulations require a recipient of DOE funding to contact the parents or guardian of students who are not receiving an adequate public education as result of their disabilities, including but not limited to disabilities related to complex trauma and its effects, to notify them of their duty to identify students who might require a reasonable accommodation.

309. Defendants Jewell, Roberts, Dearman, and Williamson receive DOE funding to provide special education services at Havasupai Elementary School.

310. Defendants have not established and implemented policies or procedures to identify and locate Havasupai students who are not properly receiving an adequate public education on account of their disabilities, including but not limited to disabilities related to complex trauma and its effects.

311. Defendants have failed to locate and identify Havasupai students who are not properly receiving an adequate public education on account of their disabilities, including but not limited to disabilities related to complex trauma and its effects.

312. Defendants have not established and implemented policies or procedures to contact the parents or guardians of Havasupai students who are not receiving an adequate public education as result of their disabilities, including but not limited to disabilities related to complex trauma and its effects, to notify them of their duty to identify students who might require a reasonable accommodation.

313. Defendants have failed to contact the parents or guardians of Havasupai students who are not receiving an adequate public education as result of their disabilities, including but not limited to disabilities related to complex trauma and its effects, to notify them of their duty to identify students who might require a reasonable accommodation.

314. Plaintiffs, including NADLC, have been damaged by the failure to provide a system for to locate and notify Havasupai students who are not receiving an adequate public education as a result of their disabilities, which has deprived those students of access to public education.

315. This is an irreparable injury that could not be adequately compensated by a remedy at law, the balance of the hardships between the parties warrant an equitable remedy, and the public interest would not be disserved by an equitable remedy.

316. Plaintiffs do not need to administratively exhaust their claim.  There is no administrative procedure for challenging Defendants' school-wide failure to provide a system for serving students with disabilities.  Indeed, the BIE has not even promulgated regulations for challenging individual denials of access to education for students with disabilities.  Even if a family could somehow obtain an individual remedy through a due process proceeding or some other form of administrative process, Defendants could not implement that remedy at Havasupai Elementary School because they have no system in place for doing so.

317. Moreover, declaratory relief, which is essential to this claim, is not available under IDEA.  Thus, the exhaustion requirement in IDEA cannot be applied to this claim under the regulations implementing 29 U.S.C. § 794(a).

318. Plaintiffs are entitled to appropriate relief.

COMPLAINT

**SIXTH CAUSE OF ACTION**

(**VIOLATION OF DEPARTMENT OF EDUCATION REGULATIONS REGARDING "PROCEDURAL SAFEGUARDS," 34 C.F.R. § 104.36**)

(**Plaintiffs Stephen C., Durell P., Levi R., Jenny A., Jordan A., and NADLC against Defendants Jewell, Roberts, Dearman, and Williamson**)

319. Plaintiffs incorporate and reallege the allegations set forth in paragraphs 1 through 318 as if set forth fully here.

320. DOE regulations provide that a recipient of DOE funding that "operates a public elementary or secondary education program or activity shall establish and implement, with respect to actions regarding the identification, evaluation, or educational placement of persons who, because of handicap, need or are believed to need special instruction or related services, a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure."

321. Defendants Jewell, Roberts, Dearman, and Williamson receive DOE funding to provide special education services at Havasupai Elementary School.

322. Defendants have not established and implemented a system of procedural safeguards with respect to actions regarding identification, evaluation, and educational placement of students who are not receiving an adequate public education as result of their disabilities, including but not limited to the fact that they have suffered complex trauma.

323. Defendants have failed to establish a system of procedural safeguards for Havasupai students that includes notice, an opportunity for parents or guardians to examine relevant records, an impartial hearing, and a review procedure.  Defendants' failure to establish such a system has resulted in negative consequences for students who were entitled to the protection of procedural safeguards, including suspension, involuntary transfer, expulsion, and law enforcement referrals.

324. Plaintiffs, including NADLC, have been damaged by the failure to provide

1634975.v1

procedural Havasupai students who are not receiving an adequate public education as a result of their disabilities, which has deprived those students of access to public education.

325. This is an irreparable injury that could not be adequately compensated by a remedy at law, the balance of the hardships between the parties warrant an equitable remedy, and the public interest would not be disserved by an equitable remedy.

