JOSEPH H. HUNT
Assistant Attorney General
CARLOTTA P. WELLS
Assistant Branch Director
LISA A. OLSON, D.C.  No. 384266
Senior Trial Counsel
CAROL FEDERIGHI, TX Bar No. 06872950
Senior Trial Counsel
CRISTEN C. HANDLEY, MO Bar No. 69114
BRADLEY CRAIGMYLE, IL Bar No. 6326760
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C.  20005
Telephone:  202-305-2677
Facsimile:  202-616-8470
Cristen.handley@usdoj.gov

Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stephen C., a minor, by Frank C., guardian ad litem, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br><br>Bureau of Indian Education, *et al.*,<br><br>    Defendants. | No. 3:17-cv-08004-SPL<br><br>**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Pursuant to the Court's Order Setting Final Pretrial Conference, ECF No. 222 at 4, Defendants respectfully submit the following proposed findings of fact and conclusions of law. For the reasons detailed below, the Court should not enjoin Defendants as to Count III because Defendants are taking appropriate steps to comply with Section 504 of the Rehabilitation Act. The Court should further find that the accommodations sought by Plaintiffs as to Count IV would, if ordered by the Court, fundamentally alter the educational program at Havasupai Elementary School and impose an undue burden on Defendants, and that Plaintiffs are therefore entitled to no relief with respect to Count IV.

## <u>DEFENDANTS' PROPOSED FINDINGS OF FACT AS TO COUNT III</u>

**I.     Injunctive relief as to Count III is unnecessary because BIE is taking appropriate steps to comply with Section 504.**

1.     As of the date of this filing, BIE is developing a Section 504 National Policy Memorandum ("NPM-EDUC-33"), which will provide BIE-operated schools interim guidance on complying with Section 504.  The NPM will expire one year from its issuance.

- Exhibit No. 1105 (forthcoming); Exhibit No. 1104 (defining "National Policy Memorandum").

2.     In accordance with the terms of NPM-EDUC-33, BIE will provide training on NPM-EDUC-33 before or during the upcoming fall 2020 school semester.

- Exhibit No. 1105 (forthcoming).

3.     In March 2019, BIE designated Marcy Oliver as BIE's Acting Section 504 Coordinator.  Ms. Oliver's job duties included developing and implementing a plan to bring BIE into compliance with Section 504 and developing Bureau-wide Section 504 compliance documents, as well as providing Section 504 trainings and technical assistance to BIE-operated schools, including HES.  In this role, Marcy also assisted in the drafting of NPM-EDUC-33 and its accompanying attachments.

4.     In her role as Acting Section 504 Coordinator, Ms. Oliver also provided the following Section 504 trainings:

- April 11-12, 2019 - One-on-One training with HES Principal and 504 coordinator Lolita Paddock;
- June 17-21, 2019 -Wingate High School - Ft. Wingate, NM;
- June 24-28, 2019 - Haskell Indian Nations University - Lawrence, KS;
- July 8-12, 2019 - College of Menominee Nation - Keshena, WI;
- July 15-19, 2019 - United Tribes Technical College - Bismarck, ND;
- September 12, 2019 - HES Training via Webinar for all teachers and administrators;
- September 25, 2019 - Training with Flandreau Indian School;
- October 2, 2019 - Training with BIE-Operated Schools Leadership;
- November 18-22 - Informal training and technical assistance with HES administrators;
- March 5, 2020 - Three training sessions open to all BIE-funded schools; and

- March 20, 2020 - Training with BIE-Operated Schools.
- Exhibit Nos. 1006-1008.

5. In June 2020, BIE appointed Tracie Atkins as BIE's Section 504 Coordinator. In that role, Ms. Atkins is responsible for overseeing BIE's compliance with Section 504 and the Department of Interior's Section 504 regulations, *see* 43 C.F.R. pt. 17. More specifically, Ms. Atkins will "provide[] oversight, development, implementation, execution and evaluation responsibility for the Section 504 Program activities for 180 elementary, secondary, and residential schools BIE-wide," including HES.

- Exhibit No. 1001.

6. As of the date of this filing, BIE has Section 504 Coordinators in place for nearly all BIE-operated schools. BIE will appoint a new Section 504 coordinator for HES at the beginning of the fall semester of the 2020-21 academic year.

- Exhibit No. 1003.

II. **Subject to the ever-present obstacles HES faces, BIE is positioning itself to address the remaining student-Plaintiffs' disabilities in the academic year 2020-21 and throughout their enrollment at HES through implementing their existing IDEA individualized education programs ("IEPs"), which will satisfy BIE's obligations under Section 504.**

7. Freddy P. currently has an updated IEP in place that is valid until November 4, 2020. Freddy P.'s primary disability is specific learning disabilities. Pursuant to his IEP, he is scheduled to receive the following special education services: (1) five 30-minute sessions per week (150 minutes total) of written expression services provided by a special education teacher, in consult with a general education teacher; and (2) five 60-minute sessions per week (300 minutes total) of reading services provided by a special education teacher. His progress will be measured by a special education teacher and a general education teacher. Freddy P. is further scheduled to receive the following related service: one 30-minute session per week of speech/language services provided by a speech-language pathologist ("SLP").

- Stipulated Fact No. 13; Exhibit Nos. 1096 & 1097.

8. During the 2019-20 school year, due to staffing shortages and turnover, BIE

could not provide all special education services hours owed to Freddy P. pursuant to his IEP. Accordingly, BIE held an IEP team meeting on May 18, 2020, to discuss compensatory educational services under IDEA for Freddy P.

- Stipulated Fact No. 14.

