1

Alexis DeLaCruz (SBN 031273)
adelacruz@nativedisabilitylaw.org
NATIVE AMERICAN DISABILITY
LAW CENTER
905 W. Apache St.
Farmington, NM 87401
Telephone: 505.566.5880

Kathryn Eidmann (*pro hac vice*)
keidmann@publiccounsel.org
Jesselyn Friley (*pro hac vice*)
jfriley@publiccounsel.org
Mark Rosenbaum (*pro hac vice*)
mrosenbaum@publiccounsel.org
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: 213.385.2977

Maria Martinez-Sánchez (*pro hac vice*)
mmartinez@aclu-nm.org
AMERICAN CIVIL LIBERTIES UNION
of NEW MEXICO
1410 Coal Avenue SW
Albuquerque, NM 87104
Telephone: 505.266.5915

Bryan H. Heckenlively (*pro hac vice*)
Bryan.Heckenlively@mto.com
Emily Curran-Huberty (*pro hac vice*)
Emily.Curran-Huberty@mto.com
Allison M. Day (*pro hac vice*)
Allison.Day@mto.com
Alison Karol Sigurðsson (*pro hac vice*)
Alison.Sigurdsson@mto.com
April Youpee-Roll (*pro hac vice*)
April.Youpee-Roll@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone: 213.683.9100

Judith M. Dworkin (SBN 010849)
Judith.Dworkin@SacksTierney.com
David C. Tierney (SBN 002385)
David.Tierney@SacksTierney.com
SACKS TIERNEY P.A.
4250 N. Drinkwater Blvd., 4th Floor
Scottsdale, AZ 85251-3693
Telephone: 480.425.2600

Tara C. Ford (*pro hac vice*)
taraford@law.stanford.edu
William S. Koski (*pro hac vice*)
bkoski@law.stanford.edu
Stanford Law School
MILLS LEGAL CLINIC
YOUTH AND EDUCATION LAW
PROJECT
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone: 650.725.8581

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stephen C., a minor, by Frank C., guardian ad litem, et al.,<br><br>                                 *Plaintiffs*,<br><br>        v.<br><br>Bureau of Indian Education, et al.,<br><br>                                 *Defendants*. | No. 3:17-cv-08004-SPL<br><br>**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Plaintiffs Anna D., Olaf D., Moana L., Taylor P., Freddy P., and Native American Disability Law Center ("NADLC") (collectively, "Plaintiffs") submit the following proposed findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

**I.    Defendants Must Implement a Comprehensive Special Education Program at Havasupai Elementary School to Comply with Section 504**

**A.    Plaintiffs' Experts are Qualified and Their Opinions are Credible.**

1.    Based on Dr. George Batsche's substantial education, including an Ed.D. degree in School and Counseling Psychology and Special Education from Ball State University, and based on Dr. Batsche's experience, expertise, and qualifications, I find that Dr. Batsche is an expert in school psychology and special education, with an emphasis on systemic school reform and improvement initiatives and improving the performance of students with disabilities and at-risk populations.

2.    Based on Dr. Batsche's substantial education, experience, expertise, and qualifications, as well as the thoroughness and rigor of his analysis, which rests on a careful application of reliable scientific principles, I find Dr. Batsche's opinions expressed at trial to be credible.

3.    Based on Dr. Joseph Gentry's substantial education, including a Ph.D. in School Psychology from Illinois State University, and based on Dr. Gentry's experience, expertise, and qualifications, I find that Dr. Gentry is an expert in psychology and behavioral analysis, with an emphasis on evaluating students with disabilities and identifying appropriate support services.

4.    Based on Dr. Gentry's substantial education, experience, expertise, and qualifications, as well as the thoroughness and rigor of his analysis, which rests on a careful application of reliable scientific principles, I find Dr. Gentry's opinions expressed at trial to be credible.

5.    Based on Dr. Nancy Eldredge's substantial education, including a Ph.D. in Counseling from Oregon State University and a M.S. in Counseling with a Deaf Specialist

Certification from Oregon College of Education, and based on Dr. Eldredge's experience, expertise, and qualifications, I find that Dr. Eldredge is an expert in psychology, with an emphasis on evaluating individuals with hearing impairments and identifying appropriate support services.

6.      Based on Dr. Eldredge's substantial education, experience, expertise, and qualifications, as well as the thoroughness and rigor of her analysis, which rests on a careful application of reliable scientific principles, I find Dr. Eldredge's opinions expressed at trial to be credible.

**B.      Plaintiffs Include Students with Qualifying Disabilities.**

7.      Plaintiffs Taylor P., Freddy P., Olaf D., and Moana L. are school-aged children who are eligible to attend BIE schools as "Indian" students under 25 C.F.R. § 39.2.  Joint Final Pretrial Order at Section 3.D.8.

8.      Taylor P. is a rising 4th grade student.  She plans to attend HES next year.  She has specific learning disabilities and a disability related to trauma and stress.  She requires services for in math, reading, and writing, as well as counseling.  Her disabilities, including her disabilities related to trauma, substantially limit her ability to learn, read, think, concentrate, and communicate.  Her disabilities have adversely impacted her ability to access, participate in, and benefit from education at HES.  Joint Final Pretrial Order at Section 3.A.1–3; Gentry Testimony ___[1]; Ranjbar Testimony ___.

9.      Freddy P. is a rising 2nd grade student.  He plans to attend HES next year.  He has a mixed receptive-expressive language disorder and specific learning disabilities.  He requires services for reading and writing.  His disabilities substantially limit one or more major life activities.  These disabilities have adversely impacted his ability to access, participate in, and benefit from education at HES.  Joint Final Pretrial Order at Section 3.A.4–6; Gentry Testimony ___.

---

[1] For the above and subsequent citations to trial testimony, Plaintiffs anticipate that testimony supporting the proposition will be offered at trial based on prior depositions and other evidence.  Plaintiffs have not directed witnesses to provide particular testimony.

10.     Moana L. is a rising 3rd grade student.  She plans to attend HES next year.  She has a hearing impairment (unilateral hearing loss), vision impairment (correctible through eyeglasses), provisional specific learning disability, and chronic asthma.  She also has disabilities related to trauma and stress, including adjustment disorder with mixed anxiety and depressed mood.  She requires services in math, reading, and written expression, as well as speech therapy, counseling services, and services related to her hearing impairment/deafness.  Her disabilities, including her disabilities related to trauma, have substantially limited her ability to learn, read, think, concentrate, and communicate.  These disabilities have adversely impacted her ability to access, participate in, and benefit from education at HES.  Joint Final Pretrial Order at Section 3.A.7–9; Eldredge Testimony ___; Ranjbar Testimony ___.

11.     Olaf D. is a rising 2nd grade student.  He plans to attend HES next year.  He was provisionally identified as having a specific learning disability.  He also has a speech and language impairment.  He requires speech therapy services. His disabilities have adversely impacted his ability to access, participate in, and benefit from education at HES.  Joint Final Pretrial Order at Section 3.A.11–13; Gentry Testimony ___.

12.     Stephen C. and Durell P. previously attended HES.  At the time they attended HES, Stephen C. and Durell P. were school-aged children who were eligible to attend BIE schools as "Indian" students under 25 C.F.R. § 39.2.  Joint Final Pretrial Order at Sections 3.C.2, 3.C.7.

13.     Stephen C. has ADHD and a specific learning disability.   He also has disabilities related to trauma and stress, including a conduct disorder, an other-specified disruptive, impulse control and conduct disorder, and a cannabis disorder.  He requires services as a student with an Emotional Disturbance, as well as services in reading, writing, and math, and services to address behavioral and social/emotional needs.  His disabilities, including his disabilities related to trauma, have substantially limited his ability to learn, read, think, concentrate, and communicate.  These disabilities adversely impacted his ability

to access, participate in, and benefit from education at HES.  Joint Final Pretrial Order at Section 3.C.2–4; Gentry Testimony ____; Ranjbar Testimony ____.

14.    Durell P. has a history of ADHD and unspecified anxiety disorder.  He also has disabilities related to trauma and stress, including an emotional disability, mental health issues, oppositional defiant disorder, and a conduct disorder.  He requires services as a student with an Emotional Disturbance, as well as services in reading, math, and writing, and counseling and transition services.  His disabilities, including his disabilities resulting from trauma, have substantially limited his ability to learn, read, think, concentrate, and communicate.  These disabilities adversely impacted his ability to access, participate in, and benefit from education at HES.  Joint Final Pretrial Order at Section 3.C.5–6; Ranjbar Testimony ____.

### C.    Plaintiff Native American Disability Law Center Frequently Represents and Advocates for Other Students with Disabilities at HES

15.    Native American Disability Law Center ("NADLC") is a 501(c) nonprofit organization based in Farmington, New Mexico, that advocates for the legal rights of Native Americans with disabilities.  NADLC is a Protection and Advocacy Organization that is part of a system supported by federal allotments to protect the legal and human rights of individuals with disabilities, and is authorized by relevant federal statutes to initiate legal action designed to protect the rights of persons with disabilities.  42 U.S.C. § 15041 *et seq.*; *see also* 42 U.S.C. § 10805; 29 U.S.C. § 794e.  NADLC's mission is to advocate so that the rights of Native Americans with disabilities in the Four Corners area are enforced, strengthened, and brought in harmony with their communities.  Joint Final Pretrial Order at Sections 3.A.21, 3.D.11; Yanan Testimony ___.

16.    Between June 2014 and June 2020, NADLC received at least 15 requests for assistance from students with disabilities attending HES concerning the school's failure to provide special education instruction, related services, and appropriate resources to enable students with disabilities to participate in public education.  During that time period, NADLC provided legal assistance in 12 of those cases.  At least six of those cases have

1   required years of advocacy to address HES's longstanding failures and to ensure that
2   students obtained the special education services they were entitled to.  Further, several cases
3   continued after the students left HES and required additional education advocacy to address
4   their educational needs because they were so far behind academically.  Yanan Testimony
5   ___.

6       17.    NADLC has devoted significant organizational resources to identifying and
7   counteracting Defendants' practices.  As a direct consequence of Defendants' practices,
8   NADLC diverted its scarce resources from other efforts to promote and protect the rights of
9   Native Americans with disabilities.  Continued advocacy on behalf of Havasupai students
10  with disabilities will significantly diminish NADLC's resources and impact its ability to
11  serve other Native Americans with disabilities in the Four Corners area.  Joint Final Pretrial
12  Order at Section 3.C.1; Yanan Testimony ___.

13      **D.    Defendants Fail to Comply with Section 504 Because They Deny
14          Students With Disabilities Meaningful Access to Public Education.**

15      18.    Havasupai Elementary School ("HES") is a program or activity conducted
16  and/or administered and/or maintained by the Bureau of Indian Education ("BIE").  Joint
17  Final Pretrial Order at Section 3.D.1; Trial Exhibit 275 at 3 (Order on Motion for Partial
18  Relief, ECF No. 221); Trial Exhibit 282 at 1 (Defendants' Responses to Plaintiffs' First Set
19  of Requests for Admission).

20      19.    Defendants conceded that they failed to comply with Section 504.  The BIE
21  has not provided accommodations to students with disabilities at HES that would remedy
22  the BIE's failure to comply with its obligations under Section 504.  Trial Exhibit 274 at 3
23  (Defendants' Motion for Partial Relief, ECF No. 216); Apr. 18, 2019 Dearman 30(b)(6) Dep.
24  Tr. at 90:12—14.  Indeed, this Court found that Defendants failed to comply with Section
25  504.  Trial Exhibit 273 at 3 (Order Granting Defendants' Motion for Summary Judgment,
26  ECF No. 214) ("At the Motion Hearing, the Defendants admitted that they have failed to
27  provide basic education as required by the law; thus, the Court finds that there is no genuine
28

dispute as to the material facts of this case."); Trial Exhibit 275 at 6 (Order on Motion for Reconsideration, ECF No. 221).

20. Specifically, in opposing Plaintiffs' motion for summary judgment, Defendants did not contest that there were periods when HES did not employ the full-time staff—including special education teachers, general education teachers, and service providers such as mental-health counselors—required to provide services to students with disabilities, Trial Exhibit 271 at 11–12, 20, 29, 31 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1); did not contest that HES staff could not recall receiving training on Section 504 obligations and could not describe the requirements of Section 504, *id.* at 37, 40–41; did not contest that HES did not properly implement the accommodations identified in Student Plaintiffs' Individualized Education Plans, *id.* at 18, 20; did not contest that HES failed to identify and evaluate Student Plaintiffs who were identified as students with disabilities only because of this litigation, *id.* at 22, 24–25, 27–28; and did not contest that there were no written policies or complaint procedures in place relating to Section 504 at the close of discovery in April 2019, *id.* at 31, 38–40. Those failures should be remedied as described below.

**E.    Injunctive Relief Is Required to Provide Nondiscriminatory and Meaningful Access for Students with Disabilities.**

21. As explained by Plaintiffs' experts, there are several elements that must be in place to provide students with disabilities appropriate services as required by Section 504. Those elements include adequate staff, resources, and support services necessary to meet the needs of students with disabilities, as well as policies, procedures, and systems to ensure compliance with Section 504.  Batsche Testimony ___; Gentry Testimony ___; Eldredge Testimony ___.

**1.    HES Must Employ Qualified and Appropriately Trained Staff to Meet the Needs of Students with Disabilities.**

22. As explained by Plaintiffs' experts, schools must consistently employ qualified and appropriately trained staff—including special education teachers and special

education aides, general education teachers, service providers, and school leadership—to meet the needs of its students with disabilities.  Adequate staffing is essential to ensure that students with disabilities are promptly identified and evaluated and to provide instructional support, behavioral support, and individual services required by those students.  In addition, inadequate staffing, high rates of teacher turnover, overuse of substitute teachers, and inconsistent leadership have been shown to have negative impact on student achievement and growth.  Those impacts are particularly pronounced for students with disabilities.  Batsche Testimony ___.

### (a)   Special Education Teachers and Education Aides

23.   As explained by Plaintiffs' experts, schools must have an adequate number of qualified special education teachers and special education aides, who are specifically trained to provide special education services and are responsible for providing those services in order to meet the needs of students with disabilities.  Special education services are those services provided to students with disabilities, not a place or separate education system.  Batsche Testimony ___.

24.   Many students with disabilities require individualized services that must be provided one-on-one or in small group settings, or that require specialized training.  Special education teachers and special education aides may either provide special education services within a general education teacher's classroom or in a separate classroom, depending on the needs of the students.  Batsche Testimony ___; Gentry Testimony ___; Eldredge Testimony ___.

25.   Defendants' failure to employ adequate special education teachers and special education support staff has deprived Plaintiffs and other students with disabilities of nondiscriminatory and meaningful access to HES.

26.   As of the 2018-2019 school year, HES's organization chart reflected that the school should have two special education teachers and three special education aides.  Between 2017 and the close of fact discovery in April 2019, HES had, at most, only one special education teacher and no special education aides as members of the full-time staff.

HES frequently relied on detailed staff to provide special education services.  Trial Exhibit 281 at 5-6, Attachment 4 (Defendants' Responses to Plaintiffs' First Set of Interrogatories). Defendants conceded that HES is not "fully staffed" when it uses detailed teachers.  Trial Exhibit 271 at 28 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1).  Even when HES had a special education teacher, she was often asked to serve as a substitute general education teacher or acting principal, interfering with her ability to provide special education services to students.  *Id.* at 29; Muhammad Dep. Tr. at 174:17–175:3; Boyd Dep. Tr. at 36:14–39:5, 40:1–42:5, 77:6–20; Trial Exhibit 190 (BIE00005904).  HES continued to rely on detailed staff throughout the 2019—2020 school year.  Joint Final Pretrial Order at Section 3.B.7; Trial Exhibit 1012.

27.     For the 2020–2021 school year, HES's organization chart reflects that the school should have three special education teachers and two special education aides.  Trial Exhibit 1011.  Although Defendants' represent that there are currently two special education teachers on staff at HES who have signed contracts for the 2020–2021 school year, they concede that BIE already anticipates that one of those teachers may not fulfill their contract.  Joint Final Pretrial Order at Section 3.B.7.  Defendants also acknowledge that they have only one special education aide and that one of the special education teachers for the 2019-2020 school year was detailed to HES and is currently on a short-term contract.  Joint Final Pretrial Order at Section 3.B.7.

28.     As a result of the inadequate number of special educations teachers and special education aids at HES, Plaintiffs and other students with disabilities did not and likely will not receive the services to which they are entitled.  Former HES administrators and teachers are aware that students with disabilities do not receive the services they are entitled to at least in part because of the lack of special education teachers.  Apr. 17, 2019 Dearman Dep. Tr. at 121:8–122:7; Williamson Dep. Tr. at 64:22–65:12; Ticeahkie Dep. Tr. at 57:4–19.  Defendants conceded that HES "is hampered in its ability to provide services to students because of its lack of staff."  Trial Exhibit 271 at 42 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1).  In

responding to Plaintiffs' motion for summary judgment, Defendants failed to dispute that Student Plaintiffs' IEPs had not been implemented due to a lack of special education teachers, counselors, or related service providers at HES. *Id.* at 17, 20.  At least one former special education teacher has testified that a lack of consistent services has had an adverse impact on HES students.  *Id.* at 30; Boyd Dep. Tr. at 160:14–162:19.

29.     Accordingly, any remedy for Defendants' violation of Section 504 must include a plan for recruiting and retaining qualified special education teachers and special education aides in order to ensure students with disabilities have nondiscriminatory and meaningful access to HES.

### (b)     General Education Teachers

30.     As explained by Plaintiffs' experts, in addition to special education teachers and special education aides, schools must also have an adequate number of qualified general education teachers, who are also trained to provide accommodations to students with disabilities, in order to meet the needs of students with disabilities.  General education teachers provide instruction to all students, including students with disabilities. Strengthening general education services is an essential part of setting high academic expectations for students with disabilities.  Highly effective educators have the capacity to provide needed special education and related services.  Factors such as limited instructional options, lack of knowledge about differences in learning styles, poor student attendance, teacher absences, and frequent use of substitutes negatively impact the effectiveness of teaching and student outcomes, particularly for students with disabilities.    Batsche Testimony ____.

31.     Many students with disabilities require accommodations from their general education teachers in addition to services provided by special education teachers or special education aides.  When there are not an adequate number of general education teachers, those teachers cannot provide those accommodations.  When special education teachers are required to substitute for general education teachers, they cannot provide special education services.  Batsche Testimony ____; Gentry Testimony ____; Eldredge Testimony ____.

PLAINTIFFS PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

32.     Defendants' failure to fully staff HES with full-time, as opposed to detailed, general education teachers has deprived Plaintiffs and other students with disabilities of nondiscriminatory and meaningful access to HES.

33.     As of the 2018—2019 school year, HES's organization chart reflected that the school should have 17 full-time employees, including 5 general education teachers.  Trial Exhibit 190 (BIE00005904); Apr. 18, 2019 Shamblin 30(b)(6) Dep. Tr. at 119:7–22; Apr. 17, 2019 Dearman Dep. Tr. at 62:15–16, 91:6–7, 232:17–23, 233:3–16.  For the 2020-2021 school year, HES's organization chart reflects that the school should have 17 full-time employees, including 5 general education teachers.  Trial Exhibit 1011.

34.     As of the close of fact discovery in April 2019, HES had at most 2 full-time general teachers.  Trial Exhibit 281 at 5-6, Attachment 4 (Defendants' Responses to Plaintiffs' First Set of Interrogatories).  Between 2017 to the close of fact discovery, HES relied on detailed teachers for months at a time, with those detailed teachers often each staying for only a week or two.  *Id.*; Apr. 17, 2019 Dearman Dep. Tr. at 53:3–20, 165:14–166:14; Hastings Dep. Tr. at 170:11–20, 177:7–19; Trial Exhibit 145 (BIE0001806); Trial Exhibit 144 (BIE0001752); Trial Exhibit 97 (BIE0001837).  HES continued to rely on detailed staff throughout the 2019-2020 school year.  Joint Final Pretrial Order at Sections 6.B.2, 3.B.7; Trial Exhibit 1012.  Defendants conceded that HES is not "fully staffed" when it uses detailed teachers.  Trial Exhibit 271 at 28 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1).

35.     Defendants concede that they do not currently have a full staff for the 2020—2021 school year.  They state that there are only three general education teachers who have signed contracts for the 2020—2021 school year and that HES is currently working to post two additional general education positions, but acknowledge that BIE may need to detail staff to the extent practicable to fill any unmet staffing needs.  Joint Final Pretrial Order at Section 3.B.7.

36.     Former general education teachers and administrators described the challenges they faced due to lack of staff at HES and admitted that at times they did not meet the needs

of students with disabilities or implement their accommodations.  Muhammad Dep. Tr.at 175:13–176:23, 224:14–226:1; 227:1–228:23; Maldonado 148:8–19..