326. Plaintiffs do not need to administratively exhaust their claim.  There is no administrative procedure for challenging Defendants' school-wide failure to provide a system for serving students with disabilities.  Indeed, the BIE has not even promulgated regulations for challenging individual denials of access to education for students with disabilities.  Even if a family could somehow obtain an individual remedy through a due process proceeding or some other form of administrative process, Defendants could not implement that remedy at Havasupai Elementary School because they have no system in place for doing so.

327. Moreover, declaratory relief, which is essential to this claim, is not available under IDEA.  Thus, the exhaustion requirement in IDEA cannot be applied to this claim under the regulations implementing 29 U.S.C. § 794(a).

328. Plaintiffs are entitled to appropriate relief.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

1.      The issuance of a Declaratory Judgment that the actions and omissions of the Defendants, as described above, constitute violations of the Indian Education Act, the Rehabilitation Act, as well as numerous other federal laws, and violate Plaintiffs' civil rights;

2.      The issuance of a Declaratory Judgment setting forth the duties and obligations of Defendants with respect to the delivery of education to students at Havasupai Elementary School.

3.      Appropriate injunctive relief requiring Defendants, their officers, agents, employees, successors in office and assigns/assignees to comply with those duties and

1634975.v1

obligations, and to provide Plaintiffs with access to the education Defendants are legally obligated to provide, including special education services, in a manner that is culturally relevant based on the unique culture, tradition, and language of the Havasupai Tribe;

4.      Requiring Defendants to provide appropriate compensatory and remedial education for all Plaintiffs, including those who previously attended but no longer attend Havasupai Elementary School;

5.      A permanent injunction enjoining Defendants, their officers, agents, employees, successors in office and assigns/assignees from engaging in the actions, omissions, policies, and practices that have resulted in their failure and refusal to enforce the requirements of the Indian Education Act and its implementing regulations and Section 504 of the Rehabilitation Act of 1973 and its implementing regulations at Havasupai Elementary School;

6.      An award of costs and attorneys' fees on behalf of Plaintiffs pursuant to 29 U.S.C. § 794(a) and any applicable provisions of law;

7.      A grant of such other or additional relief as this Court may deem just and proper.

1634975.v1

1    RESPECTFULLY SUBMITTED this 12th day of January, 2017.

2    By:  s/Alexis DeLaCruz w/permission          By:  s/Judith M. Dworkin

3        Alexis DeLaCruz                              Judith M. Dworkin
         Tara C. Ford+                                David C. Tierney
4        NATIVE AMERICAN DISABILITY                   SACKS TIERNEY P.A.
         LAW CENTER                                   4250 N. Drinkwater Blvd., 4th Floor
5        3535 E. 30th Street, Suite 201               Scottsdale, AZ 85251-3693
         Farmington, NM 87402                         Telephone:  480.425.2600
6        Telephone:  505.566.5880

7
         Mark Rosenbaum+                              Bradley S. Phillips+
8        mrosenbaum@publiccounsel.org                 Brad.Phillips@mto.com
9        Kathryn Eidmann+                             Bryan H. Heckenlively+
         keidmann@publiccounsel.org                   bryan.heckenlively@mto.com
10       Anne Hudson-Price+                           Seth J. Fortin+
11       aprice@publiccounsel.org                     Seth.Fortin@mto.com
         Elizabeth Song+                              Emily Curran-Huberty+
12       esong@publiccounsel.org                      Emily.Curran-Huberty@mto.com
         PUBLIC COUNSEL                               MUNGER, TOLLES & OLSON LLP
13       610 South Ardmore Avenue                     355 South Grand Avenue, 35th Floor
14       Los Angeles, CA 90005                        Los Angeles, CA  90071
         Telephone: 213.385.2977                      Telephone: 213.683.9100
15
16       Elisabeth Bechtold+
         ebechtold@aclu-nm.org
17       Maria Martinez-Sánchez+
         mmartinez@aclu-nm.org
18       AMERICAN CIVIL LIBERTIES
19       UNION of NEW MEXICO
         1410 Coal Avenue SW
20       Albuquerque, NM 87104
         Telephone: 505.266.5915
21

22       Attorneys for Plaintiffs
         + Application for admission Pro Hac Vice forthcoming
23

24

25

26

27

28

                                        -101-
1634975.v1