9. Olaf D. currently has an updated IEP in place that is valid until May 19, 2021. Olaf D.'s primary disability is speech or language impairments.  Pursuant to his IEP, he is scheduled to receive one 15-minute session per week of speech services provided by a SLP, with progress measured by the SLP.

- Exhibit No. 1098.

10. During the 2019-20 school year, due to staffing shortages and turnover, BIE could not provide all special education services hours owed to Olaf D. pursuant to his IEP. Olaf D. was also not provided with Student Assessment Team ("SAT") interventions, which the team has agreed are necessary to determine whether he also qualifies as a student with a specific learning disability and thus may be entitled to additional services.  Accordingly, BIE held an IEP team meeting on May 19, 2020, to discuss compensatory educational services sunder IDEA for Olaf D.  BIE is currently in the process of providing Olaf D. the SAT interventions and plans on scheduling another IEP meeting for him sometime in July 2020.

- Exhibit No. 1098.

11. Taylor P. currently has an updated IEP in place that is valid until May 18, 2021. Taylor P.'s primary disability is specific learning disabilities.  Pursuant to her IEP, she is scheduled to receive the following educational services:  (1) five 45-minute sessions per week (225 minutes total) of reading services provided by a special education teacher; (2) five 30-minute sessions per week (150 minutes total) of written expression services provided by a special education teacher; and (3) five 45-minute sessions per week (225 minutes total) of math services provided by a special education teacher.  Her progress will be measured by both a special education teacher and a general education teacher.  Taylor P. is further scheduled to receive the following related service:  one 30-minute session per week of counseling services provided by a counselor, with progress measured by the counselor.

4

- Stipulated Fact No. 17; Exhibit No. 1099.

12.     During the 2019-20 school year, due to staffing shortages and turnover, BIE could not provide all special education services hours owed to Taylor P. pursuant to her IEP. Accordingly, BIE held an IEP meeting on May 18, 2020, to discuss compensatory educational services under IDEA for Taylor P.

- Stipulated Fact No. 18.

13.     Moana L. currently has an updated IEP in place that is valid until August 26, 2020. Moana L.'s primary disability is impaired hearing/deafness.   Pursuant to her IEP, she is scheduled to receive the following educational services:  (1) one 30-minute session per week of math services provided by a special education teacher and general education teacher/assistant; (2) five 30-minute sessions per week (150 minutes total) of reading services provided by a special education teacher; and (3) four 10-minute sessions per week (40 minutes total) of written expression services provided by a special education teacher and general education teacher/assistant.  Her progress will be measured by both a special education teacher and a general education teacher.  Moana L. is further scheduled to receive the following related services:  (1) one 3-minute session per week (approximately 15 minutes per month) of speech/language consultation services provided by a SLP; and (2) one 30-minute session per week of counseling services provided by a counselor.

- Exhibit No. 1100.

14.     During the 2019-20 school year, due to staffing shortages and turnover, BIE could not provide all special education services hours owed to Moana L. pursuant to her IEP. The last meeting to develop an updated IEP for Moana L. took place on August 26, 2019.  Her IEP is set to expire on August 26, 2020.  BIE has been unable to schedule a meeting to further update Moana L.'s IEP due to Moana L.'s family member's illness.

- Exhibit No. 1100.

15.     Despite unexpected shortages in staffing for the 2020-21 school year, BIE is positioning itself to have the necessary staff to address the disabilities of the remaining student-Plaintiffs for the 2020-21 school year.  A candidate has accepted the HES Principal position for

the 2020-21 school year and is completing the background check process.  There are currently two special education teachers on staff at HES who have signed contracts for the 2020-21 school year.  BIE anticipates that one of those teachers may not fulfill their contract and that BIE will need to attempt to fill that vacancy and rely on detailed teachers in the meantime.  There is also one special education teacher who was detailed to HES for part of the 2019-2020 school year and is currently on a short-term contract with HES, Kristine Gutormson, and one special education aide, Lorna Jones.  Additionally, there are currently three general education teachers and one counselor who have signed contracts for the 2020-21 school year:  Billy Vides, Victor Leister, Tana Smith, and Jerry McDonald, respectively.  HES currently has two general education positions posted on USAJOBS.gov and is working to post a third permanent special education position.  BIE will detail staff to the extent practicable to fill any unmet staffing needs.  BIE has a contract in place for one education aide for the 2020-2021 school year; the second position remains vacant.

16.     In March 2020 (just before the COVID-19 pandemic began), Indian Health Services ("IHS"), assisted in part by the Bureau of Indian Affairs IT staff, completed a test-run of a system that will provide tele-behavioral health services to students.  Tele-behavioral health services are counseling services provided remotely.  BIE's tele-behavioral health system includes a dedicated room at the schools where students can receive services consistent with applicable privacy laws.  HES has been unable to begin offering tele-behavioral health services during the COVID-19 pandemic due to school closures and public safety concerns.  When BIE-operated schools re-open, tele-behavioral health services will begin for eligible students.  This will create additional opportunities for BIE to provide the related services of counseling to those students whose IEPs provide for such services, in addition to the counseling services BIE already provides.

### III.   BIE faces numerous intrinsic obstacles that must be considered in assessing the agency's compliance with Section 504.

17.     The current organization chart of HES allows for a principal, one secretary, three special education teachers, five general education teachers, one native culture and language instructor, two special educational aides, one counselor, one cook, and one janitor.

- Exhibit No. 1011.

18.     HES has had ongoing staffing and retention issues.  HES has not been fully staffed for a complete academic year, notwithstanding supplements to teachers' salaries, because of, among other things, the following factors:  few or no applicants for posted positions; time-consuming background checks, which may result in candidates not receiving the requisite clearance or accepting other offers before the background check is complete; and individuals who decline offers or leave their positions after a short period of time due to limitations of life in the Canyon or difficulties at HES.