37.    The lack of general education teachers at HES often required special education teachers to substitute as general education teachers.  As a result, special education teachers were frequently unable to provide required services to students with disabilities.  Boyd Dep. Tr. at 36:14–42:5; 77:6–20.  Defendants conceded that HES "is hampered in its ability to provide services to students because of its lack of staff."   Trial Exhibit 271 at 42 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1); *see also* Boyd Dep. Tr. at 160:14–162:19.

38.    The lack of consistent instruction and services adversely impacted students at HES, including those with disabilities.  With each new teacher, students experienced anxiety and lost instructional time because they are learning new "routine[s], personalities and expectations" rather than curriculum.  In addition, new teachers were often uncertain what material has been covered and therefore could not adequately cover the required curriculum. Trial Exhibit 271 at 30 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1); Boyd Dep. Tr. at 162:5–19; Williamson Dep. Tr. at 34:21–35:24, 38:6–19, 233:12–19; Muhammad Dep. Tr. at 73:7–74:10; 226:6–25.  As at least HES administrators recognized, the constant turnover affected students' ability to succeed academically and to learn to self-regulate in the classroom.  Williamson Dep. Tr. at 34:21–35:19, 233:12–19.

39.    Accordingly, any remedy for Defendants' violation of Section 504 must include a plan for recruiting and retaining general education teachers in order to ensure nondiscriminatory and meaningful access to HES for students with disabilities.

### (c)    Service Providers

40.    As explained by Plaintiffs' experts, in addition to special education teachers, special education aides, and general education teachers, schools must employ or have ready access to qualified service providers who can provide additional services necessary to evaluate and meet the needs of students with disabilities.  Depending on the needs of

students with disabilities at a particular school, those support services may include mental health counselors, behavior analysts, and other specialists.  Batsche Testimony ___; Gentry Testimony ___; Eldredge Testimony ___.

41.     In order to determine whether a student requires special education services or other accommodations, students must be evaluated by specialists to determine the nature of the students' disability and to identify services and accommodations for the student. Batsche Testimony ___; Gentry Testimony ___; Eldredge Testimony ___.

42.     Once evaluated, many students with disabilities also require support services beyond what can be provided by a special education teacher, special education aide, or general education teacher.  The failure to provide those support services has significant short-term and long-term impacts on educational outcomes for students with disabilities. In the short-term, without appropriate support services and supports, students experience poor academic growth, low test scores, poor peer relationships, poor graduation rates.  In the long-term, this type of failure results in delayed graduation and higher drop-out rates. Batsche Testimony ___.

43.     Defendants' failure to provide necessary support services have delayed or deprived Plaintiffs and other students with disabilities of nondiscriminatory and meaningful access to HES.

44.     HES does not consistently have a professional counselor on staff, mental health counseling services are not always available to students at HES, and HES did not have ready access to qualified evaluators at various times.  BIE has instead provided mental health counselors to students on a one-off basis through the Indian Health Services or by hiring providers on a contract basis.  Although HES did employ a professional counselor during the 2018-2019 school year, she was often unable to provide counseling services because she was called upon to teach general education.  Trial Exhibit 271 at 12, 31, 37 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1); Trial Exhibit 281 at 7, Attachment 10 (Defendants' Responses to Plaintiffs' First Set of Interrogatories); Trial Exhibit 282 at 8 (Defendants' Responses to Plaintiffs'

1    First Set of Requests for Admission); Apr. 17, 2019 Dearman Dep. Tr. at 163:3–6;

2    Hastings Dep. Tr. at 112:11–114:3, 114:9–115:10, 116:7–12, 116:18–117:3, 118:14–

3    119:2, 119:15–120:7, 260:6–261:2; Roanhorse-Dineyahze Dep. Tr. at 166:2–168:22,

4    174:11–175:23; Trial Exhibit 145 (BIE00001806).

5        45.    Defendants contend that some of those services can be provided through

6    tele-behavioral health services, but have not presented any evidence regarding the efficacy

7    of those services, particularly for students with disabilities.  Joint Final Pretrial Order at

8    Section 3.B.8, 3.B.11.

9        46.    As a result, many students with disabilities at HES were not able to receive

10   necessary counseling and behavioral health services.  For example, Plaintiffs Taylor P.,

11   Moana L., and Stephen C. did not receive consistent counseling services at HES, even

12   though they were entitled to those services.  Hoechst Testimony ____.  In responding to

13   Plaintiffs' motion for summary judgment, Defendants failed to dispute that Student

14   Plaintiffs' IEPs had not been implemented due to a lack of special education teachers,

15   counselors, or related service providers at HES.  Trial Exhibit 271 at 17, 20 (Defendants'

16   Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1).  At least

17   one former special education teacher has testified that a lack of consistent services has had

18   an adverse impact on HES students.  *Id.* at 30; Boyd Dep. Tr. at 160:14–162:19.

19       47.    HES frequently did not have ready or reliable access to qualified evaluators.

20   BIE instead provided qualified evaluators on a contract basis.  Roanhorse-Dineyahze Dep.

21   Tr. at 166:2–168:22, 174:11–175:23; Trial Exhibit 281 at 7, Attachment 10 (Defendants'

22   Responses to Plaintiffs' First Set of Interrogatories).  Many students with disabilities at

23   HES, including Student Plaintiffs Moana L., Olaf D., and Freddy P. were not able to

24   receive evaluations in a timely matter.  Hoechst Testimony ____; Gentry Testimony ____.

25   Because HES did not have adequate staffing or supports to properly evaluate students with

26   disabilities for special education services, Olaf D.'s Student Assistance Team ("SAT")

27   process—a process that involves identifying students who might be struggling, applying

28   interventions, monitoring the student's progress, and using the results to determine the

students' eligibility for services—was not properly implemented during the 2019-2020 school year.  This further delayed his identification as a student with a disability eligible for special education services.  Joint Final Pretrial Order at Section 3.A.16; Hoechst Testimony ___.

48.     Accordingly, any remedy for Defendants' violation of Section 504 must ensure that qualified evaluators are regularly available to provide Section 504 evaluations and that a full-time professional counselor and other service providers are employed or contracted to provide services to HES in order to ensure nondiscriminatory and meaningful access to HES for students with disabilities.

**(d)     Section 504 Committee and Section 504 Coordinator**

49.     As explained by Plaintiffs' experts schools must have a Section 504 Committee comprised of personnel knowledgeable about the students' educational history, individual needs, able to understand evaluation data, and familiar with services, placement and support options in order to ensure that the school meets the needs of its students with disabilities.  This Committee should be chaired by a designated Section 504 Coordinator. Batsche Testimony ___.

50.     Section 504 Committees led by a Section 504 Coordinator play an important role in ensuring compliance with Section 504.  Section 504 Committees are typically composed of teachers and other staff who are knowledgeable about Section 504.  Section 504 Committees typically implement a school's Section 504 procedures and safeguards to ensure that the evaluation and eligibility process is carried out in an appropriate and timely manner, receive complaints, and serve as a resource for other teachers and for families. Batsche Testimony ___; Trial Exhibit 1006 at 48 (Section 504 Presentation).

51.     As of April 2019, HES did not have a Section 504 Committee or a Section 504 Coordinator.  Hastings Dep. Tr. at 242:4–7.  Instead, Defendants stated that the DOI Office of Civil Rights and HES staff were responsible for ensuring HES's compliance with Section 504.  Trial Exhibit 281 at 9 (Defendants' Responses to Plaintiffs' First Set of Interrogatories).  During that period, however, HES administrators and teachers were not

1   familiar with the requirements of Section 504.  Trial Exhibit 271 at 37 (Defendants'
2   Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1);
3   Roanhorse-Dineyahze Dep. Tr. at 56:10–11, 56:13–21, 158:5–10; Paddock Dep. Tr. at
4   144:8–21, 151:13–16, 151:18; Maldonado Dep. Tr. at 156:24-25; 157:2–8.  In addition, the
5   DOI Office of Civil Rights failed to provide any guidance to teachers and staff at HES, and
6   failed to provide timely responses to Section 504 complaints.  Trial Exhibit 271 at 40–41
7   (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-
8   1); Apr. 17, 2019 Dearman Dep. Tr. at 141:23–142:18; Maldonado Dep. Tr. at 1150:1–3;
9   Williamson Dep. Tr. at 152:20–22; Roanhorse-Dineyahze Dep. Tr. at 154:7–10; Paddock
10  Dep. Tr. at 140:16–21; Boyd Dep. Tr. at 163:23–164:1; Muhammad Dep. Tr. at 183:9–12;
11  Yanan Testimony ___; Hoechst Testimony ___.

12      52.     As a result, Student Plaintiffs and other students represented by NADLC
13  were not identified or evaluated in an appropriate and timely manner.  In addition, Student
14  Plaintiffs and other students represented by NADLC were unable to get information
15  regarding the evaluation and eligibility process and complaints related to Section 504 were
16  not responded to in a timely manner, if at all.  Yanan Testimony ___; Hoechst Testimony
17  ___.

18      53.     Accordingly, any remedy for Defendants' violation of Section 504 must
19  provide for a Section 504 Committee and Section 504 Coordinator in order to ensure
20  students with disabilities have nondiscriminatory and meaningful access to HES.

21          **(e)     Professional Development and Coaching**

22      54.     As explained by Plaintiffs' experts, all staff must receive appropriate
23  professional development opportunities, including trainings, coaching, and regular
24  evaluations to ensure that staff have the knowledge, skills, and capacity to meet the needs of
25  students with disabilities. .  Batsche Testimony ___; Gentry Testimony ___.

26      55.     Defendants' failure to provide adequate training to teachers and staff on how
27  to identify and accommodate students with disabilities have deprived Plaintiffs and other
28  students with disabilities of nondiscriminatory and meaningful access to HES.

56.     As of April 2019, when discovery closed, neither BIE nor HES provided training to teachers or staff at HES on Section 504 or how to accommodate students with disabilities.  Trial Exhibit 271 at 40–41 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1); Apr. 17, 2019 Dearman Dep. Tr. at 141:23–142:18; Maldonado Dep. Tr. at 150:1–3; Williamson Dep. Tr. at 152:20–22; Roanhorse-Dineyahze Dep. Tr. at 154:7–10; Paddock Dep. Tr. at 140:16–21; Boyd Dep. Tr. at 163:23–164:1; Muhammad Dep. Tr. at 183:9–12.

57.     Although Defendants contend that Marcy Oliver, as Acting Section 504 Coordinator, provided various Section 504 trainings between April 2019 and March 2020, those selected trainings are not sufficient to provide adequate training to teachers and staff at HES, and particularly new teachers and staff at HES, on how to identify, evaluate, and accommodate students with disabilities.  Joint Final Pretrial Order at Section 3.B.5; Batsche Testimony ____.

58.     As a result of lack of training, even former administrators at HES could not identify any methods by which HES endeavors to identify children in the community who may need special education services, could not describe the assessments available to students potentially needing special education services, and could not identify procedures by which a student or parent could file a complaint under Section 504.  Trial Exhibit 271 at 37 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1); Roanhorse-Dineyahze Dep. Tr. at 56:10–11, 56:13–21, 158:5–10; Paddock Dep. Tr. at 144:8–21, 151:13–16, 151:18; Maldonado Dep. Tr. at 156:24–25, 157:2–8.

59.     Defendants' failure to provide appropriate training to HES staff on Section 504 or how to accommodate students with disabilities has harmed and will continue to harm students with disabilities.  Without knowledge of the disabilities covered by Section 504, the process for identifying students with disabilities, and best practices for providing accommodations and services to students with disabilities, staff will be unlikely to promptly identify students with disabilities or provide those students with the services they require. For example, Student Plaintiffs Taylor P., Freddy P., Moana L., and Olaf D. were identified

as students with disabilities only through this litigation. Trial Exhibit 271 at 22-25, 27 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1); Trial Exhibit 269 at 5-7 (Oliver Declaration); Eldredge Testimony ___; Gentry Testimony ___.   When students with disabilities do not receive appropriate accommodations, they are more likely to experience negative outcomes including decreased rates of learning, decreased test scores, decreased graduation rates, and increased mental health issues.  Batsche Testimony ____; Gentry Testimony ___.

60.    Accordingly, any remedy for Defendants' violation of Section 504 must provide the training described above to teachers and staff in order to ensure students with disabilities have nondiscriminatory and meaningful access to HES.

**2.    HES Must Provide School-Wide Instructional and Behavioral Supports and Appropriate Individual Supports to Enable Students with Disabilities to Access and Benefit from Public Education.**

61.    As explained by Plaintiffs' experts, adequate staffing alone is not sufficient to ensure compliance with Section 504.  In addition, in order to enable students with disabilities to access and benefit from public education, school staff must work together to implement the school-wide instructional materials and supports required to ensure that all students meet state-level academic standards; provide school-wide behavioral, mental-health, and social-emotional resources necessary to strengthen student engagement in the process of schooling; and provide a continuum of individual support services tailored to the needs of students with disabilities.  Batsche Testimony __.

**(a)    School-Wide Instructional Supports**

62.    As explained by Plaintiffs' experts, schools must have adequate school-wide instructional supports to enable students with disabilities at HES to access and benefit from its educational program.  Section 504 requires that students with disabilities be educated with their peers within the general education classroom setting to the extent possible and make progress in the general education curriculum aligned to applicable standards.  While many services can be provided on an individual basis, many instructional and behavioral

supports must be provided on a school-wide basis in order to provide a foundation for identifying students with disabilities and ensuring that students with disabilities are educated in the least-restrictive setting.  Teachers are likely to provide highly effective instruction when they use multiple methods of presenting instruction to accommodate the needs of diverse learners, allowing students to use multiple ways to express their knowledge and what they have learned and implementing strategies to ensure student engagement in the learning process. Schools must educate students with disabilities with non-disabled peers to the maximum extent possible using supplementary aids and services when necessary to preserve such a placement.  Students with disabilities should be removed from the regular educational environment only when it is demonstrated that the student is not achieving satisfactory results. This premise is the same for nonacademic and extracurricular services and activities as well.  Batsche Testimony ___.

63.     Adequate school-wide instructional supports, which include effective general education instruction and address multiple learning styles, are essential to prevent over-identification of students with disabilities and ensure that students with disabilities have equity in access to the general education curriculum.  Over-identification of students with disabilities strains available resources and may mean that students with disabilities do not receive sufficient instruction or related services.  Although effective instruction is important for all students, it is particularly important for students with disabilities who are often further behind than their peers.  Batsche Testimony ___.

64.     Many of the instructional supports Plaintiffs' experts recommended for the Student Plaintiffs who were evaluated as part of this litigation are most effective when implemented on a school-wide basis, and some may even require school-wide implementation.  Those supports include providing intensive, high quality, and consistent instruction in reading, writing, and mathematics; systematic and explicit teaching from a program or programs with scientific evidence to support the effectiveness; multisensory teaching including visual, auditory, and kinesthetic-tactile pathways; regular assessments

with student involvement in tracking progress on those assessments.  Gentry Testimony ___; Eldredge Testimony ___.

65.     Defendants' failure to provide school-wide instructional supports has deprived Plaintiffs and other students with disabilities of nondiscriminatory and meaningful access to HES.

66.     Those deprivations have resulted in significant educational deficits.  As Defendants acknowledge, school-wide data from recent school years reflect that students at HES are significantly underperforming compared to their peers.  Trial Exhibit 271 at 13 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1); Trial Exhibit 147 at 2 (BIE00001986); Paddock Dep. Tr. at 63:25–64:9.  Those educational deficits can translate into long-lasting negative effects on educational attainment, employment outcomes, and mental health.  Those negative effects are particularly pronounced for students with disabilities.  Batsche Testimony ____.

67.     Accordingly, any remedy for Defendants' violation of Section 504 must include a plan to ensure that HES provides appropriate and evidence based school-wide instructional supports.

**(b)     School-Wide Behavioral Supports**

68.     As explained by Plaintiffs' experts, schools must have adequate school-wide behavioral supports in order to enable students with disabilities at HES to access and benefit from its educational program.  Maintaining a consistent and predictable school environment that ensures students emotional well-being and provides a system of behavioral supports is important for all children, but is particularly important for students with disabilities who may be more susceptible to bullying and mental-health issues.  Batsche Testimony ___.  BIE administrators similarly recognize that it is important to use behavioral management techniques consistently within a classroom and across classes.  Trial Exhibit 1006 at 18 (Section 504 Presentation).

69.     Adequate school-wide behavioral supports, which include behavioral and social-emotional instruction and access to mental health counselling and behavioral support

services, are essential to prevent over-identification of students with disabilities and to ensure that all students—and particularly students with social-emotional disabilities—are not subjected to exclusionary discipline policies that would prevent students from receiving special education services in the least restrictive environment possible.  Batsche Testimony ___; Trial Exhibit 1006 at 57 (Section 504 Presentation).

70.    Many of the behavioral supports Plaintiffs' experts recommended for the Student Plaintiffs who were evaluated as part of this litigation are most effective when implemented on a school-wide basis, and some may even require school-wide implementation.  Those supports include providing a structured classroom setting that is free from distractions and has clear expectations and consequences for behavior; positive reinforcement systems; and proactive responses to bullying.   Gentry Testimony ___; Eldredge Testimony ___.

71.    HES does not have a system of behavioral supports or alternatives to exclusionary practices.  HES instead frequently resorts to exclusionary practices for students with disabilities and on multiple occasions called law enforcement to response to student behaviors.  Maldonado Dep. Tr. at 206:14–15, 206:17–207:22; Roanhorse-Dineyahze Dep. Tr. at 182:25–184:6; Ticeahkie Dep. Tr. at 57:20–58:5; Boyd Dep. Tr. at 125:19–126:9.

72.    As a result, Student Plaintiffs and other students with disabilities were frequently sent home without notice, suspended, placed on alternative schedule, or confronted by police when other, less restrictive, measures could have been taken to address behavioral issues.  Stephen C. and Durell P., for example, have long histories of not attending a full day of school, including being suspended, sent home, placed on a shortened school day, sent to alternative placements, and confronted or arrested by police.  Trial Exhibit 271 at 17, 20, 32 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1); Ticeahkie Dep. Tr. at 57:20–58:5; Boyd Dep. Tr. at 125:19–126:9; Maldonado Dep. Tr. at 123:6–124:4, 127:21–24, 132:4–20, 172:21–173:22, 186:3–187:16, 206:14–15, 206:17–207:22; Roanhorse-Dineyahze Dep. Tr. at 176:22–177:4,

182:25–184:6, 185:5–15, 229:12–231:16; Williamson Dep. Tr. at 60:21–65:16; Trial Exhibit 260 (BIE00019080); Trial Exhibit 178 (BIE00004289).

73.     Those exclusionary policies prevent students with disabilities from obtaining meaningful access to HES.  When excluded from school because of behaviors that result from their disabilities, students with disabilities are not receiving instruction in the least restrictive environment and are being discriminated against on the basis of their disability. Batsche Testimony ___.

74.     Accordingly, any remedy for Defendants' violation of Section 504 must include a school-wide system of behavioral supports and elimination of exclusionary discipline policies in order to ensure nondiscriminatory and meaningful access to HES for students with disabilities.

### (c)     Individual Support Services

75.     As explained by Plaintiffs' experts, students with disabilities may require additional support services that align with students' individual needs.  Students with disabilities require the most effective teaching that is increased through the provision of related services and aids.  Support services should be provided through a multi-tiered system of support, which offers multiple levels of intensity of instruction and intervention that can be tailored to the needs of students with disabilities.  Effective instruction and related services must be delivered in sufficient amount not only to support year-over-year expected growth, but to also close the achievement and behavior gaps year-over-year that result from the students' disabilities.  Providing appropriate support services is necessary to enable students with disabilities to access and benefit from public education.  Batsche Testimony ___.

76.     Failure to provide effective instruction and related services has short-term effects on students' academic growth, test scores, and peer relationships, and long-term effects on graduation rates, future employment, and self-esteem.  Batsche Testimony ___.