19.     Because BIE has been unable to maintain consistent staff for the majority of these positions, HES must frequently rely on rotating detailed staff members from other BIE-Operated schools to teach at HES.  In the 2019-20 school year, for instance, approximately two dozen individuals were detailed to HES over various periods of time to cover a variety of positions.  To the extent possible, BIE relies on volunteers to accept detail assignments, but BIE must also take into account any potential detailee's credentials, health, and family obligations that may be interrupted by a detail assignment to HES.

- Exhibit No. 1012.

20.     Even if retention were not a problem, BIE would still need additional housing to accommodate the full complement of staff necessary to educate the students and provide them with support services.

21.     BIE has made efforts to expand HES staff housing quarters, including retaining a contractor to provide an assessment and contacting the Tribe multiple times for permission to survey the relevant land for additional housing.  On June 2, 2020, BIE provided the Tribe a written copy of the completed assessment and requested a meeting with the Tribe to review the

report.  BIE met with the Tribe on June 10, 2020 to discuss the assessment and next steps.  The Tribe has committed to reviewing BIE's supporting documents and reports on the housing plan as well as analyzing the Tribe's local utility infrastructure to determine whether it can support the new housing units.

- Exhibit Nos. 1023, 1024, 1025.

22.    As a result of the ongoing global pandemic, BIE closed HES as of March 23, 2020, until further notice.  As of the date of this filing, it is unclear when HES will re-open.

- Stipulated Fact No. 22.

23.    On June 10, 2020, BIE issued a letter to all leaders of BIE-Operated schools, including HES, providing instruction on how to communicate with parents to discuss whether compensatory educational services under the IDEA are owed for services that BIE could not provide due to the COVID-19 pandemic.

- Exhibit No. 1093.

**DEFENDANTS' PROPOSED FINDINGS OF FACT AS TO COUNT IV**

**IV.    Implementing a trauma-informed system at HES is not a reasonable accommodation under Section 504 because it would require a fundamental and substantial transformation of HES and its programs.**

24.    Implementing a trauma-informed system at HES would require a fundamental and substantial transformation of HES that the school is not equipped and lacks the resources to undertake.

25.    Implementing a trauma-informed system at HES would require human and financial resources.

26.    Trauma-informed schools must have stability and consistency among staff members which, as discussed *supra* ¶¶ 15, 17-21, HES currently lacks.

27.    A shortage of resources can affect a school's ability to implement a trauma-informed system, particularly a shortage of resources that prevents staffing with permanent teachers.

28.    The fluidity of the staffing at HES presents an obstacle to the consistent and effective implementation of a comprehensive plan to address trauma at HES.

29.     Putting together a system of care to address childhood trauma-related issues is a complex and multi-faceted problem that requires a multi-disciplinary, multi-faceted, holistic plan.

30.     Such a plan would require components addressing and integrating educational needs, medical needs, mental health needs, nutritional needs, psychological needs, and cultural needs.

31.     In particular, instituting trauma-informed practices would require the following human resources:

- Staff and an administration that is trained in the effects of trauma, trained in cultural sensitivity in collaboration with the community, and trained in escalation behavioral management;

- Experts in education, social work, and psychology;

- Teachers and counselors who work with students and parents across settings and not just at the school regarding the effects of trauma;

- A consultant to help develop a shift in adult perspective that requires training, and then coaching and monitoring to support adults to change their viewpoint about how to address children with problems;

- Access to regular mental health care or tele-mental health or telemedicine;

- Years of mentoring to ensure that the models are fully implemented; and

- Support for staff members who are experiencing crises.

32.     The entire school staff, counselors, and parents need to be involved in and committed to undertaking a trauma-informed system both in the classroom and in the home.

33.     HES's attempts to engage with the families and the community have been met with mixed results, and the level of engagement would need to be substantially heightened to implement trauma-informed practices effectively.

**V.     Implementing a trauma-informed system at HES is not a reasonable accommodation because Plaintiffs have failed to make an individualized assessment of whether HES should be converted into a trauma-informed school for the benefit of the two remaining student-Plaintiffs identified as having trauma-related disorders.**

34.     Two of the remaining student-Plaintiffs at HES have been identified as having trauma-related disorders:  Taylor P. and Moana L.

- Stipulated Fact No. 27.

35.     Plaintiffs' putative experts who endorse trauma-informed practices have neither visited HES nor observed or worked with the students or teachers there, have no first-hand knowledge about HES or the Havasupai Tribe, and have not considered whether such practices are appropriate for HES specifically.

36.     Plaintiffs' putative experts have not taken the position that HES should be converted into a trauma-informed school for the benefit of Taylor P. and Moana L.

**VI.     Implementing a trauma-informed system at HES is not a reasonable accommodation because trauma-informed practices are an emerging field.**

37.     Data about the effects of childhood trauma on children were not available until 2013.  Christina D. Bethell *et al.*, *Adverse Childhood Experiences: Assessing the Impact on Health and School Engagement and the Mitigating Role of Resilience*, 33:12 Health Affairs 2106, 2107 (2014) ("[T]he first national and state child-level data on adverse childhood experiences" were not available until 2013.).  The United States "does not have a longitudinal population-based study that includes information on adverse childhood experiences.  Such data are needed to document the . . . mitigating effects of protective factors[.]"  *Id.* at 2108-09.  Hence, trauma-informed practices are still an emerging field.

38.     Because the models for trauma-informed schools are research-based and emerging, a randomized controlled trial has not yet been conducted, and an evidence-based trauma-informed school does not exist.