77.     Plaintiffs' experts recommended the following individual support services for the Student Plaintiffs who were evaluated as part of this litigation:

a.     Stephen C. would benefit from intensive, high quality, and consistent instruction to address his reading skills, including small-group reading instruction with a teacher with specialized training in reading instruction; goals, accommodations, and modifications addressing his specific learning disability in reading, written expression, and mathematics, as well as social-emotional and behavioral skills; preferential seating; additional time on assignments or tests; a targeted behavioral intervention plan; assistance with tracking assignments and other organizational strategies; and mental health counseling focused on behavioral treatment.  Gentry Testimony ___.

b.     Taylor P. would benefit from intensive, high quality, and consistent instruction in reading, writing, and math, including small-group integrated reading, writing, and math instruction. Gentry Testimony ___.

c.     Freddy P. would benefit from intensive, high quality, and consistent instruction in reading, writing, and math, including small-group integrated reading, writing, and math instruction; speech and language therapy; preferential seating; additional time on assignments or tests; a targeted behavioral intervention plan; and counseling focused on coping strategies.  Gentry Testimony ___.

d.     Olaf D. would benefit from intensive, high quality, and consistent instruction in reading and writing, including small-group integrated reading and writing instruction; further testing for speech and language functioning; preferential seating; additional time on assignments or tests; and skills instruction to help him plan, execute, and complete assignments, track his assignments, and organize his work on a regular basis.  Gentry Testimony ___.

e.     Moana L. would benefit from smaller class size, one-on-one instruction, reduced assignments, repetition, and preferential seating; mental health counseling to address stress and frustration; further assessment for potential attention-related deficits; additional academic interventions such as pre-teaching

1    and re-teaching lessons; verbal interventions; and an Assistive Technology

2    Evaluation.  Eldredge Testimony ____.

3    78.    Student Plaintiffs' IEP's similarly reflect that they require a public school

4    with the capacity to provide an array of special education supports and services necessary

5    to meet their individual needs:

6    a.    Pursuant to Freddy P.'s IEP, he is entitled to receive (1) five 30-

7    minute sessions per week (150 minutes total) of written expression services provided

8    by a special education teacher, in consult with a general education teacher; and (2)

9    five 60-minute sessions per week (300 minutes total) of reading services provided by

10    a special education teacher.  Freddy P. is further scheduled to receive the following

11    related service:  one 30-minute session per week of speech/language services

12    provided by a speech-language pathologist ("SLP").  Joint Final Pretrial Order at

13    Section 3.A.13; Trial Exhibit 1096; Trial Exhibit 1097.

14    b.    Pursuant to Taylor P.'s IEP, she is entitled to receive (1) five 45-

15    minute sessions per week (225 minutes total) of reading services provided by a

16    special education teacher; (2) five 30-minute sessions per week (150 minutes total)

17    of written expression services provided by a special education teacher; and (3) five

18    45-minute sessions per week (225 total) of math services provided by a special

19    education teacher.  Taylor P. is further scheduled to receive the following related

20    service: one 30-minute session per week of counseling services provided by a

21    counselor, with progress measured by the counselor.  Joint Final Pretrial Order at

22    Section 3.A.17; Trial Exhibit 1099.

23    c.    Pursuant to Moana L.'s IEP, she is entitled to receive (1) one 30-

24    minute session per week of math services provided by a special education teacher

25    and general education teacher/assistant; (2) five 30-minute sessions per week (150

26    minutes total) of reading services provided by a special education teacher; and (3)

27    four 10-minute sessions per week (40 minutes total) of written expression services

28    provided by a special education teacher and general education teacher/assistant.

Moana L. is further scheduled to receive the following related services:  (1) one 3-minute session per week (approximately 15 minutes per month) of speech/language consultation services provided by a SLP; and (2) one 30-minute session per week of counseling services provided by a counselor.  Joint Final Pretrial Order at Section 3.A.19; Trial Exhibit 1100.

d.      Pursuant to Olaf D.'s IEP, he is entitled to receive one 15-minute session per week of speech services provided by a SLP.  Joint Final Pretrial Order at Section 3.A.15.  Olaf D. may be entitled to additional services, but because he has not been provided with Student Assessment Team ("SAT") interventions, it has not been determined whether he also qualifies as a student with a specific learning disability and thus may be entitled to additional services.  Joint Final Pretrial Order at Section 3.A.16; Trial Exhibit 1098.

79.    Defendants' failure to provide individual support services has deprived Plaintiffs and other students with disabilities of meaningful access to HES.

80.    As of April 2019, HES could not provide an adequate continuum of placement options for students with disabilities.  For example, HES did not have the space or support in place to educate even one to three students in a self-contained classroom, even if that arrangement were a necessary accommodation.  Maldonado Dep. Tr. at 180:18–181:24.  In addition, during periods when HES had no special education teacher or the special education teacher was serving as a substitute, students could not receive the individualized or small-group support services they required.

81.    As a result, students with disabilities at HES did not receive the individual support service to which they were entitled.  Defendants concede that due to staffing shortages and turnover during the 2019-2020 school year, BIE could not provide all special education service hours owed to Freddy P., Taylor P., and Moana L. pursuant to their IEPs.  Joint Final Pretrial Order at Sections 3.A.14, 3.A.18, 3.A.20.  In addition, Olaf D. was not provided with SAT interventions.  Joint Final Pretrial Order at Section 3.A.16.  Student

1   Plaintiffs are owed significant services hours to make up for the services they did not

2   receive during the 2019—2020 School Year.  Hoechst Testimony ___.

3       82.     In some cases, students with disabilities even received less instructional time

4   or were placed outside of HES altogether.  For example, because HES did not have a

5   continuum of placements available to meet Stephen C's needs, he only received four hours

6   of academic instruction a day for four months during the 2018–2019 School Year.  Durell

7   P. was placed in alternative placement by his IEP Team because HES did not have a

8   continuum of placements available to meet his needs.  Ticeahkie Dep. Tr. at 57:20–58:5;

9   Boyd Dep. Tr. at 125:19–126:9; Trial Exhibit 178 (BIE00004289).

10      83.     If provided with adequate individual support services, students at HES—

11  including students with disabilities—can receive nondiscriminatory and meaningful access

12  to education.

13      84.     Accordingly, any remedy for Defendants' violation of Section 504 must

14  include appropriate instructional and support services to ensure students with disabilities

15  have nondiscriminatory and meaningful access to HES.

16               **(d)     Community Involvement**

17      85.     As explained by Plaintiffs' experts, positive engagement with families and

18  partnerships between families and educators improves student outcomes, particularly for

19  students with disabilities.  Increased connections between families and educators have a

20  direct positive impact on academic outcomes.   These connections improve student

21  attendance, increase educational attainment, and decrease the need for special education

22  services. They also improve student social-emotional outcomes by improving self-

23  awareness, self-management, social awareness, relationship skills, responsible decision-

24  making, school-based behavior, and relationships with others.   Partnerships between

25  families and educators result in educators having a better understanding of a child's strengths

26  and needs, increased collaboration to ensure consistent implementation of behavioral and

27  social-emotional supports, and earlier identification of students' needs.   Schools are

28  responsible for re-engaging disenfranchised families through regular and frequent

communication with families, school and family activities, family and community members on school boards, and requesting and valuing parent volunteers.  Schools are responsible for ensuring outreach, education, and engagement with families.  Batsche Testimony ___.

86.    Many of the accommodations and individual supports Plaintiffs' experts recommended for the Student Plaintiffs who were evaluated as part of this litigation require communication and cooperation between teachers and students' parents and guardians, including monitoring progress on academic and social-emotional skills; developing behavioral goals, interventions, and reward systems; encouraging reading outside the classroom; encouraging involvement in community activities and other interactions with both peers and adults.  Gentry Testimony ___; Eldredge Testimony ___; Hoechst Testimony ___.

87.    Defendants' failure to adequately communicate with and engage families and community members has deprived Plaintiffs and other students with disabilities of meaningful access to HES.  Hoechst Testimony ___.

88.    As of April 2019, when discovery closed, HES did not have policies or practices in place to facilitate coordination between teachers and parents or to encourage community involvement at the school.  HES does not host school events or coordinate with the School Board, and HES teachers do not participate in the community or invite parents or community members to participate in school activities.  Dominic Manakaja Testimony ___; Carletta Tilousi Testimony ___.

89.    As a result, relations between HES and the community have been strained, and these strained relationships have had and can be expected to have adverse effects on student behavior and academic performance.  Trial Exhibit 126 (Mar. 27, 2018 Letter from Tribal Council to Director Dearman); Manakaja Testimony ___; Tilousi Testimony ___; Batsche Testimony ___.  In addition, the lack of communication between HES staff and parents or guardians interferes with timely identification and evaluation of students with disabilities.  Hoescht Testimony ___.

90.     Defendants suggest that HES's "attempts to engage with families and the community have met with mixed results," Joint Final Pretrial Order at Section 4.A.17, but do not provide any evidence about those efforts and whether those efforts were sufficient to re-engaging disenfranchised families.  Batsche Testimony ___.

91.     Accordingly, any remedy for Defendants' violation of Section 504 must include measures intended to increase communication and collaboration with families and members of the community to ensure students with disabilities have nondiscriminatory and meaningful access to HES.

**3.      HES Must Have Policies and Procedures in Place to Ensure the Proper Implementation of the Nondiscrimination Requirement in Section 504.**

92.     As explained by Plaintiff's experts, schools must have procedural safeguards in order to ensure compliance with Section 504.  Procedural safeguards are processes put in place to protect the rights of students with disabilities and their parents and guardians. Appropriate procedural safeguards must include written Section 504 policies and procedures that provide for notification to parents and guardians in writing of any decision regarding identification, evaluation, and placement; the right for parents and guardians to review and examine a student's education records; the right for parents and guardians to participate in decision impacting their student's education, including participation in developing an appropriate plan to meet their student's needs; and a dispute resolution and grievance system that provides administrative due process. In order to successfully implement those procedures, school personnel should be fully trained and familiar with the procedural safeguards and knowledgeable about Section 504.    Batsche Testimony ___.    BIE administrators similarly recognize that school districts are required to establish and implement procedures that include notice, an opportunity for parents to review relevant records, an impartial hearing with opportunity for participation by the student's parents or guardian, representation by counsel and a review procedure.  Trial Exhibit 1006 at 30 (Section 504 Presentation).

### (a)    Written Section 504 Policies and Procedures

93.    As explained by Plaintiffs' experts, every school should have written procedures and guidelines to ensure the proper implementation of the nondiscrimination requirement in Section 504. These procedures and guidelines should include appropriate forms and checklists to guide the implementation of Section 504.  Codified school-wide procedures should include periodic training focused on legal procedural safeguards, to ensure that school personnel are knowledgeable of and can implement different types of plans.  It is the school's responsibility to ensure that parents and caregivers are aware of their rights and the rights of their children.   This includes written communication and collaboration in the parent or guardians' primary language or mode of communication. Schools must also distribute this information in a manner that ensures that families receive notification of their due process rights.  Batsche Testimony ___.

94.    Defendants' failure to maintain written Section 504 policies or procedures deprived Plaintiffs and other students with disabilities of nondiscriminatory and meaningful access to HES.

95.    As of April 2019, when discovery closed, neither BIE nor HES had written Section 504 policies or procedures.  Many parents and guardians of HES students never received notice of BIE's or HES's obligations under Section 504. Trial Exhibit 271 at 38 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1); Apr. 18, 2019 Dearman 30(b)(6) Dep. Tr. at 89:13–18; Hastings Dep. Tr. at 132:24–133:2, 242:22–243:4; Paddock Dep. Tr. at 146:17–147:17; Roanhorse-Dineyahze Dep. Tr. at 154:22–155:2; Williamson Dep. Tr. at 154:8–13; Maldonado Dep. Tr. at 150:4–5, 150:7–11, 150:13–19, 158:8–159:11; Muhammad Dep. Tr. at 165:11–20.   HES's Student Handbook—which Defendants stated "describes students['] rights and responsibilities"—did not include notification of BIE's or HES's obligations under Section 504 and on multiple occasions was not provided to parents and guardians.  Trial Exhibit 271 at 39 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1); Trial Exhibit 148 (BIE00003992).

96.     Without written Section 504 policies and procedures, HES cannot ensure that it has an adequate process in place to identify and provide services to students with disabilities, and parents, guardians, and administrators cannot hold HES accountable for compliance with Section 504.  Batsche Testimony ___.

97.     In addition, as a result of Defendants' failure to provide written Section 504 policies and procedures, NADLC has expended significant resources to advocate for clients who were unable to request accommodations from BIE or HES or challenge determinations regarding their students' needs.  Yanan Testimony ___.

98.     BIE's belated efforts to establish written Section 504 policies and procedures are inadequate.  Defendants recently revealed that they were close to finalizing a Section 504 National Policy Memorandum ("NPM-EDUC-33"), which they contend will provide BIE-operated schools interim guidance on complying with Section 504 and will expire one year from its issuance.   Initially, it appears that BIE engaged in these efforts years later than necessary and in an effort to avoid adverse findings in this Court.  BIE has been promising for years to develop this policy, yet could not do so before discovery closed in this case, before the summary judgment hearing, before this Court found against BIE on Count 3, or even before the deadline to exchange trial exhibits in this case.  Instead, BIE filed a motion seeking extra time to use this new policy as an exhibit and will disclose it only days before the final pretrial conference.[2]  Trial Exhibit 662 at 2-3 (ECF No. 227); Trial Exhibit 252 (June 11, 2020 Email from Cristen Handley).

99.     Accordingly, any remedy for Defendants' violation of Section 504 must provide for adequate written Section 504 policies and procedures, which are provided to parents and guardians at least once per year, in order to ensure students with disabilities have nondiscriminatory and meaningful access to HES.

---

[2] Plaintiffs reserve the right to provide proposed findings of fact regarding this policy once Defendants disclose it.

**(b)** **Procedures to Promptly Identify, Evaluate, and Provide Appropriate Accommodations for Students with Disabilities**

100.   As explained by Plaintiffs' experts, schools must have a process that accurately identifies students with disabilities in order to ensure the proper implementation of the nondiscrimination requirement in Section 504, and to prevent the over or under identification of students with disabilities.  This requires that school leaders and staff should be aware of, given training in, and be fluent with the eligibility requirements under Section 504.  In addition, this requires that schools have academic and behavior screening procedures that are designed to provide early indications that a student may be at risk regarding academic and/or behavior development.  Proper identification of students with disabilities then requires pre-placement evaluation of any students who may need special education or related services.  Standards and procedures for the evaluation and placement of students must ensure that tests and other evaluation materials have been validated for the purpose for which they are used and are administered by properly trained personnel.  Further, tests and evaluation materials must include those tailored to assess specific areas of education need and not be designed to provide a single general intelligence quotient.  When testing students with impaired sensory, manual, or speaking skills, tests should also be selected and administered to ensure that the test results accurately reflect the student's aptitude, achievement level or whatever other factor the test is intended to measure.  Schools should routinely screen, monitor progress, evaluate responses to instruction, and complete diagnostic assessments prior to determining the presence of a disability.  Batsche Testimony ___.

101.   Until the eve of trial, neither BIE nor HES had procedures in place to identify and evaluate students with disabilities under Section 504.  Trial Exhibit 1003 (spreadsheet of Section 504 coordinators stating that HES does not have a Section 504 process in place).  When asked about the procedures to identify and evaluate students with disabilities under Section 504, even the former HES principals could not identify any assessments, methods, or procedures used to identify students with disabilities under Section 504.  Paddock Dep.

1   Tr. at 144:8–21; Roanhorse-Dineyahze Dep. Tr. at 56:10–11, 56:13–21; Williamson Dep.

2   Tr. at 162:9–19.

3       102.   As a result, HES students with disabilities may go without appropriate services

4   for long periods of time.   The inadequacy of HES's procedures to identify students with

5   disabilities are evident from the fact that many students were only identified as students with

6   disabilities through this litigation.   Taylor P., Freddy P., and Olaf D. were identified as

7   students with disabilities only through this litigation.   Trial Exhibit 271 at 22 (Defendants'

8   Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1); Trial Exhibit

9   269 at 5–7 (Oliver Declaration); Gentry Testimony ___.

10      103.   Even when HES has notice of a student's disability or received repeated

11  requests for evaluation, there are still significant delays in evaluations.   For example, Moana

12  L.'s evaluation was delayed for over a year, despite HES having received repeated requests

13  that she be evaluated.   Trial Exhibit 271 at 24–25 (Defendants' Responses to Plaintiffs'

14  Separate Statement of Material Facts, ECF No. 200-1).   Similarly, Freddy P. was not

15  identified for evaluation by HES despite education records showing that he had received

16  special education services in HeadStart.   *Id.* at 27.   And Olaf D.'s SAT interventions were

17  not implemented despite HES agreeing to further assess his need for special education

18  services through this process.   *Id.* at 27–28.   *See also* Gentry Testimony ___; Hoechst

19  Testimony ___.

20      104.   These delays in identifying and evaluating students with disabilities translate

21  into failures to provide those students with appropriate accommodations.   One of Moana

22  L.'s teachers did not even know she had a hearing impairment much less that she had an

23  IEP.   Hoechst Testimony ___.

24      105.   As a result of failing to have policies and procedures to identify, evaluate, and

25  provide appropriate accommodations to students with disabilities, NADLC has expended

26  significant resources to advocate for clients who were not identified by BIE or HES and who

27  did not receive appropriate accommodations.   Yanan Testimony ___.

28

106.    Accordingly, any remedy for Defendants' violation of Section 504 must include policies and procedures designed to promptly identify and evaluate students for potential eligibility for Section 504 in order to ensure students with disabilities have nondiscriminatory and meaningful access to HES.

(c)      <b>Access to Student Records and Complaint Procedures</b>

107.    As explained by Plaintiffs' experts and NADLC, providing a process for parents and guardians to access student records or initiate a complaint, grievance, or independent review in order to ensure the proper implementation of the nondiscrimination requirement in Section 504.  Batsche Testimony ___.

108.    Defendants' failure to provide a process for parents and guardians to access student records or initiate a complaint or review under Section 504 deprived Plaintiffs and other students with disabilities of meaningful access to HES.

109.    To date, neither BIE nor HES had a process in place for requesting access to student records.  Apr. 18, 2019 Dearman 30(b)(6) Dep. Tr. at 89:13–18; Muhammad Dep. Tr. at 165:11–20; Williamson Dep. Tr. at 154:8–13; Roanhorse-Dineyahze Dep. Tr. at 154:22–155:2, 158:8-13; Maldonado Dep. Tr. at 150:4–5, 150:7–11, 150:13–19, 156:24–25, 157:2–8; Paddock Dep. Tr. at 151:13–16, 151:18.

110.    In addition, HES staff repeatedly denied parents or guardians access to students' educational records.  Paddock Dep. Tr. at 146:17–147:13; Hastings Dep. Tr. at 132:24–133:2, 242:22–243:4; Roanhorse-Dineyahze Dep. Tr. at 154:22–155:2; Williamson Dep. Tr. at 154:8–13; Maldonado Dep. Tr. at 150:4–5, 150:7–11, 150:13–19, 158:8–159:11.

111.    Until the eve of trial, neither BIE nor HES had a process in place for initiating a complaint or requesting an impartial hearing regarding HES's compliance with Section 504, and the new policy being developed is unproven.  Apr. 18, 2019 Dearman 30(b)(6) Dep. Tr. at 89:13–18; Muhammad Dep. Tr. at 165:11–20; Roanhorse-Dineyahze Dep. Tr. at 154:22–155:2, 158:8–13; Williamson Dep. Tr. at 154:8–13; Maldonado Dep. Tr. at 150:4–5, 150:7–11, 150:13–19, 156:24–25, 157:2–8; Paddock Dep. Tr. at 151:13–16, 151:18.

112.   Defendants previously suggested that complaints and challenges to HES's compliance with Section 504 could be submitted through the Department of Interior's ("DOI") complaint process.  Trial Exhibit 282 at 9 (Defendants' Response to Plaintiffs' First Set of Requests for Admission).  The DOI's Section 504 complaint process is inadequate. NADLC submitted a complaint through this process in January 2017.  It was received by DOI's Public Civil Rights Division.  The complaint was later sent to DOI's Office for Equal Opportunity Program for investigation.  Despite repeated requests for policies related to the investigation of the complaint, none were ever provided.   DOI issued one letter acknowledging receipt of the complaint, but never sent any further communication to NADLC about the complaint's investigation or resolution. The complaint remained pending for 10 months and was never resolved despite multiple attempts made by NADLC to obtain information about the status of the complaint.  Trial Exhibit 540 (Civil Rights Directive 2011-01); Trial Exhibit 457 (May 4, 2017 Letter from Sloan Farrell); Yanan Testimony ___.

113.   Without processes for requesting access to student records or initiating complaints, parents and guardians cannot be active participants in their students' education and cannot hold HES accountable for compliance with Section 504.  Batsche Testimony ___.

114.   In addition, Defendants' failure to provide access to student records and to an adequate complaint procedure for Section 504 complaints, NADLC has expended significant resources to advocate for clients who are not afforded a fair or reasonable complaint process.  Yanan Testimony ___.

115.   Accordingly, any remedy for Defendants' violation of Section 504 must include procedures for requesting student records and initiating a complaint or review in order to ensure students with disabilities have nondiscriminatory and meaningful access to HES.