39.     Given that the emerging models for trauma-informed practices are research-based only, there are no empirical standards that have been developed or applied in any school.

40.     Because there is no empirical, universally accepted set of standards for trauma-

informed schools, the financial costs of instituting a trauma-informed system at HES are uncertain.

41.     Since the costs are indeterminable, there is no way of knowing if those costs would be reasonable in the context of BIE's or HES's operations.

42.     At most, Plaintiffs have proposed best practices, and an example of how trauma-informed practices might look in an ideal world.

43.     BIE is exploring different methods for incorporating trauma-informed practices into a school's milieu and launched a small pilot program to gain a better understanding of these practices.

44.     BIE is considering how it could incorporate trauma-informed practices into its operations, including at HES.

45.     BIE has taken the following measures to address mental health needs for students at HES, which can potentially support students dealing with trauma-related issues, depending on their specific needs:

- Provided counseling;
- Worked with IHS to establish a strong partnership focused on behavioral health services that includes an addition of tele-behavioral health services that expands the scope of services for students and all HES staff;
- Provided some trauma-related training; and
- Provided behavioral/mental health training.

**VII.   Instituting a trauma-informed system at HES is not necessary to avoid discrimination on the basis of disability.**

46.     The two student-Plaintiffs who have been identified as having trauma-related disorders, Taylor P. and Moana L., have valid IEPs in place pursuant to the IDEA.

- Stipulated Fact Nos. 17 & 19; Exhibit Nos. 1099 & 1100.

47.     The IEPS for Taylor P. and Moana L. do not require that trauma-informed practices be utilized to address their trauma-related disorders.

- Exhibit Nos. 1099 & 1100.

11

**VIII.  Instituting a trauma-informed system at HES would be a hardship for HES.**

48.     Transforming HES into a trauma-informed system would require that HES be the primary, if not sole, resource for meeting the academic, psychological, medical, exercise, nutritional, and cultural needs of students identified as having trauma-related disorders.

49.     HES is not currently set up nor is it intended to provide services across such a broad spectrum.

50.     HES is primarily an academic institution, and as such HES is not equipped to serve as a treatment facility with multi-faceted requirements.

51.     Transforming HES into a trauma-informed educational system would require additional personnel costs for recruiting and hiring a full-time nurse, clinician, nutritionist, and psychiatrist.

52.     Transforming HES into a trauma-informed system would mandate ongoing training due to the high staff turnover at HES, which would add costs to the school's budget. HES does not have sufficient permanent funding to cover these costs.

53.     HES receives a significant portion of its funding according to formulas that rely heavily on the number of students enrolled in the school.  *See*, *e.g.*, 25 U.S.C. § 2007; 25 C.F.R. Part 39.  Use of that money is restricted based on the source of the funds.

54.     Although HES is eligible for funding for specific programs and projects through grants or additional allocations, such funding is not guaranteed from year to year.

55.     The only option available for increasing HES's permanent funding is an additional Congressional appropriation or modification of the formulas.  For example, to hire and pay the salary of a behavioral health specialist at HES to transform HES into a trauma-informed school on a permanent basis would not be possible without an additional Congressional appropriation or modification of the formulas.

56.     To obtain additional funding for HES on a temporary basis, BIE would be required to channel to HES funding that would otherwise be available for other BIE programs intended to support BIE-funded schools and the students who attend those schools, the effect of which would be to provide preferential treatment to HES.

57.     Even if BIE had sufficient funding and succeeded in recruiting and retaining the additional staff members necessary for a trauma-informed school, housing for the trainers, counselors, and other members of the trauma-informed community of staff would not be available given the limited availability of apartments and the need to provide housing for the positions included in HES's current organizational chart.

**DEFENDANTS' PROPOSED CONCLUSIONS OF LAW AS TO COUNT III**

**I.      Statutory and regulatory requirements.**

1.      Section 504 of the Rehabilitation Act ("Section 504") provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794.

2.      DOI's regulations implementing Section 504 with regard to programs or activities conducted by DOI, including BIE-operated schools, are located at 43 C.F.R. Part 17, subpart E.  These regulations similarly provide that "[n]o qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the agency."  43 C.F.R. § 17.530(a).

3.      Other federal agencies' regulations implementing Section 504, including the Section 504 regulations adopted by the Department of Education, *see* 34 C.F.R. Part 104 *et seq.*, do not bind Defendants in their administration of HES.  *See* ECF No. 221 at 5 ("Defendants are not subject to DOE's regulations implementing Section 504 but are subject to the DOI's own regulations under Section 504."); *see also* ECF No. 182 at 13-15 (same); ECF No. 203 at 8-12 (same); ECF No. 214 at 8-9 (same).

4.      As relevant to this case, Section 504 requires educational agencies to provide students with disabilities with the services or accommodations they "need[] to enjoy meaningful access to the benefits of a public education and that [are] available as reasonable

accommodations." *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1204 (9th Cir. 2016); *see generally Alexander v. Choate*, 469 U.S. 287, 301 (1985).

5.    What constitutes a reasonable accommodation "depends on the individual circumstances of each case, and requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to [enjoy meaningful access to the program.]" *Mark H. v. Hamamoto*, 620 F.3d 1090, 1098 (9th Cir. 2010) (internal citation and quotation marks omitted).

6.    "[M]eaningful access" may be provided through development and implementation of an individualized education plan ("IEP") developed pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, which "spells out a personalized plan to meet *all* of [a disabled] child's 'educational needs.'" *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 749 (2017).

7.    In addition to the DOI regulations, BIE's implementation of Section 504 is informed by BIE's National Policy Memorandum, NPM-EDUC-33. This memorandum provides BIE-operated schools interim guidance on complying with Section 504.