**4.      HES Must Have a System Capable of Ensuring Continued Compliance with Section 504 and the DOI's Implementing Regulations.**

116.    As explained by Plaintiffs' experts and demonstrated by the facts of this case, Defendants must implement a system capable of ensuring continued compliance with Section 504 and the DOI's implementing regulations.  As discussed above, schools must implement a student-centered data collection system that includes screening, progress monitoring, and diagnostic assessments designed to ensure early identification of students with disabilities, tracking of student progress, and the capacity to identify specifically the areas of student need that require instruction and supports.  Building on those processes, schools must also have a data management system that is used to document accountability for both the implementation of the required Section 504 procedures as well as student growth and other outcome data.  Batsche Testimony ___.

117.    Data collection and analysis is essential to ensure that students with disabilities are receiving appropriate services.  Data collection and analysis is also critical to monitoring eligibility rates by disability, gender, and socioeconomic status so that school data can be compared to national epidemiological data to identify areas of disproportionality to prevent over and under identification of students with disabilities.  For this reason, any remedy must include a system of ongoing assessment, data collection, reporting, and continued monitoring.  Batsche Testimony ___.

118.    As of April 2019, when discovery closed, neither BIE nor HES had a system in place for tracking the provision of services, student growth, or other outcome data.  For example, HES did not have a system for tracking student promotion, placement, or outcomes for former HES students.  Trial Exhibit 281 at 8–9 (Defendants' Responses to Plaintiffs' First Set of Interrogatories); Trial Exhibit 498 (March 11, 2020 Letter from Chaitna Sinha admitting that "until recently, HES has not consistently required its special education teachers to maintain service logs for IEP implementation").

119.    Without this data, it will be difficult if not impossible to assess whether HES is properly implementing Section 504.  Without school-wide data collection, schools cannot effectively identify students with disabilities and, even after a student is identified, schools cannot determine whether the accommodations and supports implemented for those students

are effective.  Batsche Testimony ____; Gentry Testimony ___; *see also* Trial Exhibit 538 (GAO Report).  Lack of progress monitoring has interfered with HES's ability to identify Student Plaintiffs' special education needs and determine whether interventions are successfully enabling those students' to access and benefit from public education.  Hoescht Testimony ___.

120.  Accordingly, any remedy for Defendants' violation of Section 504 must include a system for ongoing assessment, data collection, reporting, and continued monitoring in order to ensure that students with disabilities have nondiscriminatory and meaningful access to HES.

**F.    The Remedies Described By Plaintiffs' Experts Require School-Wide and Programmatic Relief.**

121.  As explained by Plaintiffs' experts, many of the remedies required to enable students with disabilities at HES to access, participate in, and receive the benefits of its HES's educational program must be instituted on a school-wide basis.  In order to ensure that students with disabilities receive the accommodations and support services they require for meaningful access to HES, the school must be adequately staffed.  *See supra* Plaintiffs' Proposed Findings of Fact ("Pls. FF") Section I.E.1.  Similarly, many of the instructional and behavioral supports students with disabilities require can only be provided on a school-wide basis.  *See supra* Pls. FF Section I.E.2.  And the policies and procedures that must be in place to ensure compliance with Section 504 are necessarily implemented on a school-wide basis.  *See supra* Pls. FF Section I.E.3.

122.  The importance of providing systemic and programmatic relief is further highlighted by the number of requests for assistance and complaints received by NADLC, which reflect that the issues described above are not limited to the Student Plaintiffs involved in this suit.  *See supra* Pls. FF Section I.C.

**G.    The Remedies Described By Plaintiffs' Experts Can Be Implemented At Havasupai Elementary School.**

PLAINTIFFS PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

123.    Defendants contend that their ability to implement the remedies described by Plaintiffs' experts are affected by HES's limited budget.  This contention ignores that BIE and HES could use HES's budget more effectively.  For example, using detail teachers to fill in for vacancies at HES drains HES's budget.  Trial Exhibit 271 at 47 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1).  In addition, this contention ignores that HES is eligible for funding for specific programs and projects through grants or additional allocations.  *See* Trial Exhibit 335.  In fact, HES has received additional funds through a School Improvement Grant, Trial Exhibit 147 at 2 (BIE00001986); Paddock Dep. Tr. at 63:24-64:9, and the Fiscal Year 2020 budget included funding for construction of new quarters at HES, Trial Exhibit 271 at 44 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1); Apr. 18, 2019 Dearman 30(b)(6) Dep. Tr. at 126:18–24, 131:18–133:19.

124.    Defendants also contend that their ability to implement the remedies described by Plaintiffs' experts, and particularly the recommendations regarding staffing, are limited by the housing available in Supai.  There are currently 8 teacher housing units with two bedrooms each.  Trial Exhibit 1023 at 2.  Thus, there are already an adequate number of beds to accommodate the 16 staff positions on HES's 2020-2021 school year organizational chart that must be filled on site.  Further, of the 16 on-site positions on HES's organizational chart, 6 positions either are or could be filled by community members, thus alleviating the need for housing for those staff members.  In addition, despite repeated requests, the BIE failed to present a proposal to expand teacher housing up until the eve of trial.  On June 2, 2020, BIE provided the Tribe with a long-awaited proposal for some additional housing.  Trial Exhibit 284; Trial Exhibit 1023; Trial Exhibit 1024; Trial Exhibit 1025.  The Tribe is open to moving forward on expansion plans.  Tilousi Testimony ____.

125.    Defendants also contend that their ability to implement the remedies described by Plaintiffs' experts, and particularly the recommendations regarding staffing, are limited by the remote location of HES.  Plaintiffs' experts acknowledged that schools in remote locations can face particular challenges in recruiting and retaining qualified teachers and

staff.  But Plaintiffs' experts also acknowledge that those challenges can be ameliorated by changes to salary and other compensation, reducing the cost of entry, hiring and personnel management, and providing support for teachers through leadership, collaboration, shared decision-making, and adequate resources.   In addition, as Plaintiffs' experts explain, continued professional development and coaching can be provided through online platforms. Batsche Testimony ___.

126.    Defendants also contend that their ability to implement the remedies described by Plaintiffs' experts, and particularly the recommendations regarding staffing, is limited by "intrinsic obstacles," including few or no applicants for posted positions; time-consuming background checks, which may result in candidates not receiving the requisite clearance or accepting other offers before the background check is complete; and individuals who decline offers or leave their positions after a short period of time due to limitations of life in the Canyon or difficulties at HES.  Joint Final Pretrial Order at Section 4.A.6.  As Defendants have acknowledged, there are a number of measures that Defendants can take to address those obstacles; it is unclear whether BIE is currently implementing any of those measures. Trial Exhibit 271 at 45–46 (Defendants' Response to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1).  And the limitations of life in the Canyon or difficulties at HES are not categorically different than the challenges faced by other remote or under-resourced schools.  Batsche Testimony ___.

**H.    Injunctive Relief Directing Defendants to Implement the Remedies Described by Plaintiffs' Experts Is Warranted.**

127.    Without the remedies described by Plaintiffs' experts, Student Plaintiffs and other students with disabilities at HES will be irreparably harmed.  Student Plaintiffs have not been provided with consistent instruction or behavioral supports.  *See supra* Pls. FF Sections I.E.1-2.  Student Plaintiffs have not received appropriate individual services.  *See supra* Pls. FF Sections I.E.1-2.  Those deprivations have resulted in significant educational deficits.  As Defendants' acknowledge, students at HES are significantly underperforming compared to their peers.  Trial Exhibit 271 at 13 (Defendants' Responses to Plaintiffs'

1  Separate Statement of Material Facts, ECF No. 200-1); Trial Exhibit 147 at 2
2  (BIE00001986); Paddock Dep. Tr. at 63:24-64:9.  As explained by Plaintiffs' experts, those
3  educational deficits translate into long-lasting negative effects on educational attainment,
4  employment outcomes, and mental health that are particularly pronounced for students with
5  disabilities.  Batsche Testimony ____.

6      128.  Plaintiffs are likely to continue to suffer irreparable harm absent an injunction
7  from this Court.  Defendants' past commitments to comply with Section 504 and failure to
8  meet those commitments provide strong evidence that the injuries described above will
9  continue despite Defendants' assertion that the BIE is "positioning" itself to comply with
10  Section 504.  Joint Final Pretrial Order at Section 4.A.4.

11      129.  Defendants' promises to comply with Section 504 can be traced back to before
12  Plaintiffs filed their complaint.  BIE Director Tony Dearman testified that in 2015, when he
13  was an Associate Deputy Director for BIE schools, he "made [his] commitment to
14  Havasupai," had begun visiting HES regularly, and "told them we were going to do what we
15  could to make things better."  Apr. 17, 2019 Dearman Dep. Tr. 116:10–117:14.

16      130.  More than four years later, at his deposition on April 17, 2019, Director
17  Dearman acknowledged that BIE failed to provide adequate special education services to
18  students at HES, but again gave assurance that he was now working on the problem.
19  Specifically, he testified that within the last "month or two," he had assigned a person named
20  Marcy Oliver to work on Section 504 compliance.  Apr. 17, 2019 Dearman Dep. Tr. 104:17–
21  24, 105:2–107:23.

22      131.  Almost three months after that, in July 2019, Defendants were still asserting
23  that they were working to comply.  In opposing summary judgment, Defendants asserted
24  that BIE was "diligently working" to develop and provide "a system to ensure that all
25  disabled students at HES are provided with meaningful access to an education as
26  appropriate," leaving "no further relief this Court could grant at this point[.]"  Trial Exhibit
27  270 at 9–10 (Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, ECF No.
28  200).  At that time, however, Defendants were "just beginning [that] process."  Id.; Trial

Exhibit 268 at 2 (Dearman Declaration); Trial Exhibit 269 at 3 (Oliver Declaration).  That process is apparently still ongoing today.  *E.g.*, Joint Pretrial Order at Section 3.A.1–8.

132.   In opposing summary judgment, Defendants also asserted that Marcy Oliver, Acting Section 504 Coordinator for BIE, was planning to provide two trainings "specific to HES" in August 2019; those trainings were not provided as scheduled. *Compare* Trial Exhibit 269 at 4 (Oliver Declaration), *with* Joint Pretrial Order at Section 3.B.5.

133.   Almost half a year after those promises, in January 2020, Defendants were still representing to this Court that they were working "towards full compliance" with Section 504, and that, therefore "there is no need for an injunction ensure that Section 504 will be effectively enforced."  Trial Exhibit 274 at 3–4 (Defendants' Motion for Partial Relief, ECF No. 216).

134.   The Court correctly rejected those arguments and granted Plaintiffs' summary judgment motion on the issue of liability on Count III, concluding that "Defendants have violated Section 504," and directed the parties to prepare for trial on the appropriate remedy. Trial Exhibit 275 at 6 (Order on Motion for Partial Relief, ECF No. 221).

135.   Yet even now, in a pretrial order filed on July 2, 2020, Defendants continue to invoke hollow promises to improve compliance as an attempt to evade court oversight and avoid an equitable remedy.  Specifically, Defendants argue that an injunction would be improper because "BIE is positioning itself to comply fully with Section 504 going forward."  Joint Final Pretrial Order at Section 4.A.4.

136.   Defendants repeated promises to comply with Section 504 in the future and failure to uphold those promises fatally undermine the credibility of similar promises offered at trial.  Absent additional evidence to support those promises, the Court concludes that Plaintiffs' are likely to continue to suffer irreparable injury absent the requested injunctive relief.

137.   In addition, Defendants' contention that Plaintiffs' have adequate alternative remedies available to them should a violation of Section 504 arise in the future is unfounded. Defendants do not have an adequate complaint process for Section 504, *see supra* Pls. FF

1  Section I.E.3.(c)., and their promise to implement a complaint process in the future is
2  inadequate for the reasons described above.

3       138.   The balance of the hardships weighs in favor of implementing the remedies
4  described by Plaintiffs' experts.  As described above, Student Plaintiffs and other students
5  with disabilities have been irreparably harmed by Defendants' failure to comply with
6  Section 504.  The potential hardships described by Defendants are, at most, administrative
7  and financial burdens associated with complying with their existing legal obligations to
8  students with disabilities, which are faced by many other schools.  Batsche Testimony ___.
9  Those burdens do not preclude implementation of the remedies proposed by Plaintiffs'
10  experts and do not overcome the need for compliance with Section 504.  *See supra* Pls. FF
11  Section I.G.  Although Defendants have yet to fully implement any of the remedies proposed
12  by Plaintiffs' experts, their recent proposals and efforts to come into compliance reflect that
13  those remedies are in fact feasible.

14       139.   Implementing the remedies described by Plaintiffs' experts is in the public
15  interest.  Defendants conceded that they are subject to Section 504, but that they are not
16  complying with Section 504.  *See supra* Pls. FF Section I.D.  The public interest favors
17  requiring Defendants to comply with their legal obligations.  The public interest also favors
18  providing necessary curriculum and support to students with disabilities.

19  **II.   Defendants Must Implement Reasonable Accommodations for Students at**
20      **Havasupai Elementary School Impacted by Trauma in Order to Comply with**
       **Section 504.**
21      **A.   Plaintiffs' Experts are Qualified and Their Opinions are Credible.**

22       140.   Based on Dr. George Davis's substantial education, including a M.D. from
23  Southwestern Medical School and a Fellowship in Child and Adolescent Psychiatry at the
24  University of New Mexico School of Medicine, and based on Dr. Davis's experience,
25  expertise, and qualifications, I find that Dr. Davis is an expert on matters of medicine, the
26  brain science of trauma, and the treatments that children impacted by trauma need in order
27  to learn.

28

141.    Based on Dr. Davis's substantial education, experience, expertise, and qualifications, as well as the thoroughness and rigor of his analysis, which rests on a careful application of reliable scientific principles, I find Dr. Davis's opinions expressed at trial to be credible.

142.    Based on Dr. Tami DeCoteau's substantial education, including a Ph.D in Clinical Psychology from the University of Nebraska-Lincoln, and based on Dr. DeCoteau's experience, expertise, and qualifications, I find that Dr. DeCoteau is an expert on matters of psychology, the impacts of trauma on children, what schools need to do to mitigate and accommodate the impacts of trauma in children, and how schools and other settings—especially those that serve Native American students and those in rural areas—can and have implemented trauma accommodations.

143.    Based on Dr. DeCoteau's substantial education, experience, expertise, as well as the thoroughness and rigor of her analysis, which rests on a careful application of reliable scientific principles, I find Dr. DeCoteau's opinions expressed at trial to be credible.

144.    Based on Dr. Noshene Ranjbar's substantial education, including a M.D. from the University of Virginia School of Medicine, residency training in Psychiatry at the University of Arizona, and a fellowship in Child and Adolescent Psychiatry at Harvard Medical School, and based on Dr. Ranjbar's experience, expertise, and qualifications, I find that Dr. Ranjbar is an expert on matters of evaluating children with disabilities related to trauma and identifying appropriate support services.

145.    Based on Dr. Ranjbar's substantial education, experience, expertise, and qualifications, as well as the thoroughness and rigor of her analysis, which rests on a careful application of reliable scientific principles, I find Dr. Ranjbar's opinions expressed at trial to be credible.

**B.    Childhood Adversity Can Profoundly Affect Brain Development and Learning.**

146.    Common adverse childhood experiences among children include, but are not limited to, loss of a parent, institutional abuse and neglect, discrimination, instability at home

or school, community or familial stress, growing up in a home where caregivers experience mental health challenges and/or substance abuse, and witnessing or experiencing violence. Childhood adversity, also called childhood trauma, has profound effects on physical, social, emotional, behavioral, and cognitive development.  It can also cause recurring feelings of shame, guilt, rage, isolation, and disconnection.  Davis Testimony ___; DeCoteau Testimony ___.

147.    Children who grow up with parents who have themselves been impacted by trauma are often exposed to high levels of stress, depression, and anxiety and learn maladaptive coping skills.  This is called intergenerational trauma.  DeCoteau Testimony ___.

148.    Many Native American communities are also impacted by historical trauma. Massive group trauma leads to cumulative emotional and psychological wounds over the lifespan and across generations.  Over 500 years of physical, emotional, social, and spiritual genocide, as well as programs such as forced relocation, assimilation, boarding schools, and suppression of culture and language, have caused significant historical trauma in Native American communities.  These policies resulted in many traumatic losses and disconnected people from the practices, relationships, and places that were sources of wellness and healing for them.   For these and other reasons, Native children are disproportionately likely to experience trauma, including intergenerational and historical trauma.  DeCoteau Testimony ___.

149.    Exposure to childhood trauma affects the brain's stress response systems and its self-regulatory capacity.  Adverse childhood experiences can lead to increased activation of the amygdala (the primary center in the brain for fear and emotional learning) and changes in the size and function of the hippocampus (the brain's primary center for memory retention and activation).  Childhood trauma also reduces the activity of key prefrontal cortex areas (the brain's center for planned behavior), resulting in increased sensitivity to potential trauma and decreased ability to use judgment, make decisions, and have empathy for others.

PLAINTIFFS PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Childhood trauma interferes with the hormones that help regulate and respond to stress, which in turn affects sleep and memory.  Davis Testimony ___; Ranjbar Testimony ___.

150.    Because a child's development builds upon early foundational milestones, the impact of adverse childhood experiences tends to compound over time, leading to significant consequences including problems with attention, task persistence, interpersonal skills, and empathy.  Davis Testimony ___.  Childhood trauma can also lead to cognitive deficiencies and problems with sensory integration.  DeCoteau Testimony ___.  From a mental health perspective, childhood trauma can cause numerous anxiety-related disorders, including depression, PTSD, adjustment disorder, and acute stress disorder.  Ranjbar Testimony ___.

151.    Traces of trauma remain in children's minds and bodies throughout their lives. Everyday sensory experiences, such as a smell, a touch, or a tone of voice, can hijack the brain of a traumatized person and trigger a behavioral response that seems out-of-proportion to the stimulus.   In some children, trauma can lead to a state of helplessness or immobilization.  DeCoteau Testimony ___.

152.    It takes a clear, calm mind to engage in the abstract, reflective processes that are essential for learning.  Children impacted by trauma are often too anxious or worried to settle down enough to learn.  At school, they often can't concentrate on learning because they are focused on scanning their environment for danger.   They may startle easily, exhibit reactive behaviors, and have difficulty calming themselves.  Davis Testimony ___.

153.    Teachers tend to treat the effects of trauma as oppositional behaviors.  This attitude is misguided because children impacted by trauma often lack the capacity, *not* the desire, to behave appropriately. Children impacted by trauma are unlikely to respond positively to contingency-based programs such as rewards for good behavior because they associate contingencies with blame, danger, and loss.  Davis Testimony ___.

154.    Although early traumatic experiences can cause lasting damage, human brains, and particularly the brains of children, are "plastic" and can change over time with the right treatment.  The effects of childhood trauma can be overcome with such treatment.  Davis Testimony ___.

1          **C.     Plaintiffs Include Students With Disabilities Related to Trauma**

2          155.    Plaintiffs Taylor P. and Moana L are school-aged children who are eligible to

3   attend BIE schools as "Indian" students under 25 C.F.R. § 39.2.  Joint Final Pretrial Order

4   at Section 3.D.8.

5          156.    Taylor P. is a rising 4th grade student.  She attended HES during the 2019–

6   2020 school year and plans to attend HES for the next school year.  She experienced

7   childhood adversity, physical and verbal bullying at school, and a chaotic childhood.  She

8   has a disability related to trauma and stress. Joint Final Pretrial Order at Sections 3.A.1,

9   3.C.9; Ranjbar Testimony ____.

10         157.    Taylor P.'s trauma-related disabilities substantially limit her ability to learn,

11  read, think, concentrate, and communicate, and have adversely impacted her ability to

12  access, participate in, and benefit from education at HES.  Joint Final Pretrial Order at

13  Sections 3.C.9, 3.C.11; Ranjbar Testimony ____.

14         158.    Taylor P. was only identified as a student with a disability through this

15  litigation; HES never raised concerns about Taylor P. with Billie P.  Trial Exhibit 271 at 22

16  (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-

17  1); Trial Exhibit 269 at 5–6 (Oliver Declaration); Gentry Testimony ____; Ranjbar Testimony

18  ____.

19         159.    Moana L. is a rising 3rd grade student.  She attended HES throughout the

20  2019–2020 school year and plans to attend HES next year.  She has experienced childhood

21  adversity at school and at home, including having absent and incarcerated parents and

22  experiencing abuse at school. She has disabilities related to trauma and stress, including

23  adjustment disorder with mixed anxiety and depressed mood.  Joint Final Pretrial Order at

24  Sections 3.C.10–11; Ranjbar Testimony ____.

25         160.    Moana L.'s trauma-related disabilities substantially limit her ability to learn,

26  read, concentrate, think and communicate, and have adversely impacted her ability to access,

27  participate in, and benefit from education at HES.  Joint Final Pretrial Order at 3.C.10–11;

28

Ranjbar Testimony ___; Boyd Dep. Tr. at 187:10–13, 190:1–17; 213:2–7; Ticeahkie Dep. Tr. at 162:21–164:11; Trial Exhibit 262 (Psychoeducational Evaluation for Moana L.).