**II.    Injunctive relief as to Count III is unwarranted because BIE is already taking appropriate steps to comply with Section 504, Plaintiffs have not identified an injunction that satisfies Rule 65's specificity requirement, and the Court lacks authority to direct BIE in programmatic implementation.**

8.    The Court has broad discretion in fashioning equitable relief, *United States. v. Oakland Cannabis Buyers' Co-Op*, 532 U.S. 483, 496 (2001), and any injunction should be "mould[ed] [sic] to the necessities of the particular case," *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) (citation omitted). *See also High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 641 (9th Cir. 2004) (a district court has "broad latitude in fashioning equitable relief when necessary to remedy an established wrong") (citation omitted). "Equitable remedies are a special blend of what is necessary, what is fair, and what is workable." *Lemon*, 411 U.S. at 200-01.

9.    An injunction is "a drastic and extraordinary remedy" that courts should not undertake lightly. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). "This is particularly so in the case of [injunctions against] federal agencies, which are charged with

14

efficient administration of complex federal statutes and regulations." *Cal. Ins. Guar. Ass'n v. Price*, 252 F. Supp. 3d 948, 960 (C.D. Cal. 2017). The Court need not employ "the extraordinary remedy of an injunction" if there are other means of ensuring compliance with a statute. *Oakland Cannabis*, 532 U.S. at 496-98.

10.     "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

11.     Every order granting an injunction must: "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail--and not by referring to the complaint or other document--the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1).

12.     Plaintiffs have not established that they are likely to suffer irreparable injury in the absence of an injunction, since BIE is positioning itself to comply fully with Section 504 going forward:

   a. BIE's guidance, NPM-EDUC-33, provides appropriate and sufficient guidelines and procedures to ensure that, going forward, all eligible students at HES will, subject to the ever-present obstacles that HES faces, be provided with "meaningful access" to an education as required by Section 504.

   b. BIE is positioning itself to address the remaining student-Plaintiffs' disabilities in the academic year 2020-21 and throughout their enrollment at HES, subject to the ever-present obstacles that HES faces, through implementation of their existing IDEA IEPs, with updates and revisions as necessary over the years.

13.     Plaintiffs have adequate alternative remedies available to them should a violation of Section 504 arise in the future.

   a. If BIE fails to comply with Section 504 in the future, NPM-EDUC-33 provides for a process by which a student may bring a complaint to the agency

[can the student then appeal into federal court?]. *See Cal. Ins. Guar. Ass'n*, 252 F. Supp. 3d at 960 (declining to issue injunction where the "administrative appeals process provides an avenue through which [plaintiff] may obtain redress").

14. The burden on BIE and the balance of hardships argue against imposition of an injunction.

    a. An injunction will be burdensome on BIE, which already faces numerous, intractable difficulties in its administration of HES. Specifically, any additional steps involved in complying with a court injunction not fully necessary for implementing Section 504 compliance will divert BIE's scarce resources and time away from its efforts to address the conditions at HES and to successfully administer the school.

    b. This burden outweighs the hardship on Plaintiffs, who, as explained above, are subject to valid and sufficient IEPs that will continue to be re-evaluated as necessary, and have administrative remedies should they believe their Section 504 rights are being violated.

15. The Court does not have the power or authority to address through an injunction the numerous obstacles that BIE continues to face with regard to implementation of any of the aspects of the programs or services at HES, including compliance with Section 504. These obstacles include, but are not limited to, difficulties with regard to hiring and retention of staff, provision of staff housing, access to medical or psychological professionals, access to the Internet, and funding. It is not the role of the Court to address these human and programmatic issues—for example, the Court cannot order Congress to appropriate more funds or the agency to reallocate agency staff, nor can it compel teachers to remain at HES. *See Lewis v. Casey*, 518 U.S. 343, 349 (1996) ("[I]t is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution."); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (noting that "programmatic improvements are normally made" "in the offices of the [agency] or the halls of Congress," not

by court decree); *Laird v. Tatum*, 92 S. Ct. 2318, 2326, 408 U.S. 1, 15 (1972) (stating that "it is not the role of the judiciary, absent actual present or immediately threatened injury resulting from unlawful governmental action," to serve as "virtually continuing monitors of the wisdom and soundness of Executive action"); *Rochester Pure Waters Dist. v. E.P.A.,* 960 F.2d 180, 184 (D.C. Cir. 1992) ("It is beyond dispute that a federal court cannot order the obligation of funds for which there is no appropriation."); *Cumberland County Hosp. System, Inc. v. Burwell*, 816 F.3d 48, 56 (4th Cir. 2016) ("[I]f the [agency's] backlog were attributable to Congress' failure to fund the program more fully or otherwise to provide a legislative solution, it would likewise be a problem for Congress, not the courts, to address").

16.     The injunction Plaintiffs request also lacks the necessary specificity required by Federal Rule of Civil Procedure 65.  First, Plaintiffs request an injunction directing BIE to "(1) consistently employ[] qualified and appropriately trained general and special education teachers and staff sufficient to meet the needs of its students with disabilities;" and "(2) provid[e] the resources and curriculum to enable students with disabilities to access and benefit from public education." *See Joint Proposed Final Pretrial Order* ¶ 4(B)(2).  These broad requirements are precatory goals common to schools everywhere but afford no "specific terms" directing the "act or acts" sought to be commanded.  *See Natural Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 887 (9th Cir. 2007) (directing district court to narrowly tailor its injunction to provide specific "mitigation conditions under which the Navy may conduct its training exercises").  *Cf. Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075, 1087 (9th Cir. 2004) (injunction directing that defendant "modify its policies regarding companion seating to ensure that a companion of a wheelchair-bound patron be given priority in the use of companion seats . . . [up until] ten (10) minutes prior to show time" provides "fair and precisely drawn notice of what the injunction actually prohibits").