161.   Moana L. is behind her peers in math, reading, and writing, and typically requires 1:1 support in the classroom. Gentry Testimony ___; Ranjbar Testimony ___; Boyd Dep. Tr. at 187:10–13, 190:1–17, 213:2–7; Ticeahkie Dep. Tr. at 162:21–164:11; Trial Exhibit 1100 (Moana L. IEP).

162.   Moana L. is not receiving counseling at HES, even though HES staff know that Moana L. is being bullied, having trouble concentrating, and cries frequently out of fear. Ranjbar Testimony ___; Hoechst Testimony ___; Trial Exhibit 262 at 20 (Psychoeducational Evaluation for Moana L.).

163.   Stephen C. and Durell P. previously attended HES. At the time they attended HES, Stephen C. and Durell P. were school-aged children who were eligible to attend BIE schools as "Indian" students under 25 C.F.R. § 39.2. Joint Final Pretrial Order at Sections 3.C.2, 3.C.7.

164.   Stephen C. has experienced childhood adversity, including, but not limited to, his mother's substance abuse and arrests, his absent and unknown father, bullying, encounters with law enforcement (including classroom-based arrest), and confrontations with intoxicated individuals at school and in his community. He has disabilities related to trauma and stress, including a conduct disorder, an other-specified disruptive, impulse control and conduct disorder, and a cannabis disorder. Joint Final Pretrial Order at Section 3.C.3; Ranjbar Testimony ___.

165.   Stephen C.'s trauma-related disabilities substantially limit his ability to learn, read, think, concentrate, and communicate, and have adversely impacted his ability to access, participate in, and benefit from education at HES. Joint Final Pretrial Order at Section 3.C.4; Ranjbar Testimony ___.

166.   Durell P. has experienced childhood adversity, including physical and verbal abuse at home, at school, at residential placements, and at the hands of the police. He has disabilities related to trauma and stress, including an emotional disability, mental health

issues, oppositional defiant disorder, and a conduct disorder.  Joint Final Pretrial Order at Section 3.C.5; Ranjbar Testimony ___.

167.   Durell P.'s trauma-related disabilities substantially limit his ability to learn, read, think, concentrate, and communicate, and have adversely impacted his ability to access, participate in, and benefit from education at HES.  Joint Final Pretrial Order at Section 3.C.6; Ranjbar Testimony.

168.   Student Plaintiffs are not the only students at HES impacted by childhood adversity.  BIE administrators and HES staff acknowledge that students at HES have experienced significant childhood adversity and trauma.  Dearman Testimony ___; Hastings Dep. Tr. at 200:18–201:11; Maldonado Dep. Tr. at 212:6–213:20; Roanhorse-Dineyahze Dep. Tr. at 187:22–188:5; Ticeahkie Dep. Tr. at 166:18–19, 166:21–167:13, 167:18–168:8; Trial Exhibit 100 at 9 (2014 School Improvement Grant Application).  This is in addition to the burden of generations of historical trauma stemming from a legacy of chronic discrimination—including forced relocations, loss of homes, families, and culture, and the use of boarding schools as a form of forcible assimilation.  Hastings Dep. Tr. at 201:12–19; Maldonado Dep. Tr. at 213:20–214:25; Tilousi Testimony ___.

169.   In addition to Taylor P., Moana L., Stephen C., and Durell P., NADLC has served other students at HES who have had adverse childhood experiences and mental health diagnoses consistent with trauma-related disabilities. Yanan Testimony ___.

**D.     Plaintiff Native American Disability Law Center Frequently Represents and Advocates for Students With Disabilities Related to Trauma and Students Impacted by Childhood Adversity at HES.**

170.   Native American Disability Law Center ("NADLC") is a 501(c) nonprofit organization based in Farmington, New Mexico, that advocates for the legal rights of Native Americans with disabilities.  NADLC is a Protection and Advocacy Organization that is part of a system supported by federal allotments to protect the legal and human rights of individuals with disabilities, and is authorized by relevant federal statutes to initiate legal action designed to protect the rights of persons with disabilities.  42 U.S.C. § 15041 *et seq.*; *see also* 42 U.S.C. § 10805; 29 U.S.C. § 794e.  NADLC's mission is to advocate so that the

1   rights of Native Americans with disabilities in the Four Corners area are enforced,

2   strengthened, and brought in harmony with their communities.  Joint Final Pretrial Order at

3   Sections 3.A.21, 3.D.11; Yanan Testimony ___.

4   171.   NADLC has received requests for assistance from parents and guardians of

5   students attending HES, including but not limited to requests from the parents and guardians

6   of Student Plaintiffs.  Some of the students are identified as having trauma-related emotional

7   and behavioral needs and mental health needs that HES failed to meet.  Those parents and

8   guardians were concerned about the school's failure to offer the support, services, and

9   resources necessary to enable students with those needs to participate in public education.

10   For some of those students, such as Stephen C. and Durell P., addressing HES's failures has

11   required frequent and ongoing legal assistance even after those students were no longer

12   attending HES.  Yanan Testimony ___.

13   172.   NADLC has devoted significant organizational resources to identifying and

14   counteracting Defendants' practices.  As a direct consequence of Defendants' practices,

15   NADLC diverted its scarce resources from other efforts to promote and protect the rights of

16   Native Americans with disabilities, including disabilities related to trauma.  Continued

17   advocacy on behalf of Havasupai students with unaddressed disabilities related to trauma

18   will significantly diminish NADLC's resources and impact its ability to serve other Native

19   Americans with disabilities in the Four Corners area.  Joint Final Pretrial Order at Section

20   3.C.1; Yanan Testimony ___.

21   **E.   Defendants Fail to Comply with Section 504 Because They Deny
            Students With Disabilities Related to Trauma Meaningful Access to**

22   **Public Education.**

23   173.   Havasupai Elementary School ("HES") is a program or activity that receives

24   federal funds conducted and/or administered and/or maintained by the Bureau of Indian

25   Education ("BIE").  Joint Final Pretrial Order at Section 3.D.1; Trial Exhibit 275 at 3 (Order

26   on Defendants' Motion for Partial Relief, ECF No. 221); Trial Exhibit 282 at 1 (Defendants'

27   Responses to Plaintiffs' Requests for Admission).

28

174.    BIE officials and HES principals confirmed that trauma can negatively affect a student's ability to learn, read, think, concentrate, communicate, and work in the classroom.  Dearman Testimony ___; Hastings Dep. Tr. at 201:25–202:23; Paddock Dep. Tr. at 179:11–180:22; Paul Dep. Tr. at 41:7–42:8; Maldonado Dep. Tr. at 215:1, 215:3–216:6, 216:8–216:16, 216:18; Roanhorse-Dineyahze Dep. Tr. at 189:1–16; Williamson Dep. Tr. at 192:9, 192:11–193:10; Apr. 17, 2019 Dearman Dep. Tr. at 182:15–16, 182:18–183:9.

175.    BIE officials and HES staff admitted that inconsistent and incomplete staffing at HES is harmful for students impacted by trauma.  Dearman Testimony ___; Apr. 17, 2019 Dearman Dep. Tr. at 121:14–123:1; Williamson Dep. Tr. at 34:21–35:19; Boyd Dep. Tr. at 162:5–19; Muhammad Dep. Tr. at 226:6–25.

176.    As of the close of fact discovery in April 2019, HES principals and teachers admitted that HES did not offer a trauma-informed curriculum, nor does HES offer instructional supports to students impacted by trauma.  Paddock Dep. Tr. at 177:16–19, 177:21–179:1; Muhammad Dep. Tr. at 221:7–22.

177.    As of the close of fact discovery in April 2019, BIE officials and HES principals admitted that they had not created or implemented procedures or policies for positively addressing conflict and other behavioral manifestations of trauma.  As a result, Defendants excluded students with trauma-related disabilities from the classroom by calling the police or sending them to the principal's office because of their disabilities.  Dearman Testimony ___; Apr. 18, 2019 Dearman 30(b)(6) Dep. Tr. at 107:18–108:11; Boyd Dep. Tr. at 125:19–126:9; Roanhorse-Dineyahze Dep. Tr. at 50:8–51:1; Ticeahkie Dep. Tr. at 57:20–58:5.

178.    Although BIE has failed to make HES trauma-informed, it has set goals, strategies, and milestones related to "Wellness, Behavioral Health, and Safety" in its Strategic Direction for 2018-2023.  These goals include identifying partners to provide behavioral health support, training and services to students; "[p]rovid[ing] trauma-informed curriculum for all grade levels," and "[p]roviding trauma-informed teaching practices for all grade levels."  Trial Exhibit 10; Apr. 17, 2019 Dearman Dep. Tr. 130:3–25, 189:7–24.

F.   **Plaintiffs' Experts Proposed Accommodations That Would Allow Nondiscriminatory and Meaningful Access for Students With Disabilities Related to Trauma.**

179.   As explained by Plaintiffs' experts Dr. Davis, Dr. DeCoteau, and Dr. Ranjbar, accommodations including a trauma-trained staff, a trauma-informed curriculum and instructional supports, and policies and procedures for addressing the manifestations of trauma are necessary to provide students with disabilities related to trauma with meaningful access to education.  Davis Testimony ___; Ranjbar Testimony ___; DeCoteau Testimony ___.

180.   These proposed accommodations are evidence-based and in use at schools throughout the country.  Peer-reviewed studies on adverse childhood experiences data back decades.  Davis Testimony __; DeCoteau Testimony __; Ranjbar Testimony __.  Trauma-informed practices such as Positive Behavior Interventions and Supports (PBIS) and Cognitive Behavioral Intervention for Trauma in Schools (CBITS) have been subject to randomized controlled trials.  Persinger Dep. Tr. at 49:23–50:5; Davis Testimony __; DeCoteau Testimony __; Ranjbar Testimony __.

1.   **A Consistent, Trauma-Trained Staff Is a Reasonable Accommodation That Would Provide Meaningful Access to Students With Disabilities Related to Trauma.**

181.   A fully staffed and consistent roster of general education teachers is necessary to provide students with disabilities related to trauma with meaningful access to education. For children impacted by trauma, having effective teachers is important for both academic and behavioral reasons.  Davis Testimony____; DeCoteau Testimony____.

182.   BIE's Trauma Resilient School Systems Initiative, a program that BIE is implementing at 10 of its schools, includes several training program components.  Trial Exhibit 158 at 4–6.  BIE's Strategic Direction sets the goal of "[p]roviding trauma-informed teaching practices for all grade levels."  Trial Exhibit 10 at BIE00003408.

183.   Children impacted by trauma need academic assistance that can lead to proficiency.  Persistent academic failures are demoralizing and can lead children to act out in order to avoid situations in which they believe they will fail.  Davis Testimony ___.

184.   A consistent school staff also creates a safe, predictable, and nurturing environment, which is essential for children impacted by trauma to learn.   Unstable environments and relationships can prolong a traumatized child's feelings of fear. Connections between caregivers, such as teachers and school staff, and children are also essential foundations for self-regulation.   When the adults at a school are constantly changing, children impacted by trauma have no opportunity to build the connections that will help them self-regulate in the classroom.   The ability to self-regulate is a necessary foundation for learning, concentrating, and thinking abstractly.   DeCoteau Testimony ___.

185.   School staff must also be trained to identify students impacted by trauma, respond appropriately to manifestations of trauma in the classroom, and avoid exacerbating or re-traumatizing students.   Davis Testimony ___; DeCoteau Testimony ___.   Teachers spend a great deal of time with their students and are critical to their learning.   For this reason, teachers need to learn basic concepts about trauma and the brain, including how to recognize trauma-induced behaviors and signs of dysregulation in students, and how to mitigate these behaviors in the classroom.   DeCoteau Testimony ___.

186.   Trauma training must extend beyond teachers to all staff members at the school.   Counselors, special education teachers, administrators, and other school staff are all in a position to treat students impacted by trauma in ways that trigger stress responses, encourage stigma and bullying, and hinder their learning.   For this reason, every staff member should be trained to recognize and respond appropriately to students impacted by trauma.   DeCoteau Testimony ___.

187.   In order to ensure retention and consistency among staff, trauma training must address secondary or vicarious trauma among staff.   Working with traumatized students exposes staff to traumatic experiences and may cause staff members to become traumatized themselves.   Failure to address this secondary trauma may result in emotional exhaustion, compassion fatigue, and burnout.   These conditions manifest in ways that harm students impacted by trauma—for instance, by contributing to cycles of conflict in the classroom or by causing staff turnover.   Davis Testimony ___; DeCoteau Testimony ___.

188.   As Dr. Ranjbar explained, a shortage of teachers and special education resources, constant staff turnover, and a lack of cultural competency and trauma-informed training at HES reduced the chance of each student with disabilities related to trauma, including Taylor P. and Moana L., to learn at their specific level of education and in accordance with their needs.   Staff shortages and lack of staff training also led to bullying being "rampant" in the lives of Taylor P., Moana L., Stephen C., and Durell P.   As children with disabilities related to trauma, these students faced higher risk of negative consequences from bullying than their peers.   Ranjbar Testimony ___.

189.   Defendants' failure to fully staff HES with full-time, as opposed to detailed, general education teachers and support staff has deprived students with disabilities related to trauma of nondiscriminatory and meaningful access to HES.

190.   As of the 2018–2019 school year, HES's organization chart reflected that the school should have 17 full-time employees, including 5 general education teachers.   Trial Exhibit 190; Apr. 18, 2019 Shamblin 30(b)(6) Dep. Tr. at 119:7–22; Apr. 17, 2019 Dearman Dep. Tr. at 62:15–16, 91:6–7.   For the 2020–2021 school year, HES's organization chart reflects that the school should have 17 full-time employees, including 5 general education teachers.   Trial Exhibit 1011.

191.   As of the close of fact discovery in April 2019, HES had at most 2 full-time teachers.   Trial Exhibit 281 at 5-6, Attachment 4 (Defendants' Responses to Plaintiffs' First Set of Interrogatories).   Between 2017 to the close of fact discovery, HES was not fully staffed and relied on detailed teachers for months at a time, with those detailed teachers often each staying for only a week or two.   *Id.*; Apr. 17, 2019 Dearman Dep. Tr. at 53:3–20, 231:8–25; Hastings Dep. Tr. at 170:11–19, 177:7–20; Trial Exhibit 145 (BIE00001806); Trial Exhibit 144 (BIE00001752); Trial Exhibit 97 (BIE00001837).   HES continued to rely on detailed staff throughout the 2019–2020 school year.   Joint Final Pretrial Order at Section 4.A.7; Trial Exhibit 1012.   Defendants conceded that HES is not "fully staffed" when it uses detailed teachers.   Trial Exhibit 271 at 28 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1); Apr. 17, 2019 Dearman Dep. Tr. at 233:3–16.

192.    Defendants concede that they do not currently have a full staff for the 2020–2021 school year.  They state that there are only three general education who have signed contracts for the 2020–2021 school year and that HES is currently working to post two additional general education positions, but acknowledge that BIE may need to detail staff to the extent practicable to fill any unmet staffing needs.  Joint Final Pretrial Order at Sections 4.A.4, 4.A.7.

193.    The lack of consistent teachers adversely impacted students at HES, especially those with disabilities related to trauma.  With each new teacher, students experienced anxiety and lost instructional time because they are learning new "routine[s], personalities, and expectations."  Trial Exhibit 271 at 30 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1); Boyd Dep. Tr. at 160:14–162:19; Muhammad Dep. Tr. at 226:6-25.  As at least one HES administrators recognized, the constant turnover affected students' ability to succeed academically and to learn to self-regulate in the classroom.  Williamson Dep. Tr. at 34:21–35:19, 233:12–19.

194.    Accordingly, a plan for recruiting and retaining general education teachers is a reasonable accommodation that would ensure nondiscriminatory and meaningful access to HES for students with disabilities related to trauma.

195.    Defendants' failure to provide adequate training to teachers and staff on how to accommodate students with disabilities related to trauma have deprived Plaintiffs and other students with disabilities related to trauma of nondiscriminatory and meaningful access to HES.

196.    As of the close of fact discovery in April 2019, HES did not require its staff to complete any training about trauma and its effects in children.  Boyd Dep. Tr. at 246:7–14; Muhammad Dep. Tr. at 221:7–22; Paddock Dep. Tr. 177:16–19; Ticeahkie Dep. Tr. at 170:16–1.

197.    As a result, students with disabilities related to trauma have not been cared for or instructed by staff members who know how to help their brains develop and to teach them how to self-regulate.

198.   Accordingly, providing the trauma training described above to teachers and staff is a reasonable accommodation that would ensure students with disabilities related to trauma have nondiscriminatory and meaningful access to HES.

### 2. School-Wide Curricular Supports and Individual Supports Are a Reasonable Accommodation That Would Provide Nondiscriminatory and Meaningful Access to Students With Disabilities Related to Trauma.

199.   Plaintiffs' experts identified school-wide curricular supports and individual services and supports as accommodations necessary to provide meaningful access to students with disabilities related to trauma.

### A. Curricular Supports

200.   Children with disabilities related to trauma need curricular supports that accommodate their needs in the classroom.  These curricular supports include instruction in self-regulation strategies and tools, such as physical education, mindfulness, yoga, and/or breathing relaxation.  DeCoteau Testimony ___.  Physical activity and health-promoting curriculum, covering such topics as nutrition and exercise, are also essential accommodations because they teach children with disabilities related to trauma to develop self-efficacy skills.  Collectively, these curricular supports are called "mind-body skills." Ranjbar Testimony ___.

201.   As of April 2019, when discovery closed, HES did not offer consistent instruction in physical education, health, nutrition, yoga, or mind-body skills.  Trial Exhibit 271 at 8–9 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1); Trial Exhibit 282 at 2 (Defendants' Responses to Plaintiffs' First Set of Requests for Admission).  As a result, students with disabilities related to trauma including Taylor P. and Moana L. have had no opportunity to learn the self-regulation and self-efficacy skills that they need to overcome the effects of trauma.

202.   BIE offers mind-body curriculum like physical education and health at schools other than HES.  Dearman Testimony ___; Paddock Testimony ___.  It is required to do so at all elementary schools by regulation.  25 C.F.R. 36.22.  BIE's Trauma Resilient School

Systems Initiative, a program that BIE is implementing at 10 of its schools, includes several training program components.  Trial Exhibit 158 at 4–6.  BIE's Strategic Direction sets the goal of "[p]roviding trauma-informed curriculum for all grade levels."  Trial Exhibit 10 at BIE00003408.  The 10 BIE schools that are part of the Trauma Resilient School Systems Initiative also offer social/emotional learning programs.  Trial Exhibit 158 at 5.

## B. Individual Services and Supports

203.  Some students who are significantly impacted by trauma need individual and/or group mental health services in order to access education.  Early intervention is necessary to limit the impacts of trauma on a child's development and brain function.  Davis Testimony ___; Ranjbar Testimony ___.

204.  As Dr. Ranjbar explained, the cases of Taylor P., Moana L., Durell P., and Stephen C. illustrate that access to basic mental health services is so limited at HES that profound disorders and disabilities can go entirely undiagnosed and untreated for years.  Ranjbar Testimony ___.

205.  HES needs to provide mental health services to students through a counselor on staff, or needs to have the ability to refer students to mental health providers who are meaningfully available to students.  Ranjbar Testimony ___.

206.  The regulations that require BIE to provide counseling services define a counselor as "a staff member, including those in both academic and dormitory situations, who helps the students to understand educational, personal, and occupational strengths and limitations; to relate abilities, emotions, and aptitudes to educational and career opportunities; to utilize abilities in formulating realistic plans; and to achieve satisfying personal and social development."  25 C.F.R. 36.3.

207.  BIE's Strategic Direction sets the goal of identifying partners to provide behavioral health support and services to students.  Trial Exhibit 10 at BIE00003408.

208.  HES does not consistently have a professional counselor on staff and mental health counseling services are not always available to students at HES.  BIE instead provided mental health counselors to students on a one-off basis through the Indian Health

Services or by hiring providers on a contract basis.  Although HES did employ a professional counselor during the 2018-2019 school year, she was often unable to provide counseling services because she was called upon to teach general education.  Trial Exhibit 271 at 12, 31-32, 37 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1); Trial Exhibit 281 at 7, Attachment 10 (Defendants' Responses to Plaintiffs' First Set of Interrogatories); Trial Exhibit 282 at 8 (Defendants' Responses to Plaintiffs' First Set of Requests for Admission); Apr. 17, 2019 Dearman Dep. Tr. at 162:24-163:6; Hastings Dep. Tr. at 112:11–114:3, 114:9–115:10, 116:7–12, 116:18–117:3, 118:14–119:2, 119:15–120:7, 260:16–261:2; Roanhorse-Dineyahze Dep. Tr. at 166:2–168:22, 174:11–175:23; Trial Exhibit 145 (BIE00001806).