17.     Second, Plaintiffs request that the injunction also direct BIE to "(3) implement[] procedures and practices required by Section 504 and the DOI's implementing regulations; and (4) develop[] a system capable of ensuring continued compliance with Section 504 and the DOI's implementing regulations." *See Joint Proposed Final Pretrial Order* ¶ 4(B)(2).  These

commands also fail to satisfy Rule 65's requirement of specificity for the same reasons set forth above.  Moreover, they constitute the type of "obey-the-law" injunction courts routinely reject. *NLRB v. Express Pub. Co.*, 312 U.S. 426, 435-36 (1941) ("[T]he mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if *436 he shall at any time in the future commit some new violation."); *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) ("[T]o comply with Rule 65(d), 'an injunction must be more specific than a simple command that the defendant obey the law.'") (citation omitted).

### III.   Appointment of a special master at BIE's expense is unwarranted.

18.   In the absence of an injunction, there is no need for a special master to "oversee the implementation of . . . remedial measures" imposed by such an injunction, as Plaintiffs request.  Moreover, the same issues rendering court intervention inappropriate (*see supra* ¶¶ 12-17) would similarly affect the ability of a special master to effect any change beyond what BIE is already doing itself.  In any event, the framework suggested by Plaintiffs is elaborate, consisting of special master, consultants retained by such master, and a "process by which the special master may hear and make recommendations."  *See Joint Proposed Final Pretrial Order* ¶ 4(B)(7).  This framework will be expensive, and Plaintiffs request that the costs be borne by Defendants.  But requiring Defendants to pay such costs will siphon needed funds away from the same source available to Defendants for implementing Section 504 and ensuring that HES students receive all necessary accommodations and services.  Put differently, Plaintiffs seek to squeeze more juice from an already tapped-out lemon and then to direct that "juice" into the pockets of already well-paid third parties (the special master and consultants).  Plaintiffs' request for a special master is accordingly denied.  *See generally United States v. City of Parma*, 661 F.2d 562, 578-79 (6th Cir. 1981) ("The appointment of a special master to oversee implementation of a court order by a municipality is an extraordinary remedy.").

**DEFENDANTS' PROPOSED CONCLUSIONS OF LAW AS TO COUNT IV**

19.     "An organization . . . violates § 504 if it denies a qualified individual with a disability a reasonable accommodation that the individual needs in order to enjoy meaningful access to the benefits of public services." *Hamamoto*, 620 F.3d at 1097.

20.     As part of their Section 504 *prima facie* case, Plaintiffs have the burden of showing that trauma-informed practices are a reasonable accommodation for their situations specifically. *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816 (9th Cir. 1999) (explaining that, to show *prima facie* case of discrimination under Section 504, plaintiffs must satisfy their "initial burden of producing evidence" that a reasonable accommodation exists); *accord Quinones v. Potter*, 661 F. Supp. 2d 1105, 1125 (D. Ariz. 2009).

21.     Only if Plaintiffs satisfy their initial burden does the burden shift to defendants to show that implementing trauma-informed practices "would require a fundamental or substantial modification of its program or standards," *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1047 (9th Cir. 1999), or that it "would result in . . . undue financial and administrative burdens," 43 C.F.R. § 17-550(a)(3).

**IV.  Instituting a trauma-informed system at HES is not a reasonable accommodation, is not necessary to avoid discrimination on the basis of disability, and would create an undue hardship for HES.**

**A.  Plaintiffs have failed to meet their burden of showing that their proposed accommodation—the systemic transformation of HES into a trauma-informed school—is reasonable.**

21.     Requiring HES to implement "trauma-informed and culturally sensitive strategies" or "restorative practices to prevent, address, and heal after conflict[,]" TAC Relief ¶ 3i, is not a "reasonable accommodation" in the these circumstances.

22.     Reasonableness must be evaluated "in light of the totality of the circumstances." *Zukle*, 168 F.3d at 1048.

23.     According to the Ninth Circuit, schools are entitled to deference on the academic decisions that support their decisions about how to structure their programs.  *See id.* at 1049 (deferring to programmatic "academic decision").

24.     The Supreme Court has "cautioned that courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 208 (1982).

25.     Looking at the circumstances surrounding HES, Plaintiffs' proposed accommodation is not reasonable for three reasons:

(1)     it would require a fundamental transformation of the school;

(2)     Plaintiffs failed to make an individualized assessment of whether a transformation to trauma-informed school would be appropriate;

(3)     trauma-informed practices are still an evolving field.

**1.     Not reasonable - fundamental transformation of HES**

26.     First, Plaintiffs' proposed accommodation is not reasonable because instituting trauma-informed practices at HES would require a fundamental and substantial transformation of the school and its programs.

27.     "[T]he focus of the prohibition in § 504 [of the Rehabilitation Act] is 'whether disabled persons were denied meaningful access to state-provided services.'"  *Mark H. v. Lemahieu*, 513 F.3d 922, 937 (9th Cir. 2008) (quoting *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996)).

28.     To ensure such access, schools must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the [school] can demonstrate that making the modifications would fundamentally alter the nature of the service[s], program, or activity." 28 C.F.R. § 35.130(b)(7)(i) (implementing Title II of the Americans with Disabilities Act ("ADA")); *accord Zukle*, 166 F.3d at 1045 n.11.