209.   Defendants contend that some of those services can be provided through tele-behavioral health services, but have not presented any evidence regarding the efficacy of those services, particularly for students with disabilities.  Joint Final Pretrial Order at Section 4.A.5.

210.   As a result, many students with disabilities at HES were not able to receive necessary counseling and behavioral health services.  For example, Plaintiffs Taylor P., Moana L., and Stephen C. did not receive counseling services at HES, even though they were entitled to or requested those services.  Hoechst Testimony ____; Trial Exhibit 260; Trial Exhibit 553; Trial Exhibit 554; Trial Exhibit 628.

211.   Defendants' failure to provide instructional and support services has deprived Plaintiffs and other students with disabilities related to trauma of meaningful access to HES.  Ranjbar Testimony ___.

212.   Accordingly, school-wide curricular supports and access to mental health services are reasonable accommodations that would give students with disabilities related to trauma nondiscriminatory and meaningful access to HES.

        **3.**    **Behavioral Support Policies and Procedures Are a Reasonable Accommodation That Can Provide Nondiscriminatory and Meaningful Access to Students With Disabilities Related to Trauma.**

213.   As explained by Plaintiffs' experts, children with disabilities related to trauma need culturally appropriate behavioral support policies and procedures that accommodate their needs in the classroom.  These policies and procedures must have three objectives: making children feel safe so that they are capable of learning; promoting relationships between children and staff and among children; and teaching children self-regulation and emotional skills.  They must also replace toxic disciplinary policies such as restraint and seclusion practices with trauma-sensitive alternatives.  Davis Testimony ___; DeCoteau Testimony ___.

214.   Positive Behavioral Interventions and Supports (PBIS) is one example of a research-based, trauma-informed behavioral support system that is in use at many schools, including the 10 BIE schools that are part of the BIE's Trauma Resilient School Systems Initiative.  Trial Exhibit 158 at 5–6.

215.   Children with disabilities related to trauma need school environments that feel safe, structured, and predictable so that they can think, concentrate, and learn.  DeCoteau Testimony ___.  A number of de-escalation and behavioral management techniques can help reduce the amount of fear that a child feels so that the child's brain is capable of learning.  Davis Testimony ___.   School staff must use these techniques to resolve instances of conflict and bullying, creating a safe environment so that children's brains are capable of learning.  Davis Testimony ___.  De-escalation and behavioral management techniques must be widely adopted within a school so that children with disabilities related to trauma are not subject to unpredictable, chaotic, or stress-activating experiences.  Davis Testimony ___.

216.   Building relationships is an essential aspect of trauma-informed behavioral management.  Staff must use trauma-informed strategies to build relationships with students while helping them learn to self-regulate.  Experts call these strategies "connecting while correcting."  DeCoteau Testimony ___.

217.   Adults at schools, including teachers, administrators, and other staff, must help children with disabilities related to trauma learn self-regulation and emotional skills.  While a mind-body curriculum is an essential part of teaching these skills, adults at schools must

also be trained to help children with self-regulation and emotional skills in the context of their individual behaviors and manifestations of their disabilities. DeCoteau Testimony ___; Ranjbar Testimony.

218.   Behavioral management policies and procedures must prohibit and provide alternatives to physical restraint and seclusion practices.  These practices have no therapeutic benefit to children with disabilities related to trauma and can stimulate their fight or flight responses by making them feel physically or mentally threatened.  Davis Testimony ___. Even witnessing coercive physical discipline at a school can trigger a stress response in a child with disabilities related to trauma.  Davis Testimony ___.  Likewise, exclusionary and punitive discipline policies that rely on suspensions and expulsions are harmful and counter-productive to children who have experience trauma and must be eliminated.   Davis Testimony ___.

219.   Children excluded from classrooms are not only denied the opportunity to learn academic subject matter—they are denied the chance to learn the coping and self-regulation skills that will help them overcome their disabilities.  DeCoteau Testimony ___. Physical removal from the classroom is the ultimate denial of meaningful access to education.

220.   Behavioral support policies and procedures must be culturally appropriate in order to be effective.  Non-verbal signals of safety and security vary between different cultural contexts.  Davis Testimony ___.  And for Native American people specifically, cultural practices and traditions are a major source of wellness.  DeCoteau Testimony ___. For this reason, any remedy must include implementation of school-wide behavior supports that are culturally relevant to the Havasupai Tribe.

221.   Defendants' failure to develop and implement culturally-relevant behavioral support policies and procedures has deprived Plaintiffs and other students with disabilities related to trauma of nondiscriminatory and meaningful access to HES.

222.   At HES, it is a common practice for students to be sent home when they misbehave or are not able to participate in class.  This practice contributes to students' sense

of inadequacy and shame, and denies them the opportunity to learn to self-regulate, connect with staff, and find safety in the school environment.  Ranjbar Testimony ___.

223.    HES does not have behavioral support policies and procedures, nor does it have alternatives to exclusionary practices.  HES instead resorts to exclusionary practices for students with disabilities and on multiple occasions called law enforcement to response to student behaviors.  Trial Exhibit 271 at 32 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1); Maldonado Dep. Tr. at 206:14–207:22; Roanhorse-Dineyahze Dep. Tr. at 182:25–184:6.

224.    As a result, Student Plaintiffs and other students with disabilities were frequently sent home without notice, suspended, placed on alternative schedule, or confronted by police when other, less restrictive, measures could have been taken to address behavioral issues.  Stephen C. and Durell P., for example, have long histories of not attending a full day of school, including being suspended, sent home, placed on a shortened school day, sent to alternative placements, and confronted or arrested by police.  Trial Exhibit 271 at 17, 20 (Defendants' Responses to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1) Ticeahkie Dep. Tr. at 57:20–58:5; Boyd Dep. Tr. at 125:19–126:9; Maldonado Dep. Tr. at 123:6–124:4, 127:21–24, 132:4–20, 172:21–173:22, 186:3–187:16, 199:2–25, 206:14–15, 206:17–207:22; Roanhorse-Dineyahze Dep. Tr. at 176:22–177:4, 182:25–184:6, 185:5–15, 229:12–231:16; Williamson Dep. Tr. at 60:21–65:16; Trial Exhibit 260 (BIE00019080); Trial Exhibit 178 (BIE00004289).

225.    The lack of behavioral support policies and procedures at HES has also caused widespread bullying, including bullying of Taylor P. and Moana L.  Ranjbar Testimony ___; Trial Exhibit 262 at 20 (Psychoeducational Evaluation of Moana L.; Hoechst).

226.    As a result, students with disabilities related to trauma, including Durell P. and Stephen C., were subject to exclusionary discipline practices.  Other students with disabilities related to trauma, including Taylor P. and Moana L., were denied a safe and predictable school environment where they could anticipate the consequences of student misbehavior and rely on staff to address conflict and bullying in a trauma-informed manner.

227.   Accordingly, written behavioral support policies and procedures that conform to trauma-informed principles, which are provided to students and parents and are implemented at the school, are a reasonable accommodation that would give students with disabilities related to trauma nondiscriminatory and meaningful access to HES.

### G.   The Remedies Described By Plaintiffs' Experts Require School-Wide and Programmatic Relief.

228.   Reasonable accommodations for students with disabilities related to trauma are necessarily school-wide.  Plaintiffs' experts identified accommodations—a consistent, trauma-trained staff, a system for providing curricular and individual supports, and behavioral policies and procedures—that operate at the school level.  This is no surprise because children with disabilities related to trauma are especially sensitized to their environment and to their interactions with others, particularly with authority figures.  Davis Testimony ___; DeCoteau Testimony.

229.   Defendants' characterization of Plaintiffs' proposed accommodations as being solely for the benefit of two students, Taylor P. and Moana L., is incorrect.  First, NADLC is an organizational plaintiff who has represented numerous HES students who have had adverse childhood experiences and mental health diagnoses consistent with trauma-related disabilities and will benefit from the proposed accommodations.   A trauma-informed approach will reduce the need for NADLC to represent other students with disabilities related to trauma at HES and will lessen the diversion of resources that results from representing HES students.  *See supra* Pls. FF Section II.D.  Second, Student Plaintiffs are not the only students at HES impacted by childhood adversity, and their community also faces the burden of generations of historical trauma stemming from a legacy of chronic discrimination—including forced relocations, loss of homes, families, and culture, and the use of boarding schools as a form of forcible assimilation.  *See supra* Pls. FF Section II.C. These students will benefit from Plaintiffs' proposed accommodations.

230.   If provided with the accommodations described by Plaintiffs' experts, students at HES—including students with disabilities related to trauma—can receive nondiscriminatory and meaningful access to education.

**H.   The Accommodations Described By Plaintiffs' Experts Can Be Implemented At Havasupai Elementary School.**

231.   Defendants contend that they cannot implement the accommodations proposed by Plaintiffs' experts because they would entail financial burdens or would fundamentally alter the school.  Both arguments are not supported the documents submitted into evidence or the testimony presented at trial.

232.   With respect to budgetary constraints, Defendants argue that HES has no available funds outside of its per-student formula, but BIE has used funding outside of the formula to implement a trauma-resilient schools pilot at 10 other schools.  Through this pilot, each school received $100,000 in funding to spend on items like behavioral intervention supports, trainings, materials, and "Trauma-Informed Tribal School Systems Change."  BIE education resource centers earmarked another $300,000 for the trauma-resilient schools initiative, to be spent on additional trainings, travel, gatherings, and an annual conference.  Trial Exhibit 158 at 4–6.

233.   Defendants have not produced evidence explaining why they have made $100,000 and more available for accommodations like the ones Plaintiffs have proposed at 10 other schools, but cannot make *any* funds available for such accommodations at HES.

234.   As Plaintiffs' experts explained, the accommodations proposed by Plaintiffs can be implemented without significant additional financial resources.  DeCoteau Testimony ___; Davis Testimony ___.  Dr. Davis testified that he had never seen a trauma-informed setting encounter budgetary obstacles that were insurmountable.  Davis Testimony ___.  Dr. DeCoteau testified to her experience implementing trauma-informed care in schools and other settings with extremely limited resources, including schools serving Native students.  DeCoteau Testimony ___.  She described how existing school and community resources can support trauma-informed interventions.   DeCoteau Testimony ___.   Dr. Ranjbar also

described experience implementing trauma interventions in low-resource settings.  Ranjbar Testimony ___.   Dr. Ranjbar confirmed that just the basic staff needed for a school can implement trauma accommodations.  Ranjbar Testimony ___.

235.   Importantly, Defendants have not put on evidence of the costs of Plaintiffs' proposed accommodations, nor have they demonstrated that no additional sources of funding are available.  Indeed, the BIE's trauma-resilient schools pilot and associated expenditures suggest that the necessary funding can be found.

236.   Plaintiffs' proposed accommodations are in keeping with the nature and purpose of HES and would not fundamentally alter it.  Each of the accommodations that Plaintiffs propose is a trauma-informed version of a basic component of K-12 education: a staff, a curriculum and individualized assistance, and behavioral management.  *See supra* Pls. FF Section II.F.1-3.  BIE has implemented trauma-informed versions of each of these components at 10 other schools without fundamentally altering them.  Trial Exhibit 158 at 4-6.

237.   Plaintiffs' experts testified that they personally had worked on or knew about the successful implementation of trauma-informed practices in schools and other settings across the country—including schools serving Native youth and schools in remote, rural, and/or resource-constrained settings—including in Boston public schools, Pine Ridge Reservation schools, Bismarck Public Schools, the Justice Resource Institute in Massachusetts, The Perry Project (Bruce Perry's Child Trauma Academy), the ADOBE project in New Mexico, with the San Carlos Apache Tribe (San Carlos Unified School District), the Menominee Tribe, the McLaughlin Public School on the Standing Rock Indian Reservation, the community of Turtle Mountain and the Fort Berthold Reservation, the Tohono O'odham schools, the Viejas Tribe, Sisseton Reservation, Spirit Lake Reservation, the Yakama Nation, and the states of Tennessee, Kentucky, Vermont, Washington, and Oregon, among others.   Davis Testimony ___; DeCoteau Testimony ___; Ranjbar Testimony ___.

**I.   Injunctive Relief Directing Defendants to Implement the Accommodations Proposed by Plaintiffs' Experts Is Warranted.**

238.   Without the accommodations described by Plaintiffs' experts, Student Plaintiffs and other students with disabilities related to trauma at HES will be irreparably harmed.  Without consistent, trauma-trained staff, students with disabilities related to trauma will continue to be placed in classrooms where their traumas are exacerbated.  *See supra* Pls. FF Sections II.F.1.  Without curricular supports that promote self-regulation and mental health services, students with disabilities related to trauma will lack the supports they need to overcome the effects of trauma.  *See supra* Pls. FF Sections II.F.2.  And without changes to school-wide behavioral policies, students with disabilities related to trauma will continue to face exclusionary policies that prevent them from accessing education on the same terms as their peers.  *See supra* Pls. FF Section II.F.3.  As explained by Plaintiffs' experts, those impacts translate into long-lasting negative effects on children's brain development, their self-efficacy and esteem, their mental and physical health, their academic progress, and their relationships.  Davis Testimony ___; DeCoteau Testimony; Ranjbar Testimony ___.

239.   Plaintiffs are likely to continue to suffer irreparable harm absent an injunction from this Court.  In responding to Plaintiffs' motion for summary judgment, defendants asserted that Teresia Paul was "working on formulating trauma-informed practices for BIE" and that BIE was "working to develop trauma-informed instruction, trauma-informed curriculum, and then training for those different types of trauma-informed practices."  Trial Exhibit 271 at 36 (Defendants' Responses to Plaintiffs' Separate Statement of Facts, ECF No. 200-1).  Despite those promises, those practices are not yet in place at HES.  Those past failures, along with Defendants' past commitments to comply with Section 504, Defendants' failure to meet those commitments, and the absence of adequate alternative remedies for those failures, *see supra* Pls. FF Section I.H, provide strong evidence that the injuries described above will continue despite Defendants' assertion that the BIE is "positioning" itself to comply with Section 504.  Joint Final Pretrial Order at Section 4.B.

240.   Defendants' efforts to provide Student Plaintiffs with services using Individualized Education Plans (IEPs) are not sufficient to avoid irreparable harm.  First, as Defendants admit, the students are not receiving the services to which they are entitled under their IEPs.  Joint Final Pretrial Order at Section 3.A.13–20.  Second, the IEPs do not offer students with disabilities related to trauma the school-wide accommodations that they need.  Third, organizational plaintiff NADLC faces an ongoing diversion of resources because of its advocacy on behalf of current and former HES students, including Stephen C. and Durell P. who do not currently have IEPs at the school.  This diversion of resources cannot be corrected by offering limited services to only some of the students with disabilities related to trauma at HES.

241.   The balance of the hardships weighs in favor of implementing the accommodations described by Plaintiffs' experts.  As described above, Student Plaintiffs and other students with disabilities related to trauma have been irreparably harmed by Defendants' failure to comply with Section 504 with respect to those disabilities.  The potential hardships described by Defendants are, at most, administrative and financial burdens associated with complying with their existing legal obligations to students with disabilities, which are faced by many other schools.  DeCoteau Testimony ___; Ranjbar Testimony.  Those burdens do not preclude implementation of the remedies proposed by Plaintiffs' experts and do not overcome the need for compliance with Section 504.  *See supra* Pls. FF Section II.H.  Although Defendants have yet to fully implement any of the accommodations proposed by Plaintiffs' experts, their recent implementation of a trauma-informed pilot program reflect that those remedies are in fact feasible.  Trial Exhibit 158 at 4-6.

242.   Implementing the accommodations described by Plaintiffs' experts is in the public interest.  Defendants conceded that they are subject to Section 504, but they are not complying with Section 504.  *See supra* Pls. FF Section I.D.  The public interest favors requiring Defendants to comply with their legal obligations.  The public interest also favors providing necessary curriculum and support to students with disabilities.

1
2

### III.   The Remedies Described By Plaintiffs' Experts Should be Monitored by a Special Master.

3   243.   Defendants have been aware of their failure to comply with Section 504 and

4   their failure to adequately address the needs of students who have experienced trauma since

5   well before this lawsuit was initiated in 2017.  Defendants have repeatedly promised to take

6   steps to comply with Section 504, but those promises have not been fulfilled.  Defendants'

7   continued failure to comply with Section 504 has deprived Plaintiffs and other students with

8   disabilities of nondiscriminatory and meaningful access to HES, and significantly

9   undermines Defendants' credibility as to any proposals to implement future reforms.

10   244.   Defendants' belated and inconsistent efforts to address those failures

11   constitute an exceptional circumstance that merits the appointment of a special master to

12   ensure compliance with Court's order granting injunctive relief.

13   245.   Although Defendants represent that BIE is "positioning itself" to have

14   adequate staff to address the needs of students with disabilities, including disabilities related

15   to trauma, the descriptions of their efforts to date reflect that they continue to fail to fully

16   staff HES.  Joint Final Pretrial Order at Sections 4.A.4, 4.A.7.  For example, Defendants

17   admit that they detailed a special education teacher to HES for at least part of the 2019–2020

18   school year and that they only have one special education aid.  Defendants state that HES is

19   "currently working to post two additional general education positions and third permanent

20   special education position" for the 2020–2021 school year.  Defendants' suggest that they

21   have advertised for additional special education aides, including within the community, but

22   that they have not received any applications.  Joint Final Pretrial Order at Sections 4.A.4,

23   4.A.6.  Those past failures reflect that continued monitoring is required to ensure that

24   Defendants take additional steps to try to fully staff the school.

25   246.   Until March 2019, shortly before discovery closed, BIE did not have a

26   designated Section 504 Coordinator.  In March 2019, the BIE designated Marcy Oliver as

27   BIE's Acting Section 504 Coordinator.  BIE did not, however, appoint a permanent Section

28   504 Coordinator until June 2020, well after discovery closed and shortly before trial.  Joint

1   Final Pretrial Order at Section 3.B.3.  Those delays reflect that continued monitoring is
2   required to ensure that Defendants take additional steps to identify leaders and provide
3   training on Section 504.

4   247.   Defendants had not issued policies or procedures implementing Section 504
5   prior to April 2019, when discovery closed.  In opposing summary judgment, Defendants
6   continued to assert that BIE was "diligently working" to develop and provide "a system to
7   ensure that all disabled students at HES are provided with meaningful access to an education
8   as appropriate." Trial Exhibit 270 at 9–10 (Defendants' Opposition to Plaintiffs' Motion for
9   Summary Judgment, ECF No. 200).  But even the most basic steps to come into compliance
10  are still not complete over a year later.  In an email dated June 11, 2020, Defendants' counsel
11  indicated that it would not be able to produce BIE's Section 504 policies and procedures
12  until approximately July 20, 2020, three days before the Pretrial Conference scheduled in
13  this case.  Trial Exhibit 252 (June 11, 2020 Email from Cristen Handley).  In Defendants'
14  pre-trial submissions, Defendants admit that BIE's Section 504 policies and procedures will
15  provide only "interim guidance" and will expire within one year.  Joint Final Pretrial Order
16  at Section 3.B.1.  Those delays and the short-term nature of the proposed measures reflect
17  that continued monitoring is required to ensure that Defendants issue and continue to update
18  BIE's policies and procedures implementing Section 504.

19  248.   Defendants had also failed to make meaningful progress regarding the
20  availability of teacher housing prior to April 2019, when discovery closed.  Defendants have
21  long been aware that the available teacher housing is not adequate to support a full staff.  As
22  early as April 2018, BIE had been in discussions with the Tribe regarding expanding
23  available teacher housing.  Despite promises to engage in further discussions, BIE did not
24  provide a formal proposal for additional housing until the eve of trial.  Joint Final Pretrial
25  Order at Section 4.A.9; Trial Exhibit 1023; Trial Exhibit 1024; Trial Exhibit 1025; Apr. 18,
26  2019 Dearman 30(b)(6) Dep. Tr. at 146:2–12.

27  249.   In light of Defendants' continued failures to comply with Section 504 and the
28  need for ongoing monitoring to ensure that any proposed reforms are actually implemented,

1   the remedies described by Plaintiffs' experts should be monitored by a special master who

2   can more effectively monitor and ensure continued compliance with those remedies.

3          250.   In addition, a special master would assist in overcoming some of the alleged

4   hurdles to implementation of the remedies described by Plaintiffs' experts.   Although

5   liability is clear with respect to compliance with Section 504—indeed, Defendants have

6   conceded liability for failure to comply with Section 504 up through the close of discovery,

7   *see supra* Pls. FF Section I.D., the path to remedying those violations is less clear.   Plaintiffs'

8   experts have provided a clear outline of the appropriate remedy, which the Court adopts.