29.     The "same analysis" is applied "to claims brought under both" the ADA and Section 504. *Zukle*, 166 F.3d at 1045 n.11.

30.     A modification is not reasonable if it requires a school to fundamentally or substantially alter its programs. *Id.* at 1046 ("The Supreme Court has made clear that an educational institution is not required to make fundamental or substantial modifications to its programs or standards; it need only make reasonable ones." (citing *Alexander*, 469 U.S. at 300-01); *see* 43 C.F.R. § 17.550 (agency is not required to take any action that "would result in a fundamental alteration in the nature of a program or activity or in undue financial and administrative burdens").

31.     "[S]imply because the accommodations [are] not to plaintiffs' satisfaction" does not mean the agency failed to make a reasonable accommodation. *Quinones*, 661 F. Supp. 2d at 1125.

32.     Section 504 guarantees disabled individuals equal access to federal programs. *Alexander*, 469 U.S. at 304.

33.     There is no authority for the conclusion that the denial of systemic relief in the context of educational programming results in a Section 504 violation.

34.     No court has found that Section 504 requires a school to provide an accommodation such as Plaintiffs seek here. *See, e.g.*, *Zukle*, 166 F.3d at 1048.  To the contrary, a court presented with a similar proposed accommodation—establishing "districtwide and school-wide policies and practices that address trauma and its effects"—declined to grant a preliminary injunction because it was "not prepared to conclude that the law and facts clearly favor [p]laintiffs and would allow the Court to award the relief sought."  *See P.P. v. Compton Unified Sch. Dist.*, 135 F. Supp. 3d 1126, 1144 (C.D. Cal. 2015).  And that was even in the context of a putative class action which, by its very nature, involves class-wide relief beyond the individual plaintiffs.  *Id.*

35.     For these reasons, Plaintiffs have failed to meet their burden to show that BIE denied a reasonable accommodation otherwise required by Section 504.  *See Zukle*, 166 F.3d at 1047.

### 2.     Not reasonable - no individualized assessment

36.     The second reason that Plaintiffs' proposed accommodation is not reasonable is that Plaintiffs have not made any individualized assessment of whether trauma-informed practices are necessary for Moana P. and Taylor P. to have equal access to federal programs.

37.     What constitutes a reasonable accommodation "depends on the individual circumstances of each case and requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to [enjoy meaningful access to the program.]"  *Hamamoto*, 620 F.3d at 1098; *Zukle*, 166 F.3d at 1048 ("Whether a particular accommodation is reasonable depends on the circumstances of the individual case." (citation omitted)); *Crowder*, 81 F.3d at 1486 ("[T]he determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry.").

38.     A determination of reasonableness must be made based on the circumstances at HES specifically, and simply because a program may be reasonable in other locations does not mean it is reasonable given the unique circumstances at HES. "[R]easonableness is not a constant.  To the contrary, what is reasonable in a particular situation may not be reasonable in a different situation -- even if the situational differences are relatively slight."  *Zukle*, 166 F.3d at 1048; *Wong*, 192 F.3d at 821.

39.     Plaintiffs have failed to produce evidence demonstrating that the systemic accommodation of a "trauma-informed school" would necessarily allow each of these individual students to obtain meaningful access to education at HES.  *See Zukle*, 166 F.3d at 1047.

40.     The fact that Plaintiffs' putative experts may believe that trauma-informed practices are generically good in an abstract or ideal world does not necessarily mean that they are good for HES, much less that they are a "reasonable accommodation."

41.     The opinions of Plaintiffs' putative experts as to whether trauma-informed practices are appropriate for HES are irrelevant to this case because the experts lack any familiarity with HES or with HES's ability to effectively implement trauma-informed practices.

### 3.     Not reasonable - evolving field

42.     The third reason Plaintiffs' proposed conversion of HES into a trauma-informed school is not a reasonable accommodation is that—in the words of Plaintiffs' own putative expert—trauma-informed practices are an "emerging" area.  *See* Persinger Depo. 43:21-22, 46:17, 49:12-13.

43.     It is not "reasonable" for BIE to adopt such practices on a system-wide basis when there apparently is still internal debate—even among Plaintiffs' own expert witnesses—as to exactly what those practices should be.

44.     The fact that BIE might have pilot programs elsewhere "does not obligate it" to implement such a program here or "render the accommodation reasonable as a matter of law." *Wong*, 192 F. 3d at 820

45.     Given the totality of circumstances—HES's shortage of resources, the fact that Plaintiffs' witnesses have failed to investigate whether trauma-informed practices are appropriate and necessary for HES students, the fact that such practices are still evolving, and the fact that instituting such practices would require restructuring the entire school for the benefit of two students—Plaintiffs have failed to show, and cannot show, that the adoption of trauma-informed practices would be a "reasonable accommodation."

**B.     Plaintiffs' proposed accommodation is not necessary to avoid discrimination on the basis of disability.**

46.     Under Section 504, HES need not modify its programs to do more than eliminate discrimination.  *See Lemahieu*, 513 F.3d at 937 ("[Section] 504 does not require 'substantial adjustments in existing programs beyond those necessary to eliminate discrimination against otherwise qualified individuals[.]'" (citing *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 410 (1979))).

47.     An extension of Defendants' obligations under Section 504 beyond what is necessary to eliminate discrimination would be "unauthorized."  *See Se. Cmty. Coll.,* 442 U.S. at 410 (Requiring "substantial adjustments" "beyond those necessary to eliminate discrimination . . . would constitute an unauthorized extension of the obligations imposed by [Section 504].").