9   *See supra* Pls. FF Sections I.E, II.F.   But additional guidance may be required to implement

10  that remedy.   As Defendants emphasize, the challenges facing HES—including its remote

11  location, difficulties securing staff, and the complex and at times rigid budget constraints—

12  are particularly complex and require a detailed understanding of the realities on the ground.

13  Joint Final Pretrial Order at Section 4.A.4–9; Trial Exhibit 271 at 41–52 (Defendants'

14  Response to Plaintiffs' Separate Statement of Material Facts, ECF No. 200-1).   Those

15  challenges further highlight that this is an exceptional circumstance where a special master

16  can more effectively address any post-trial issues that arise with respect to implementation

17  of and compliance with the injunctive relief issued by this Court.

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# PROPOSED CONCLUSIONS OF LAW

**I.  Injunctive Relief Is Necessary to Ensure that BIE at Last Complies with Its Obligations Under Section 504 of the Rehabilitation Act.**

    **A.  The Non-Discrimination Mandate of Section 504 of the Rehabilitation Act and Its Implementing Regulations Requires BIE to Provide Students with Disabilities with Meaningful Access to Education.**

1.  Section 504 of the Rehabilitation Act of 1973 ("Section 504") prohibits the BIE from discriminating on the basis of disability under its program of education. Specifically, Section 504 provides "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 794.

2.  A disability under Section 504 is a physical or mental impairment that substantially limits one or more major life activities, including learning, reading, thinking, concentrating, and communicating. 42 U.S.C. §§ 12102(1)(A), 12102(2)(A).

3.  HES is a program or activity conducted by the BIE. *See* Trial Exhibit 275 at 5 (Order on Motion for Partial Relief, ECF No. 221). Thus, BIE must comply with the mandates of Section 504 in administering the educational program at Havasupai Elementary School ("HES").

4.  Under Section 504, the BIE must provide students with disabilities attending HES—including students with disabilities related to trauma—with "meaningful access" to benefits and services offered to students without disabilities. *See Alexander v. Choate*, 469 U.S. 287, 301 (1985).

5.  An organization subject to Section 504 violates the statute "if it denies a qualified individual with a disability a reasonable accommodation that the individual needs in order to enjoy meaningful access to the benefits of public services." *Mark H. v. Hamamoto*, 620 F.3d 1090, 1097 (9th Cir. 2010) (citing *Alexander*, 469 U.S. at 301-02 & n.21; *Mark H. v. Lemahieu*, 513 F.3d 922, 937 (9th Cir. 2008); *Bird v. Lewis & Clark Coll.*, 303 F.3d 1015, 1020, 1022 (9th Cir. 2002)). "To that end, it may be required to make

reasonable, but not fundamental or substantial, modifications to its programs." *Bird*, 303 F.3d at 1020.

6.      Beyond the antidiscrimination mandate imposed by Section 504 itself, BIE is also subject to "Subpart E" of the Department of the Interior's ("DOI's") regulations implementing Section 504.  *See* Trial Exhibit 275 at 5 (Order in Motion for Partial Relief, ECF No. 221); 43 C.F.R. §§ 17.501-17.570, Subpart E; *see also* Trial Exhibit 258 at 14 (ECF No. 182).

7.      Subpart E of the DOI regulations sets forth more specific prohibitions against discrimination on the basis of disability.  It too requires that students with disabilities be provided with access to public education and the equal opportunity to participate in and benefit from public education at HES.  *See* 43 C.F.R. § 17.530.

8.      Among its specific mandates and prohibitions, Subpart E prohibits BIE from administering its program of education at HES in a manner that "defeat[s] or substantially impair[s] accomplishment of the objectives of [the] program" with respect to students with disabilities.  43 C.F.R. § 17.530(b)(3)(ii).

9.      The objectives of the BIE's program of education are to ensure that the programs are of the highest quality and provide for the basic elementary and secondary educational needs of Indian children, including meeting the unique educational and cultural needs of those children.  25 U.S.C. §2000.  Thus, under Subpart E and Section 504 generally, BIE may not administer the program of education at HES in a manner that defeats or substantially impairs the provision of high quality basic elementary education to students with disabilities.

10.     In addition, Subpart E expressly recognizes the importance of providing individuals with disabilities the opportunity to participate in the same programs and activities as individuals without disabilities, and mandates that BIE administer its program of education at HES in an inclusive, integrated manner.  *E.g.*, 43 C.F.R. § 17.530(b)(2) ("The agency may not deny a qualified handicapped person the opportunity to participate in programs or activities that are not separate or different, despite the existence of permissibly

separate or different programs or activities."); *id.* § 17.530(d) ("The agency shall administer programs or activities in the most integrated setting appropriate to the needs of qualified handicapped persons."). Thus, Subpart E specifically and expressly requires BIE to administer its education program at HES in a manner that integrates students with disabilities into the general education program wherever possible.

11.    Other components of Subpart E require BIE to provide procedural protections to individuals with disabilities, including students at HES. For instance, BIE must "make available to employees, applicants, participants, beneficiaries, and other interested persons such information regarding the provisions of this part and its applicability to the programs or activities conducted by the agency, and make such information available to them in such manner as the agency head finds necessary to apprise such persons of the protections against discrimination assured them by section 504 and this regulation." 43 C.F.R. § 17.511.

12.    Relatedly, the BIE must have in place a Section 504 complaint and resolution procedure consistent with the "Compliance procedures" set forth in 43 C.F.R. § 17.570.

### B.    Several Student Plaintiffs Are Students with Disabilities Entitled to Protection Under Section 504.

13.    Plaintiffs Taylor P., Freddy P., Olaf D., and Moana L. are school-aged children who are eligible to attend BIE schools under 25 C.F.R. § 39.2.

14.    At the time Stephen C. and Durell P. attended HES, they were school-aged children who were eligible to attend BIE schools as "Indian" students under 25 C.F.R. § 39.2.

15.    Plaintiffs Taylor P., Freddy P., Olaf D., and Moana L. are students with disabilities entitled to protection from discrimination at HES under Section 504.

16.    At the time Stephen C. and Durell P. attended HES, they were students with disabilities entitled to protection from discrimination at HES under Section 504.

### C.    BIE Denies Students with Disabilities at HES Meaningful Access to Education, Necessitating Injunctive Relief.

17.     BIE denies students with disabilities at HES meaningful access to education and discriminates against such students solely on the basis of their disabilities, because HES (1) lacks the staff to meet the needs of its students with disabilities; (2) fails to provide the resources and curriculum to enable students with disabilities to access and benefit from public education; (3) lacks procedures and practices required by Section 504 and the DOI's implementing regulations; and (4) has no system capable of ensuring continued compliance with Section 504 and the DOI's implementing regulations.  *See supra* Pls.' Proposed Findings of Fact ("Pls. FF") Section I.D.

18.     These failures are longstanding and persist today, thus necessitating the award of prospective injunctive relief.  The BIE's eleventh-hour efforts to come into compliance with its obligations under section 504 are not sufficient.  Having systematically failed to comply with Section 504 for years despite being on clear notice of numerous Section 504 obligations, the BIE cannot avoid an injunction with the mere promise to remedy its behavior going forward—or with stopgap measures implemented on the eve of trial.  *See, e.g.*, *Fikre v. FBI*, 904 F.3d 1033, 1037 (9th Cir. 2018) (defendants' voluntary cessation of an illegal activity is grounds for denying relief only where "it can be said with assurance that there is no reasonable expectation . . . that the alleged violation will recur and interim relief or events have *completely and irrevocably eradicated the effects of the alleged violation*" (emphasis added) (alteration in original) (internal quotation marks omitted)); *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015) ("A presumption of good faith . . . cannot overcome a court's wariness of applying mootness under 'protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption.'").

**D.      School-Wide Relief is Necessary and Appropriate to Address BIE's Failure to Comply with Section 504 at HES.**

19.     The scope of injunctive relief should match the scope of the violation it remedies.  *See Hills v. Gautreaux*, 425 U.S. 284, 294 (1976); *Clement v. Cal. Dep't of Corr.*, 364 F.3d 1148, 1153 (9th Cir. 2004).  This principle holds for class actions and individual

or multi-plaintiff actions alike: Relief is "not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Bresgal v. Brock*, 843 F.2d. 1163, 1170-71 (9th Cir. 1987) (emphasis in original); *see also Clement*, 364 F.3d at 1153 (statewide injunctive relief was warranted to prohibit unconstitutional policy in action brought by individual prisoner); *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996) (statewide injunction against unconstitutional law enforcement policy was appropriate in action brought by 14 individuals and an organization); see also *Davis v. Astrue*, 874 F. Supp. 2d 856, 867-69 (N.D. Cal. 2012) (rejecting Social Security Administration's contention that injunction sought by two individual plaintiffs under the Rehabilitation Act was necessarily overbroad, even where injunction sought nationwide relief).

20.     Here, school-wide relief aimed to remove systemic and programmatic barriers to education is required to remedy Defendants' violations of Section 504 and its implementing regulations at HES and to afford the individual plaintiffs all of the relief to which they are entitled. *See Easyriders*, 93 F.3d at 1502. Defendants' failure to have and to follow policies, procedures, and practices that implement and comply with the mandates of the Section 504 results in impermissible discrimination against students with disabilities. Without system-wide equitable relief, the discrimination will continue.

21.     If an injury results from "violations of a statute . . . that are attributable to policies or practices pervading the whole system," then "[s]ystem-wide relief is required." *Armstrong v. Schwartzenegger*, 622 F.3d 1058, 1072-73 (9th Cir. 2010). Courts have thus permitted and granted claims for systemic relief under Section 504 in individual actions and class actions alike. *See, e.g.*, *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1259-61 (D.C. Cir. 2008); *Christopher S. v. Stanislaus Cty. Office of Educ.*, 384 F.3d 1205, 1207 (9th Cir. 2004); *Davis*, 874 F. Supp. 2d at 867-69; *Gray v. Golden Gate Nat'l Rec. Area*, 279 F.R.D. 501, 503 (N.D. Cal. 2011); *Huezo v. Los Angeles Cmty. Coll. Dist.*, 672 F. Supp. 2d 1045, 1051, 1059-68 (C.D. Cal. 2008).

**E.**     **Plaintiffs' Proposed Remedial Measures Are Necessary and Appropriate to Ensure that BIE Complies with Its Section 504 Obligations.**

**1.**     **Students with Disabilities at HES Require Adequate Numbers of Appropriately Trained Teachers and Staff to Have Access to and Benefit from BIE's Education Program.**

22.     Adequate numbers of qualified general and special education teachers and staff (including service providers and administrators) are necessary to educate students with disabilities with their non-disabled peers in general education classrooms at HES, as appropriate to the needs of students with disabilities, and to administer the educational program at HES in the most integrated setting appropriate to the needs of students with disabilities.  Such teachers and staff must be appropriately trained in meeting the needs of students with disabilities.  43 C.F.R. § 17.530(b)(2), (d); 29 U.S.C. § 794(a); *see supra* Pls. FF Section I.E.1.

23.     The BIE must have adequate numbers of qualified and appropriately trained general and special education teachers and staff (including service providers and administrators) to provide general education and special education to students with disabilities so that they are able to participate in and benefit from public education at HES. 43 C.F.R. § 17.530 (a); 43 C.F.R. § 17.530(b)(1)(iii, iv & vi); 43 C.F.R. § 17.530(b)(3); 29 U.S.C. § 794(a); *see supra* Pls. FF Section I.E.1.

24.     Further, *consistent* staffing is required to provide general education and special education to students with disabilities so that they are able to participate in and benefit from the BIE educational program and activities at HES.  43 C.F.R. § 17.530(a); 43 C.F.R. §§ 17.530(b)(1)(ii, iv and vi); 43 C.F.R. § 17.530(3); 29 U.S.C. § 794(a); *see supra* Pls. FF Section I.E.1.

25.     Adequate numbers of qualified and appropriately trained teachers and staff are necessary to ensure that students with disabilities at HES are not excluded or subject to a shortened school day due to their disabilities.  43 C.F.R. § 17.530(b)(1)(i); 29 U.S.C. § 794(a); *see also Christopher S.*, 384 F.3d at 1212 (blanket policy of shortened school days for disabled students violates Section 504); *J.S., III v. Houston Cty. Bd. of Educ.*, 877 F.3d

979, 986-876 (11th Cir. 2017) (citing *Olmstead v. L.C. ex tel. Zimring*, 527 U.S. 581, 597 (1999)) (exclusion of students with disabilities leads to "stigmatization and deprivation of opportunities for enriching interaction with fellow students").

26.     The BIE must have a continuum of special education services and supports to enable students with disabilities at HES meaningful access to education.  *See* 43 C.F.R. § 17.530 (a); 43 C.F.R. §§ 17.530(b)(1)(iv & vi); 43 C.F.R. § 17.530(b)(3); 29 U.S.C. § 794(a); *see supra* Pls. FF Section I.E.1.

**2.      Section 504 Requires School-Wide Instructional and Behavioral Supports and Appropriate Individual Supports to Enable Students with Disabilities at HES to Access and Benefit from Public Education.**

27.     In order to enable students with disabilities at HES to access, participate in, and receive the benefits of its educational program in the least-restrictive environment possible, the BIE must provide a school-wide system of evidence-based instructional supports.    43  C.F.R.  § 17.530(a);  43  C.F.R.  § 17.530(b)(ii)-(iv),  &(vi);  43  C.F.R. § 17.530(b)(3); 29 U.S.C. § 794(a); *see supra* Pls. FF Section I.E.2.(a).

28.     In order to enable students with disabilities at HES to access, participate in, and receive the benefits of its educational program in the least-restrictive environment possible, the BIE must provide a school-wide system of evidence-based behavioral supports. 43 C.F.R. § 17.530(a); 43 C.F.R. § 17.530(b)(ii)-(iv), &(vi); 43 C.F.R. § 17.530(b)(3); 29 U.S.C. § 794(a); *see supra* Pls. FF Section I.E.2.(b).

29.     In order to enable students with disabilities at HES to access, participate in, and receive the benefits of its educational program in the least-restrictive environment possible, the BIE must provide individual support services as appropriate to the needs of individual students with disabilities, including student Plaintiffs.  43 C.F.R. §§ 17.530; 29 U.S.C. § 794(a); *see supra* Pls. FF Section I.E.2.(c).

30.     In order to enable students with disabilities at HES to access, participate in, and receive the benefits of its educational program in the least-restrictive environment

1  possible, the BIE must engage with families of HES students.  43 C.F.R. §§ 17.530; 29

2  U.S.C. § 794(a); *see supra* Pls. FF Section I.E.2.(d).

3  **3.  Section 504 Requires the BIE to Have Procedures and Practices in Place to Ensure the Proper Implementation of Section 504's Non-discrimination Mandate at HES.**

4

5  31.  The BIE must have written policies, procedures and guidelines to ensure the

6  proper implementation of Section 504's non-discrimination mandate.  43 C.F.R. §§ 17.530;

7  43 C.F.R. § 17.570; 29 U.S.C. § 794(a); *see supra* Pls. FF Section I.E.3.(a).

8  32.  The BIE must provide students with disabilities at HES and their parents or

9  guardians, as interested persons, information regarding the application of Section 504 to the

10  BIE, as necessary to apprise students and parents or guardians of the protections against

11  discrimination assured them by Section 504 and DOI regulations.  43 C.F.R. § 17.511; *see*

12  *supra* Pls. FF Section I.E.3.(a).  Such notice is equally important to ensure that students with

13  disabilities are provided meaningful access to the BIE's program of education.  43 C.F.R.

14  § 17.530; 29 U.S.C. § 794(a); *see supra* Pls. FF Section I.E.3.(a).

15  33.  The BIE must have practices and procedures to identify, evaluate, and provide

16  appropriate accommodations to students with disabilities eligible for enrollment at HES, so

17  as not to discriminate against them.  43 C.F.R. § 17.530; 29 U.S.C. § 794(a); *see supra* Pls.

18  FF Section I.E.3.(b).

19  34.  The BIE must have regulations, policies or practices regarding Section 504

20  complaints that, at a minimum, comply with the requirements of the DOI enforcement

21  regulations set forth in 43 C.F.R. §17.570, and that afford student, parents and other

22  interested persons access to student records.  43 C.F.R. § 17.530; 43 C.F.R. § 17.570; 29

23  U.S.C. § 794a; *see supra* Pls. FF Section I.E.3.(c).

24  35.  The BIE must ensure effective communication to develop and maintain

25  partnerships with families of students with disabilities.  43 C.F.R. § 17.560(a).

26  **4.  The BIE Must Have in Place a System of Accountability to Ensure Continued Compliance with Section 504's Non-discrimination Mandate.**

27

28

36. The BIE must collect and manage data necessary to ensure that it is complying with Section 504 and the DOI's implementing regulations and promoting the accomplishment of its objective to provide programs that are of the highest quality and provide for the basic elementary and secondary educational needs of Indian children, including meeting the unique educational and cultural needs of those children, with respect to students with disabilities. 43 C.F.R. § 17.530; 25 U.S.C. § 2000; 29 U.S.C. § 794(a); *see supra* Pls. FF Section I.E.4.

37. The BIE must provide the oversight necessary to ensure compliance with procedures and implementation of education and special education services to students with disabilities at HES in a non-discriminatory manner. 43 C.F.R. § 17.530; 29 U.S.C. § 794(a); *see supra* Pls. FF Section I.E.4.

### F. Plaintiffs Are Entitled to Injunctive Relief to Remedy BIE's Longstanding Failure to Comply with Section 504 Under Traditional Equitable Principles.

38. A permanent injunction is appropriate "when the party seeking relief demonstrates that: (1) it is likely to suffer irreparable injury that cannot be redressed by an award of damages; (2) that 'considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted'; and (3) 'that the public interest would not be disserved by a permanent injunction.'" *City and Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1243 (9th Cir. 2018) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

39. Absent a permanent injunction, the student Plaintiffs and other students with disabilities at HES will continue to face unlawful discrimination and be deprived of meaningful access to education. Plaintiff NADLC will also continue to have to devote its limited resources to addressing the BIE's systemic failure to comply with Section 504 at HES. Such harms are plainly irreparable and cannot be adequately remedied by money damages (which are not available in any event). *See, e.g.*, *Issa v. Sch. Dist. Of Lancaster*, 2016 WL 4493202, at *7 (E.D. Pa. Aug. 26, 2016) (denial of access to education constitutes irreparable harm); *P.P. v. Compton Unified Sch. Dist.*, 135 F. Supp. 3d 1126, 1149 (C.D.

Cal. 2015) (same); *D.R. v. Antelope Valley Union High Sch. Dist.*, 746 F. Supp. 2d 1132, 1145 (C.D. Cal. 2010) (same); *see also Plyler v. Doe*, 457 U.S. 202, 223 (1982) (deprivation of education "imposes a lifetime hardship").

40.     Defendants' belated claim that they are now—after years of delay and many months after first representing to the Court that they were working on complying with Section 504—"positioning [themselves] to comply fully with Section 504 going forward," Joint Final Pretrial Order at Section 4.B, does not show that Plaintiffs will not suffer irreparable harm absent injunctive relief.  Defendants have failed to achieve compliance with Section 504 for *years* despite repeated promises to do so.  *See supra* Pls. FF Section I.H. Courts routinely reject the argument that such professions of remorse and plans for future compliance can negate a plaintiff's showing of irreparable harm.  *See, .e.g.*, *Am. Council of the Blind v. Paulson*, 581 F.Supp.2d 1, 2 (D.D.C. 2008); *Huezo*, 672 F. Supp. at 1051, 1062–1064, 1067; *see also U.S. v. Oregon State Med. Soc.*, 343 U.S. 326, 333 (1952) ("It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption."); *Gomez v. Vernon*, 255 F.3d 1118, 1129 (9th Cir. 2001) (holding that plaintiffs had satisfied the injunctive relief requirement of irreparable injury where Defendant "claim[ed] that its employees will not [engage in the violation] again," but no "policy or mechanism [was] in place to back up that promise"); *Human Rights Def. Ctr. v. Sw. Virginia Reg'l Jail Auth.*, 2020 WL 1444916, at *2 (W.D. Va. Mar. 25, 2020) (issuing a permanent injunction and rejecting defendants' argument that the plaintiff "ha[d] not met its burden of showing . . . irreparable harm" because defendants had described "significant contemplated policy changes"); *Rasho v. Walker*, 376 F. Supp. 3d 888, 916–17, 926 (C.D. Ill. 2019) (imposing a permanent injunction despite defendants' evidence of improvement where deficiencies in the provision of constitutionally-required medical care remained, and defendants "fail[ed] to act urgently without the Court's intervention").

41.     That specific individual student Plaintiffs may be eligible for special education services under the Individuals with Disabilities Education Act ("IDEA") does not indicate

that Plaintiffs have an adequate available remedy at law.  The individual student Plaintiffs have an independent right under Section 504 to receive meaningful access to education at HES, and the BIE has concededly failed to provide such meaningful access.  Moreover, even if specific student Plaintiffs are eligible to and do receive services under IDEA, the availability of such services in no way remedies the harm to NADLC, which continues to devote its scarce resources to students at HES who are deprived of meaningful access in violation of Section 504.