48.     With respect to each of the two student-Plaintiffs who have been identified as having trauma-related disorders, Moana L. and Taylor P., the parents and other IEP team members have agreed to Individualized Education Plans pursuant to the Individuals with Disabilities Education Act ("IDEA") that does not require the utilization of trauma-informed practices to address the students' trauma-related disorders, and have agreed that these are appropriate IEPs to address the students' needs.

### C.     Plaintiffs' proposed accommodation would be an undue hardship for HES.

49.     Defendants have met their burden of showing that Plaintiffs' proposed accommodation would constitute an undue hardship.  *See* 43 C.F.R. § 17.550(a)(3) (explaining that the agency need not "take any action that it can demonstrate would result in a fundamental alteration in the nature of a program or activity or an undue financial and administrative burdens").

50.     "What constitutes undue hardship must be determined within the particular factual context of each case."  *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) ("[A]n accommodation results in undue hardship when there is more than a de minimis cost [to the defendant]. . . .").

51.     "Undue hardship refers not only to financial difficulty, but to reasonable accommodations that are unduly extensive, substantial, or disruptive, or those that would fundamentally alter the nature or operation of the business."  *Weaving v. City of Hillsboro*, No. 10-cv-1432-HV, 2012 WL 526425, at *17 (D. Or. Feb. 16, 2012).

52.     "[W]here the employer is a government entity, Congress could not have intended the only limit on the employer's duty to make reasonable accommodation to be the full extent of the tax base on which the government entity could draw."  *Borkowski v. Valley Cent. Sch. Dist.*,

63 F.3d 131, 138 (2d Cir. 1995); *cf. Johnson v. Ga. Dep't of Human Res.*, 983 F. Supp. 1464, 1474 n. 11 (N.D. Ga. 1996) (noting that public agencies need not deplete "scarce and limited public funds" to hire second employee to perform essential functions of an ADA plaintiff's job).

53.     Defendants "must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *U.S. Airways v. Barnett*, 535 U.S. 391, 402 (2002); *see also Barth v. Gelb*, 2 F.3d 1180, 1187 (D.C. Cir. 1993) ("[The] undue hardship inquiry focuses on the hardships imposed . . . in the context of the particular agency's operations."); *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001) (same)); *Se. Cmty. Coll.*, 442 U.S. 397, 412 (1979) (adjustments that "impose[] undue financial and administrative burdens" are unreasonable.).

54.     "An accommodation imposes an undue financial or administrative burden if its costs are clearly disproportionate to the benefits it will produce." *Kulin v. Deschutes Cty.*, 872 F. Supp. 2d 1093, 1100 (D. Or. 2012); *Borkowski*, 63 F.3d at 138 ("'[U]ndue' hardship, like 'reasonable' accommodation, is a relational term; as such, it looks not merely to the costs that the employer is asked to assume, but also to the benefits to others that will result.").

55.     Defendants have shown undue hardship by demonstrating the significant and virtually insurmountable burdens that instituting a trauma informed system at HES would entail.

56.     Moreover, with only two students at issue—who are already receiving special education services—the burdens of implementing such a system-wide accommodation are "disproportionate to the benefit." *See Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1267 (D.C. Cir. 2008); *cf. Borkowski*, 63 F.3d at 138 ("We would not, for example, require an employer to make a multi-million dollar modification for the benefit of a single individual with a disability, even if the proposed modification would allow that individual to perform the essential functions of a job that she sought.").

57.     Because Plaintiffs have failed to propose a reasonable accommodation, a trauma informed system is unnecessary to avoid discrimination on the basis of disability, and Plaintiffs'

proposed measure would be an undue hardship to defendants, judgment should be entered for defendants on Count IV of the complaint.

**V.   Injunctive relief as to Count IV is inappropriate.**

58.   "In shaping equity decrees, the trial court is vested with broad discretionary power. . . ." *Lemon*, 411 U.S. at 200; *see also High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 641 (2004) ("A district court has broad latitude in fashioning equitable relief when necessary to remedy an established wrong.").

59.   Equity decrees should be molded "to the necessities of the particular case." *Lemon*, 411 U.S. at 200.

60.   "In equity . . . courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests . . . ." *Id.* at 201.

61.   "The qualities of mercy and practicality have made equity the "instrument for nice adjustment and reconciliation between the public interest and private needs . . . ." *Id.*

62.   Because of the absence of any universal set of standards or objective criteria for a trauma-informed school system, the Court would have no reasonable means for measuring compliance with an injunction requiring the instituting of such a system at HES.

63.   Similarly, the Court has no reasonable means of estimating the costs of instituting a trauma-informed system at HES.

64.   The obstacles BIE faces with respect to staff recruitment and retention, a housing shortage, and budgetary limitations will impede or prevent BIE from being able to comply with an injunction.

65.   HES presents a fluid situation, and Defendants need flexibility to adapt to changing circumstances.

66.   An injunction that binds Defendants to particular measures in implementing a trauma-informed school system may quickly become obsolete, and may prevent Defendants from taking measures that are more appropriate.

67.   For these reasons, even if Plaintiffs had satisfied the Court that Defendants are liable as to Count IV of the Third Amended Complaint, the Court would nonetheless decline to enter an injunction.

Respectfully submitted,

Dated:  July 2, 2020

JOSEPH H. HUNT
Assistant Attorney General
CARLOTTA P. WELLS
Assistant Branch Director

/s/ Cristen C. Handley
LISA A. OLSON, D.C. Bar No. 384266
CAROL FEDERIGHI, TX Bar No. 06872950
CRISTEN C. HANDLEY, MO Bar No. 69114
BRADLEY CRAIGMYLE, IL Bar No. 6326760
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Telephone: 202-305-2577
Facsimile: 202-616-8470
E-mail: cristen.handley@usdoj.gov