42.     The balance of hardships tips decisively in favor of a permanent injunction.  Plaintiffs have already suffered irreparable harm as a result of Defendants' pernicious and persistent non-compliance with Section 504.   Absent injunctive relief, Plaintiffs will continue to face an irreparable deprivation of educational access that is assured to students with disabilities as a matter of federal law.  Defendants, by contrast, face "constraints" that are, at most, administrative and financial burdens associated with complying their existing legal obligations to students with disabilities.  Such constraints are faced by many schools that nonetheless manage to comply with the law.  *See supra* Pls. FF Section I.G.  Balanced against the grave, irreparable damage of profound educational deprivation, Defendants' hardships of administrative and financial inconvenience do not justify the denial of injunctive relief.  *See, e.g.*, *Rasho*, 376 F. Supp. 3d at 917 (challenges associated with appropriately staffing correctional facilities did not outweigh inmates' right to appropriate and legally mandated mental health care).

43.     The public interest will not be disserved by a permanent injunction.  To the contrary, "there is an overwhelmingly strong public interest in . . . ensuring that the defendants at last comply with their legal obligations."  *D'Amico Dry D.A.C. v. Primera Maritime (Hellas) Ltd.*, 431 F. Supp. 3d 317, 321 (S.D.N.Y. 2019) (S.D.N.Y. Mar. 20, 2019) (alterations adopted) (quoting *Cordius Trust v. Kummerfeld*, 2010 WL 234823, at *2 (S.D.N.Y. Jan. 21, 2010)); *see also Human Rights Def. Ctr.*, 2020 WL 1444916, at *3 (upholding legal rights is in the public interest).

**G.   Plaintiffs' Requested Injunction Complies with Federal Rule of Civil Procedure 65(d).**

44.   Federal Rule of Civil Procedure 65(d) requires that every order granting an injunction must "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."

45.   Plaintiffs' requested injunction satisfies the requirements of Rule 65(d).  As demonstrated by the foregoing discussion, Plaintiff seek to enjoin or require specific acts with regard to staffing, school-wide behavior supports and individual supports, policies and procedures, and monitoring in order to ensure complete and durable compliance with Section 504 at HES.  *See supra* Pls. FF Section I.E.  Plaintiffs do not merely ask the Court to enter a "favor-the-law" injunction.

46.   Nonetheless, to the extent any genuine doubt remains regarding the specific relief Plaintiffs ask the Court to order, the Court shall invite Plaintiffs to submit a proposed injunction and/or invite additional briefing on the content of the injunction at an appropriate time.

**II.   Injunctive Relief Is Necessary to Ensure that BIE Accommodates Students With Disabilities Related to Trauma as Required by Section 504 of the Rehabilitation Act.**

**A.   The Non-Discrimination Mandate of Section 504 of the Rehabilitation Act Requires BIE to Provide Students With Disabilities Related to Trauma with Meaningful Access to Education.**

47.   Section 504 of the Rehabilitation Act of 1973 ("Section 504") prohibits the BIE from discrimination on the basis of disability under its program of education. Specifically, Section 504 provides "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency . . . ."  29 U.S.C. § 794.

PLAINTIFFS PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

48.     Havasupai Elementary School ("HES") is a program or activity conducted by the BIE.  *See* Trial Exhibit 275 at 5 (Order on Motion for Partial Relief, ECF No. 221).  Thus, BIE must comply with the mandates of Section 504 in administering the educational program at HES.

49.     A disability under Section 504 is a physical or mental impairment that substantially limits one or more major life activities, including learning, reading, thinking, concentrating, and communicating.  42 U.S.C. §§ 12102(1)(A), 12102(2)(A).

50.     Exposure to trauma can affect the brain in a way that substantially limits a person's ability to learn, read, think, concentrate, and communicate.  The impacts of trauma can therefore be a disability under Section 504.  *P.P. v. Compton Unified Sch. Dist.*, 135 F. Supp. 3d 1098, 1110-11 (C.D. Cal. 2015); Order on Defendants' Second Partial Motion to Dismiss at 7, ECF No. 100.

51.     An organization subject to Section 504 violates the statute "if it denies a qualified individual with a disability a reasonable accommodation that the individual needs in order to enjoy meaningful access to the benefits of public services."  *Mark H. v. Hamamoto*, 620 F.3d 1090, 1097 (9th Cir. 2010) (citing *Alexander*, 469 U.S. at 301-02 & n.21; *Mark H. v. Lemahieu*, 513 F.3d 922, 937 (9th Cir. 2008); *Bird v. Lewis & Clark Coll.*, 303 F.3d 1015, 1020, 1022 (9th Cir. 2002).  "To that end, it may be required to make reasonable, but not fundamental or substantial, modifications to its programs."  *Bird*, 303 F.3d at 1020.

**B.     Several Student Plaintiffs Are Students with Disabilities Related to Trauma Who Are Entitled to Protection Under Section 504.**

52.     Plaintiffs Taylor P. and Moana L. are school-aged children who are eligible to attend BIE schools under 25 C.F.R. § 39.2.

53.     At the time Stephen C. and Durell P. attended HES, they were school-aged children who were eligible to attend BIE schools as "Indian" students under 25 C.F.R. § 39.2.

54.     Plaintiffs Taylor P. and Moana L. are students with disabilities with disabilities related to trauma who are entitled to protection from discrimination at HES under Section 504.

55.     At the time Stephen C. and Durell P. attended HES, they were students with disabilities related to trauma who were entitled to protection from discrimination at HES under Section 504.

56.     Plaintiff NADLC represents and serves HES students with disabilities related to trauma and diverts organizational resources to advocate for the unaddressed needs of HES students with disabilities related to trauma who are entitled to protection from discrimination at HES under Section 504.

**C.     BIE Denies Students With Disabilities Related to Trauma at HES Meaningful Access to Education.**

57.     The objectives of the BIE's program of education are to ensure that the programs "are of the highest quality and provide for the basic elementary and secondary educational needs of Indian children, including meeting the unique educational and cultural needs of those children."  25 U.S.C. § 2000.

58.     BIE denies students with disabilities related to trauma at HES meaningful access to public education and discriminates against such students solely on the basis of their disabilities in violation of Section 504 because HES (1) lacks a consistent, trauma-trained staff; (2) fails to provide a trauma-informed curriculum and individual supports; and (3) has not created or implemented behavioral support procedures and practices that appropriately respond to manifestations of students' trauma-related disabilities.  *See Mark H.*, 620 F.3d at 1098-99; *supra* Pls. FF Section II.E.

**D.     Plaintiffs' Proposed Accommodations are Reasonable Under Section 504's Burden-Shifting Test.**

59.     A Section 504 plaintiff bears the initial burden of producing evidence that a reasonable accommodation exists and that the accommodation would enable him to access the benefits of the program. *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 816 (9th

PLAINTIFFS PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Cir. 1999).  This initial burden is not a high bar: the evidence must show that the requested accommodation is "facially plausible."  *Guerra v. W. L.A. Coll.*, 2017 WL 10562682, at *9 (C.D. Cal. June 14, 2017).  Once such evidence is produced, the burden shifts to the defendant to "produce rebuttal evidence" that the suggested accommodation is not reasonable because it would fundamentally alter the program.  *Wong*, 192 F.3d at 817.

60.    "Because the issue of reasonableness depends on the individual circumstances of each case, this determination requires a fact-specific, individualized analysis of the *disabled individual's* circumstances" and the accommodations that might allow him to access the program.  *Id.* at 818 (emphasis added).

61.    An accommodation is likely to be reasonable if the defendant has offered or provided it to other students, or to the plaintiff in the past.  *See, e.g.*, *Mark H.*, 620 F.3d at 1098-99; *Wong*, 192 F.3d at 820.

62.    The obligation to provide reasonable accommodations may require defendants to "assume reasonable financial burdens" in accommodating individuals with disabilities. *United States v. Cal. Mobile Home Park Mgmt. Co.*, 29 F.3d 1413, 1416-17 (9th Cir. 1994); *see also Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 334-35 (2d Cir. 1995).  For instance, courts and federal regulations have established that the hiring of a reader, an interpreter, or an aide is a reasonable accommodation even if the new hire is for the benefit of only one plaintiff. *E.g.*, *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 142 n.5 (2d Cir. 1995) (citing 34 C.F.R. § 104.12(b); 45 C.F.R. Pt. 84 App. A at 360; *Overton v. Reilly*, 977 F.2d 1190, 1195 (7th Cir. 1992); *Arneson v. Sullivan*, 946 F.2d 90, 93 (8th Cir. 1991)).

63.    "[M]ere speculation that a suggested accommodation is not feasible falls short of" Defendants' burden because Section 504 "create[s] a duty to gather sufficient information from the disabled individual and qualified experts as needed to determine what accommodations are necessary."  *Mark H.*, 620 F.3d at 1098.

64.    As operators of a K-8 school, Defendants are not entitled to academic deference as to whether an accommodation is reasonable.  *See Wong*, 192 F.3d at 817 (academic deference may attach to "[a] *faculty's* professional judgment" of "whether a

student meets a *university's* reasonable standards for academic and professional achievement" (emphasis added)).

65.     The accommodations that Plaintiffs' experts identified are reasonable as a matter of law under the Section 504 burden-shifting test.  *See id.* at 816-17.  Plaintiffs assert that students with disabilities related to trauma require the following reasonable accommodations in order to meaningfully access education at HES: (1) a consistent staff of teachers, administrators, and other personnel with training in understanding and appropriately responding to the impact of trauma; (2) a curriculum and individual resources that support trauma-impacted students in the classroom; and (3) procedures and practices that appropriately respond to behavioral manifestations of students' disabilities resulting from trauma.  In support of these accommodations, Plaintiffs put forth the testimony of Dr. George Davis, Dr. Tami DeCoteau, and Dr. Noshene Ranjbar.  Plaintiffs' experts explained the effects of trauma on children's brains, the role that safety, consistency, and culturally relevant supports play in allowing traumatized children to learn, and the individualized needs of the Student Plaintiffs who were evaluated by Dr. Ranjbar.  *See supra* Section II.A & II.F.  This evidence meets Plaintiffs' burden of production with respect to the accommodations they propose.  *See Wong*, 192 F.3d at 817-18; *Mark H.*, 620 F.3d at 1098-99.

66.     The burden shifts to Defendants to "produce rebuttal evidence" that Plaintiffs' proposed accommodations are not reasonable.  *Wong*, 192 F.3d at 817.  Defendants have not met their burden.

67.     As an initial matter, Defendants do not offer *evidence*, as opposed to mere speculation, that the accommodations are not reasonable.  Speculation does not satisfy a defendant's burden.  *Mark H.*, 620 F.3d at 1098.  It is especially irrelevant here because Defendants have not attempted to calculate the cost of Plaintiffs' proposed accommodations, and because Plaintiffs *have* produced evidence to counter Defendants' unsupported claims about burdens: evidence from Plaintiffs' experts that the proposed accommodations can be implemented using existing school and community resources, and evidence that Defendants

have found the funding and administrative capacity to implement trauma-resilient schools at 10 other schools.  *See, e.g.*, *Mark H.*, 620 F.3d at 1098; *see supra* Pls. FF Section II.H.

68.     As a matter of law, Plaintiffs' proposed accommodations would not fundamentally alter the nature of HES.  The U.S. Supreme Court has described a fundamental alteration as one that "alter[s] such an essential aspect" of the activity that "it would be unacceptable even if it affected all [participants] equally" or one that "fundamentally alter[s] the character of the [activity]."  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682-83 (2001).  The Court went on to consider what aspects of the activity would be lost if the proposed accommodation were put in place, and determined that none of those aspects were "essential."  *Id.* at 685.  Plaintiffs propose taking nothing away from HES, but instead shifting to a trauma-informed perspective in its basic components, including its staff and training, curriculum, student supports, and procedures. These accommodations would not fundamentally alter the school—rather, they would advance the BIE's stated mission to provide educational programs that "are of the highest quality and provide for the basic elementary and secondary educational needs of Indian children, including meeting the unique educational and cultural needs of those children."  25 C.F.R. § 2000.

69.     Defendants' claim that the court in *P.P. v. Compton Unified School District* declined to award similar accommodations is misleading—in evaluating a motion for a preliminary injunction, that court explicitly left the accommodations analysis for a later stage.  135 F. Supp. 3d 1126, 1143, 1144, 1150 (C.D. Cal. 2015).  In any event, whether the proposed accommodations have been ordered by another court is legally irrelevant. "Just because no other case has required [a particular accommodation] does not mean that such an accommodation might not be required." *Guerra v. W. L.A. Coll*., 2017 WL 10562682, at *9.  Here, it may be that no other court has ordered these accommodations because few schools lack such basic fundamentals as a full staff, a physical education curriculum, or policies that address student behavior.

70.     Because Plaintiffs meet their burden to establish that reasonable accommodations exist, and Defendants fail to meet their burden of rebutting Plaintiffs'

evidence, Plaintiffs have established Defendants' liability for violating Section 504 for failure to accommodate students with disabilities related to trauma.

71.   These failures are longstanding and persist today, thus necessitating the award of prospective injunctive relief that requires BIE to implement the reasonable accommodations identified by Plaintiffs.

**E.   School-Wide Relief is Necessary and Appropriate to Address BIE's Failure to Accommodate Students With Disabilities Related to Trauma.**

72.   Plaintiffs are entitled to school-wide relief under Section 504 because school-wide accommodations are required to provide students with disabilities related to trauma at HES with meaningful access are necessarily school-wide. If an injury results from "violations of a statute . . . that are attributable to policies or practices pervading the whole system," then "[s]ystem-wide relief is required." *Armstrong v. Schwartzenegger*, 622 F.3d 1058, 1072-73 (9th Cir. 2010) (alteration in original).  Courts have thus permitted and granted claims for systemic relief under Section 504 in individual actions and class actions alike. *See, e.g.*, *Am. Council of the Blind*, 525 F.3d at 1259-61; *Christopher S.*, 384 F.3d at 1207; *Davis*, 874 F. Supp. 2d at 867-69; *Gray v. Golden Gate Nat'l Rec. Area*, 279 F.R.D. 501, 503 (N.D. Cal. 2011); *Huezo*, 672 F. Supp. 2d at 1051, 1059-68.

73.   School-wide relief is also required under equitable principles.  The scope of injunctive relief should match the scope of the violation it remedies.  *See Hills v. Gautreaux*, 425 U.S. 284, 294 (1976); *Clement v. Cal. Dep't of Corr.*, 364 F.3d 1148, 1153 (9th Cir. 2004).  This principal holds for class actions and individual or multi-plaintiff actions alike: Relief is "not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Bresgal v. Brock*, 843 F.2d. 1163, 1170-71 (9th Cir. 1987) (emphasis in original) (internal quotation marks omitted); *see also Clement*, 364 F.3d at 1153 (statewide injunctive relief was warranted to prohibit unconstitutional policy in action brought by individual prisoner); *Easyriders*, 92 F.3d at 1501-02 (statewide injunction against unconstitutional law enforcement policy was

1   appropriate in action brought by 14 individuals and an organization); *see also Davis*, 874 F.

2   Supp. 2d at 867-69 (rejecting Social Security Administration's contention that injunction

3   sought by two individual plaintiffs under the Rehabilitation Act was necessarily overbroad,

4   even where injunction sought nationwide relief).

5       74.    Here, school-wide relief aimed to remove systemic and programmatic barriers

6   to education is required to remedy Defendants' violations of Section 504 with respect to

7   students with disabilities related to trauma at HES and to afford the individual plaintiffs all

8   of the relief to which they are entitled. *See Easyriders*, 93 F.3d at 1502. Defendants' failure

9   to have and to follow policies, procedures, and practices that implement and comply with

10  the mandates of the Section 504 results in impermissible discrimination against students

11  with disabilities related to trauma. Without school-wide equitable relief, the discrimination

12  will continue.

13      **F.**    **Plaintiffs Are Entitled to Injunctive Relief to Remedy BIE's**
    **Longstanding Failure to Accommodate Students With Disabilities**

14      **Related to Trauma Under Traditional Equitable Principles.**

15      75.    A permanent injunction is appropriate "where the party seeking relief

16  demonstrates that: (1) it is likely to suffer irreparable injury that cannot be redressed by an

17  award of damages; (2) that 'considering the balance of hardships between the plaintiff and

18  defendant, a remedy in equity is warranted'; and (3) 'that the public interest would not be

19  disserved by a permanent injunction.'" *City and Cty. of San Francisco v. Trump*, 897 F.3d

20  1225, 1243 (9th Cir. 2018) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391

21  (2006)).

22      76.    Absent a permanent injunction, the Student Plaintiffs and other students with

23  disabilities related to trauma at HES will continue to face unlawful discrimination and be

24  deprived of meaningful access to education. *See supra* Pls. FF Section II.I. Such harm is

25  plainly irreparable and cannot be adequately remedied by money damages (which are not

26  available in any event). *See, e.g.*, *P.P. v. Compton Unified Sch. Dist.*, 135 F. Supp. 3d 1126,

27  1149 (C.D. Cal. 2015) (denial of access to education constitutes irreparable harm); *D.R.*, 746

28

F. Supp. 2d at 1145 (same); *see also Plyler v. Doe*, 457 U.S. 202, 223 (1982) (deprivation of education "imposes a lifetime hardship").

77. The balance of hardships tips decisively in favor of a permanent injunction. Absent injunctive relief, Plaintiffs face permanent deprivation of educational access that is assured to students with disabilities as a matter of federal law. *See supra* Pls. FF Section II.I. Balanced against such grave, irreparable damage, Defendants' hardships of administrative inconvenience do not justify the denial of injunctive relief.

78. The public interest will not be disserved by a permanent injunction. To the contrary, "there is an overwhelmingly strong public interest in . . . ensuring that the defendants at last comply with their legal obligations." *D'Amico Dry D.A.C.*, 431 F. Supp. 3d at 321 (alterations adopted) (quoting *Cordius Trust v. Kummerfeld*, 2010 WL 234823, at *2 (S.D.N.Y. Jan. 21, 2010)).

**III.  Appointment of a Special Master Is Necessary to Oversee Implementation of the Measures Needed to Remedy the BIE's Ongoing Failure to Comply with Section 504 at HES.**

79. Under Fed. R. Civ. P. 53 the court may appoint a special master to "address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C).

80. Defendants' pervasive, chronic and ongoing failure to comply with Section 504 at HES—despite having been on notice of such failures and professing to be working on the problem *for* years—merits the appointment of a special master to ensure compliance with the Court's order granting injunctive relief. For instance, even now, while the BIE insists it is "positioning itself" to comply with Section 504 in the future, it must also admit that it has not fully staffed HES for the upcoming school year and has not even posted job openings for two of three needed special education teachers. *See* Pls. FF Section I.H. Similarly, Defendants still have not issued Section 504 policy guidance, have only just recently hired a permanent Section 504 coordinator, and have only just began to make proposals to the Havasupai Tribe that would expand teacher housing. *Id.* The BIE's demonstrated pattern of failing to act unless faced with imminent legal findings against it

weighs heavily in favor of appointing a special master who can monitor the BIE's implementation of Section 504 remedial measures and ensure ongoing compliance.

81.     In addition to the need for monitoring, the BIE may benefit from additional expertise and guidance as it works to implement the Court's order granting injunctive relief. An appropriately qualified special master can assist with the complex technical tasks inherent in implementing the Court's order.  This too militates in favor of appointing a special master.

82.     In light of the above, the Court will order the appointment of a special master on motion by the Plaintiffs following the entry of final judgment.

83.     The special master shall have subject-matter expertise regarding the requirements of Section 504 in education and federal Indian law.

84.     The special master shall have the authority to hire consultants as needed to assist the BIE and the special master in implementing the remedy Plaintiffs obtain and ensuring the BIE's compliance with the remedy.

85.     There shall be a process by which the special master may hear and make recommendations to the Court resolving any dispute arising between the parties as to the BIE's implementation of and compliance with the remedy.

86.     In appointing a special master, the Court "must consider the fairness of imposing the likely expenses on the parties." Fed. R. Civ. P. 53(a)(3).  Under the Rule, the special master's compensation may be paid "by a party or parties." *Id.* at 53(g)(2)(A).  Here, the salary of the special master shall be paid by the BIE, as Defendants are responsible for the BIE's longstanding failure to comply with their statutory and regulatory obligations under Section 504.

DATED:  July 2, 2020

By:     */s/ Emily Curran-Huberty*
Attorneys for Plaintiffs

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on July 2, 2020, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants for this matter.

*/s/ Sarah Williams*

PLAINTIFFS PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW